**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **PUBLIC CITIZEN and SIERRA CLUB**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**VANTAGE DATA CENTERS MANAGEMENT COMPANY, LLC, VANTAGE DATA CENTERS TX11, LLC, VANTAGE DATA CENTERS TX21, LLC, and VOLTAGRID LLC**<br><br>**Defendants.** | **No. 5:26-cv-6032** |

## COMPLAINT

Plaintiffs Public Citizen and Sierra Club, by and through undersigned counsel, allege as follows:

## INTRODUCTION

1. This is a citizen-enforcement action under the Clean Air Act to stop ongoing violations of federal preconstruction permitting requirements and federally enforceable provisions of the Texas State Implementation Plan ("Texas SIP") at two data center campuses in San Antonio, Texas serving artificial intelligence. Each campus will have industrial-size diesel backup emergency generators and a dedicated "behind-the-grid" gas-fired power plant to feed continuous daily power to the data centers. Although further expansion is possible, the scale of electric gas-fired generating capacity at the two data center campuses as currently disclosed to the Texas Commission on Environmental Quality ("TCEQ") is approximately 405 MW, which is enough electricity to power a city the size of Richmond, Virginia. The highly polluting diesel backup

generators have the capacity to generate approximately 455 MW of electricity to ensure the data centers never stop computing should an outage at one of the power plants occur.

2. While Defendants and their investors hope to reap the financial windfalls of the artificial intelligence gold rush, those living near the data center campuses and throughout the San Antonio region had no notice of these plans but they will pay the price. The air in San Antonio is already unhealthy due to ground-level ozone.

3. Defendants' data center campuses are located at 14270 Omicron Drive, San Antonio, Texas 78245 and at 5207 Rogers Road, San Antonio, Texas 78251. Both are located in Bexar County. This Complaint refers to the campuses as the "data center campus(es)" or the Omicron Drive Campus and the Rogers Road Campus, whichever is relevant and for the sake of clarity.

4. The data center campuses fall within a distinct market segment known as wholesale hyperscale colocation, where companies like Defendants build, own, and operate the physical shell, including power delivery, while their tenants own and run their own networking equipment inside.

5. Defendants have bypassed critical provisions of the Clean Air Act and the Texas SIP meant to ensure large industrial projects do not jeopardize health and air quality by constructing and/or operating the data center campuses without submitting to a rigorous preconstruction permitting process required of new or modified "major sources" of "criteria" pollutants.

6. Defendants sought to circumvent or bypass these critical preconstruction permitting reviews through sham permitting tactics, which are illegal.

7. Criteria pollutants are pollutants that EPA determines are commonly present in the ambient air throughout the country and are harmful enough to health, especially sensitive populations, to warrant the establishment of National Ambient Air Quality Standards ("NAAQS"). Relevant to this complaint are the criteria pollutants ozone and carbon monoxide.

8. The preconstruction permitting process meant to achieve or maintain compliance with the NAAQS is called New Source Review.

9. Volatile organic compounds (VOC) and nitrogen oxides (NOx) contribute to the formation of ground-level ozone and are treated separately as pollutants subject to major New Source Review.

10. Regions of the country in compliance with one or more criteria pollutant are in attainment with the NAAQS; those not meeting NAAQS are designated as being in nonattainment. Nonattainment is further divided by degrees of severity; for example, moderate, serious or severe.

11. At the request of Texas Governor Abbott, EPA designated Bexar County, where San Antonio is located, as being in "serious" nonattainment for the 2015 8-hour ozone standard established by NAAQS.

12. The 8-hour ozone standard applies to ground-level ozone (*i.e.*, smog).

13. Serious nonattainment with the ozone standard is a health-based air pollution problem that drives people more frequently to doctors' offices and hospitals, increases hospitalization rates, results in missed days of work, school and daycare, increases the prevalence of asthma and other lung diseases, causes cardiovascular problems, can lead to premature death, and imposes a social and economic cost on taxpayers, business owners, schools and daycares who must account for the increased threats to health and the resulting costs of emergency and urgent health care, absenteeism, and a less productive workforce.

14. For purposes of New Source Review, owners and operators of projects to construct emission sources like power plants and large industrial diesel backup generating systems must calculate the total potential to emit pollutants and determine whether their potential emissions render them a “major” source of criteria pollutants or a “minor” source of criteria pollutants.

15. New minor sources are eligible for minor source permits. New major sources must submit to major New Source review preconstruction permitting.

16. Permits available to new or modified minor sources of air pollutants are normally not available for construction projects large enough to generate electricity sufficient to power mid-size American cities like Richmond, Virginia.

17. For Defendants’ data center campuses, the potential to emit calculations must assume worst case emission scenarios under maximum capacity to operate to ensure a major source of criteria pollution isn’t masquerading as a minor source to evade major source New Source Review.

18. In this case, Defendants intend to operate their data center campuses 365 days a year, 24 hours a day, without interruption. This equates to 8,760 hours per year of operations at the power plants and up to 876 hours per year per generator at each campus’ data center facilities.

19. In the absence of federally enforceable limitations on operating capacity and/or emission rates, including monitoring and reporting to demonstrate compliance, the potential to emit is the uncontrolled emissions rates at the maximum design capacity of combustion units at a source (ie, “worst case scenario” potential emissions).

20. The potential to emit “worst case scenario” regarding the pollutants from the Vantage diesel backup generators at both campuses assumes 876 operating hours per engine per year because they are designed to operate intermittently and TCEQ regulation limits their operation

to 10 percent of the normal annual operating schedule of the primary equipment, in this case the power plants.

21. The use of the diesel backup generators is authorized under very limited circumstances, primarily related to emergency situations, such as a power plant outage at one of the campuses. 30 Tex. Admin. Code § 106.511.

22. The use of the diesel backup generators as a primary power source in the absence of an emergency is prohibited.

23. A source with the physical capacity to emit pollution at rates exceeding major source thresholds may qualify for a minor source New Source Review permit if its owner or operator accepts federally enforceable physical or operational limits on equipment as part of the source's design sufficient to reduce the source's maximum potential emissions below major source thresholds. These limits may include add-on emissions controls, reduced hours of operation, or other limitations, but are only considered federally enforceable if they include monitoring, recordkeeping, and reporting sufficient to ensure compliance.

24. TCEQ minor source preconstruction permits and authorizations without clear requirements limiting or controlling a source's capacity to emit pollution or that lack monitoring, reporting and recordkeeping requirements sufficient to ensure compliance requirements are not federally enforceable.

25. Each data center campus is a single major source of criteria pollutants capable of emitting thousands of tons each year of harmful pollution, including ozone-forming pollutants and carbon monoxide.

26. Even if treated as four separate sources, the backup diesel generators and co-located power plant at each campus all surpass major source thresholds for one or more criteria pollutants, including ozone-forming pollutants (VOC and/or NOx) and carbon monoxide.

27. Defendants' data center campuses are major sources of ground-level ozone and/or carbon monoxide and were required to seek major source preconstruction permits consistent with New Source Review under the Clean Air Act.

28. Construction and/or operation of the data center campuses by Defendants without major New Source Review authorization is a violation of the Clean Air Act.

29. EPA has authorized the State of Texas to implement all portions of the federal Clean Air Act program relevant to this Complaint through what is known as a State Implementation Plan, or SIP.

30. The construction and/or operation of Defendants' data center campuses without major New Source Review authorization also is a violation of the Texas SIP.

31. These violations have significant impacts on health that will persist for decades.

32. NOx is comprised of both nitric oxide and nitrogen dioxide ($NO_2$). $NO_2$ is a Clean Air Act criteria pollutant and comprises the majority of NOx emissions. $NO_2$ also is the most toxic component of NOx. Once emitted nitric oxide rapidly converts to $NO_2$.

33. The health impacts from $NO_2$ include respiratory illnesses such as asthma, particularly in children, respiratory mortality, diabetes, allergic reactions or worsening of allergies, cardiovascular effects, reproductive and developmental effects and possibly even cancer as a result of certain long term exposures.

34. EPA and the TCEQ define VOC as any compound of carbon, excluding carbon monoxide, carbon dioxide, carbonic acid, metallic carbides or carbonates, and ammonium

carbonate, which participates in atmospheric photochemical reactions. 40 C.F.R. § 51.100(s); 30 Tex. Admin. Code § 101.1(116).

35. Breathing VOCs can cause both short-term and long-term health effects, ranging from respiratory irritation to cancer. Short-term exposures to VOCs can exacerbate asthma and allergies and cause dizziness and headaches. Long-term exposures can lead to cancer, central nervous system damage, and major organ damage, including brain, heart, liver and kidneys.

36. Defendants are emitting and will continue to emit additional Clean Air Act criteria pollutants from the data center campuses: particulate matter (PM), including PM2.5, and sulfur dioxide ($SO_2$).

37. PM is a mixture of solid particles and liquid droplets suspended in air that, when inhaled, penetrates the lungs and irritates airways, causes or worsens respiratory and cardiovascular function, and leads to premature deaths. The smallest particles, referred to as PM2.5, pose the greatest threat to health because the particles are so small – about 30 times smaller than a human hair – that they lodge deep in the lungs and penetrate the blood stream, contributing to persistent inflammation, the development and worsening of asthma, and even permanent lung scarring.

38. Sulfur Dioxide ($SO_2$) is a colorless, highly reactive gas. Fossil fuel combustion at power plants is a major source of $SO_2$. Short-term exposure to $SO_2$ can irritate the respiratory system, making breathing more difficult, and trigger asthma attacks, particularly in children and adults with pre-existing respiratory conditions. Long-term exposure can increase the risk of cardiovascular and respiratory diseases.

39. In addition to NOx, VOC, carbon monoxide, PM, and $SO_2$, the data center campuses will also emit large quantities of hazardous air pollutants such as formaldehyde, which is both a VOC and a carcinogen.

40. According to EPA, inhalation of formaldehyde can cause irritation of the eyes, nose and throat, respiratory symptoms such as coughing, wheezing, chest pain, bronchitis, and can contribute to the development of cancer.

41. Defendants failed to include formaldehyde as a VOC in their potential to emit calculations for the data center campuses. Defendants also failed to include the weight of non-carbon atoms in their potential to emit VOC, leading to significant underestimation.

42. The inclusion of formaldehyde and the weight of non-carbon atoms in Defendants' potential to emit VOC calculations from the power plants renders each power plant, without regard to the significant emissions from the data center diesel backup generators, a major source of ozone.

43. Inclusion of formaldehyde alone in Defendant's potential to emit VOC calculations for each power plant renders each a major source of ozone.

44. The assertion in the preceding paragraph is true based on Defendant VoltaGrid's own certified representations to TCEQ in minor source standard permit registrations.

45. Defendant VoltaGrid's potential to emit NOx calculations also are flawed.

46. The potential to emit NOx calculations for the power plants rely on emission rates that are only possible through use of add-on pollution control technology called Selective Catalytic Reduction.

47. VoltaGrid's standard permit registrations do not require installation or operation of Selective Catalytic Reduction or establish operating or monitoring and reporting requirements necessary to ensure proper operation.

48. Use of Selective Catalytic Reduction results in potentially significant ammonia emissions, which are unauthorized by VoltaGrid's standard permit registrations.

49. NOx reductions resulting from the application of Selective Catalytic Reduction at VoltaGrid's power plants are not federally enforceable and do not affect VoltaGrid's potential to emit NOx. Moreover, VoltaGrid cannot operate these controls without violating the Texas SIP because the ammonia emissions that occur as a result of the use of these controls are not authorized.

50. Major New Source Review is the bedrock permitting program meant to achieve one of the primary goals of the Clean Air Act: achievement, maintenance and attainment of the NAAQS through preventative, stringent requirements that must be adhered to before construction of a major source begins.

51. The primary NAAQS standards are promulgated by EPA to protect public health, particularly sensitive populations.

52. Although unhealthy for all, infants and children, older adults, and those with underlying medical conditions are particularly vulnerable to the health impacts of smog (*i.e.*, ground-level ozone).

53. Plaintiffs' members live near Defendants' data center campuses.

54. Plaintiffs' members include individuals with severe asthma, pulmonary fibrosis, heart conditions, young children, older adults. For them, added pollution can cause severe short- and long-term health impacts that require emergency room care, hospitalization, increased need for medical treatment, trouble breathing, and difficulties engaging in everyday activities like walking and gardening.

55. Plaintiffs' members are relying on Defendants to comply with New Source Review preconstruction permitting requirements. In an ozone nonattainment area such as San Antonio,

these requirements are intended to prevent new construction of "major" sources of air pollution unless the project results in a *net improvement* of air quality.

56. The protections and public scrutiny afforded by Congress and EPA have not been realized or respected in this case. Instead, the requirement to undergo New Source Review for projects of this magnitude, in order to protect Plaintiffs' members and San Antonians more generally, has been flaunted and manipulated by Defendants to save money, move faster, obscure their expansion plans, leave their neighbors out of the permitting process, and develop more and more artificial intelligence computing capacity at the expense of human health and air quality.

57. Defendants are aware their data center campuses will annually contribute hundreds of tons of harmful air pollution and worsen San Antonio's existing air quality for decades to come.

58. The timeline of Defendants' actions with regard to the planning, acquisition of property, the entering into a partnership, and piecemeal approach to the buildout demonstrates the extent to which Defendants sought to avoid and circumvent New Source Review. Defendants did this to eliminate the real possibility that major New Source Review could have resulted in expensive emissions controls, smaller data centers, or no approvable projects at all.

59. Defendants wanted to ensure their data center campuses were quickly constructed and rendered operational, which is impossible with the kind of analysis, pollution offsets and other balancing of interests that major New Source Review requires.

60. Vantage Data Centers entered into a formal partnership with VoltaGrid LLC shortly after learning, in late 2024, that it was unlikely that the Vantage Defendants would be able to connect to the local utility for power.

61. The existence of the partnership was announced by Vantage in a February 11, 2025 article on Vantage's website entitled *Vantage Data Centers and VoltaGrid Establish Partnership*

*to Deploy More Than One Gigawatt of Power Generation*, found at https://vantage-dc.com/news/vantage-data-centers-and-VoltaGrid-establish-partnership-to-deploy-more-than-one-gigawatt-of-power-generation/ (last accessed September 19, 2026).

62. The first line of the above-referenced article states: "Vantage Data Centers, a leading global provider of hyperscale data center campuses, and VoltaGrid, an innovator in advanced microgrid power generation, today announce a groundbreaking partnership aimed at delivering rapid, scalable energy solutions in markets where grid power is constrained." *Id.*

63. Toward this aim, and strengthened by the formal partnership, Defendants developed a "minor" source permitting strategy that involved masking their true potential to emit by: (1) splitting the power generating capacity of each data center campus nominally into two sources—a gas-fired power plant and a suite of industrial scale diesel-powered backup generators; and (2) by seeking minor source standard permits and registrations without federally enforceable limits or controls. Defendants are "minor" sources on paper only.

64. An important ancillary benefit to Defendants of this strategy is that it allowed Defendants to avoid public scrutiny before securing minor source authorization from TCEQ, which does not require public notice, opportunities to comment or request hearings, or a regulatory appeals process. These public participation rights are baked into the major Clean Air Act and Texas SIP New Source Review process. TCEQ requires public participation for some minor New Source Review permits but not the standard permits and registrations used by Defendants.

65. Defendants have disregarded the requirements of the Clean Air Act and the Texas SIP to such an extent that they also began operating the Rogers Road data center campus by running the diesel backup generators as a primary power source. This is strictly forbidden but this

clear prohibition failed to deter Defendants from operating even before construction of the power plant was complete.

66. Defendants' strategy to avoid major source New Source Review fails for three distinct reasons:

a. The power plant and diesel backup generators at each campus constitute a single, integrated major source of criteria pollutants: pre-cursors to ground-level ozone formation (VOC and NOx) and carbon monoxide.

b. The Defendants failed to count formaldehyde and other VOCs in their potential to emit VOC calculations from the data center campuses' power plants. This alone renders both power plants major sources of ozone-forming pollutants whether they are aggregated together with the diesel backup generators as a single source or treated as stand-alone separate sources.

c. The data centers at each campus cannot operate without electricity generated from the power plants.

67. Defendants are in violation of the prohibition against unauthorized major source construction and they are in violation of the prohibition against using emergency diesel backup generators as a primary power source, all in violation of the Clean Air Act and the Texas SIP.

68. As a result of these violations, Plaintiffs seek declaratory relief, injunctive relief, mitigation, appropriate civil penalties, litigation costs, including attorney and expert witness fees, and all other relief authorized by the Clean Air Act and/or the Texas SIP as well as any other relief this Court deems just and proper.

**JURISDICTION AND VENUE**

69. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the federal Clean Air Act, 42 U.S.C. §§ 7401–7671q.

70. This Court has jurisdiction under the Clean Air Act citizen-suit provision in 42 U.S.C. § 7604(a)(1) because Plaintiffs allege that Defendants are in violation of emission standards or limitations under the Clean Air Act.

71. This Court has jurisdiction under the Clean Air Act citizen-suit provision in 42 U.S.C. § 7604(a)(3) because Plaintiffs allege that Defendants have constructed and/or are constructing major emitting sources of criteria pollutants without required major New Source Review preconstruction permits.

72. Venue is proper in this District because the sources of the violations are located in this District. 42 U.S.C. § 7604(c)(1).

73. Venue is also proper in this District because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and because the data center campuses are located in this District. 28 U.S.C. § 1391(b)(2).

74. The Court may award costs of litigation, including reasonable attorney and expert witness fees. 42 U.S.C. § 7604(d).

75. On July 22, 2026, Plaintiffs provided written notice of violations alleged in this Complaint to Defendants, the EPA Administrator, the Regional Administrator of EPA Region 6, the TCEQ Office of Air Director, and other recipients at least 60 days before filing this action, as applicable. *See* 42 U.S.C. § 7604(b)(1)(A) and 40 C.F.R. Part 54. Ex. A, Notice of Intent to Sue.[1]

76. Neither EPA nor the State of Texas has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or in Texas state court to require compliance with the violations alleged in this Complaint. 42 U.S.C. § 7604(b)(1)(B).

[1] A copy of the Notice of Intent to Sue return receipts are incorporated into Ex. A.

77. The Court may order appropriate civil penalties, which are payable to special CAA-dedicated fund within the United States Treasury to fund air compliance and enforcement activities. 42 U.S.C. §§ 7413(e), 7604(a), and 7604(g).

78. Assignment to the San Antonio Division is proper because the data center campuses are located in Bexar County, Texas.

## PARTIES

### A. Plaintiffs

79. Plaintiff Public Citizen is a nonprofit consumer advocacy organization headquartered at 1600 20th Street NW, Washington, D.C. 20009, with a Texas office at 309 E. 11th Street, Suite 2, Austin, Texas 78701.

80. Public Citizen advocates for the right of individuals and families to live and work in communities that are healthy and safe from pollution. Through its Texas office, Public Citizen works to protect the health, environment, and consumer rights of Texans.

81. Public Citizen has members who live, work, whose children attend school, worship, exercise, recreate, and/or otherwise spend time near the Omicron Drive and Rogers Road campuses and in areas affected by emissions from those campuses.

82. Public Citizen members are concerned about Defendants' emissions and the effects of those emissions on their health, their families' health, their ability to use and enjoy their homes and neighborhoods, and their use and enjoyment of outdoor areas.

83. Public Citizen's members are also concerned about the lack of public notice and opportunity to comment, request a public hearing or avail themselves of other public participation opportunities during the Clean Air Act preconstruction permitting phase for the data center campuses.

84. Plaintiff Sierra Club is a nonprofit environmental membership organization headquartered at 2101 Webster Street, Suite 1300, Oakland, California 94612.

85. Sierra Club's mission includes exploring, enjoying, and protecting the wild places of the earth; practicing and promoting responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out those objectives.

86. Sierra Club has members who live, work, whose children attend school, exercise, recreate, or otherwise spend time near the Omicron Drive and Rogers Road campuses and in areas affected by emissions from those campuses.

87. Sierra Club members are concerned about Defendants' emissions and the effects of those emissions on their health, their families' health, their ability and their children's ability to use and enjoy their homes and neighborhoods, and their use and enjoyment of outdoor areas.

88. Sierra Club's members are also concerned about the lack of public notice and opportunity to comment, request a public hearing or avail themselves of other public participation opportunities during the Clean Air Act preconstruction permitting phase for the data center campuses.

89. Defendants' violations have injured and continue to injure Sierra Club and its members. Those injuries are fairly traceable to Defendants' unlawful construction and operation of the campuses and would be redressed by the relief requested in this Complaint.

90. Defendants' violations have injured and continue to injure Sierra Club and its members. Those injuries are fairly traceable to Defendants' unlawful construction and operation of the data center campuses and would be redressed by the relief requested in this Complaint.

91. Plaintiffs' standing declarations and member declarations are attached to this Complaint and incorporated herein as Exhibits J–S.

**B. Defendants**

92. Defendant Vantage Data Centers Management Company, LLC is a Delaware limited liability company and an operator of the two data center campuses in San Antonio, Texas.

93. Vantage Data Centers Management Company, LLC is registered with the Texas Secretary of State, indicating that it conducts business in Texas.

94. Vantage Data Centers Management Company, LLC directly manages operational personnel and departments with responsibility for emissions-related systems, including design, construction and operational performance.

95. Vantage Data Centers Management Company, LLC is a "person" within the meaning of the Clean Air Act. 42 U.S.C. § 7602(e).

96. Vantage Data Centers Management Company, LLC is an "operator" within the meaning of the Clean Air Act. 42 U.S.C. § 7411(5).

97. The partnership announced by Vantage Data Centers on February 11, 2025, is a "person" within the meaning of the Clean Air Act. 42 U.S.C. § 7602(e).

98. The partnership announced by Vantage Data Centers on February 11, 2025, is an "operator" within the meaning of the Clean Air Act. 42 U.S.C. § 7411(5).

99. Defendant Vantage Data Centers TX11, LLC is a Delaware limited liability company that owns the parcel of land on which the Omicron Drive campus is being constructed and/or operated and is an owner and operator of that data center campus. 42 U.S.C. § 7411(5).

100. Vantage Data Centers TX11, LLC is a "person" within the meaning of the Clean Air Act. 42 U.S.C. § 7602(e).

101. Defendant Vantage Data Centers TX21, LLC is a Delaware limited liability company that owns the parcel of land on which the Rogers Road campus is being constructed and/or operated and is an owner and/or operator of that data center campus. 42 U.S.C. § 7411(5).

102. Vantage Data Centers TX21, LLC is a "person" within the meaning of the Clean Air Act. 42 U.S.C. § 7602(e).

103. Vantage Data Centers Management Company, LLC and Vantage Data Centers TX11, LLC in conjunction with VoltaGrid LLC, own and operate the Omicron campus through a partnership, or other agreement, arrangement, or common enterprise, the purpose of which is to construct and operate an integrated, dedicated "behind-the-meter" power plant and industrial scale diesel backup generators to ensure continuous power necessary to feed electricity to the Omicron Drive Campus 365 days a year, 24 hours a day.

104. Vantage Data Centers Management Company, LLC and Vantage Data Centers TX21, in conjunction with VoltaGrid LLC, own and operate the Rogers Road campus through a partnership, or other agreement, arrangement, or common enterprise, the purpose of which is to construct and operate an integrated, dedicated "behind-the-meter" power plant and diesel backup generators to ensure continuous power necessary to feed the Rogers Road Campus 365 days a year, 24 hours a day.

105. In the alternative, Vantage Data Centers Management Company, LLC operates the diesel backup generators at each data center campus, Vantage Data Centers TX11, LLC owns and operates the diesel backup generators at the Omicron Drive campus, and Vantage Data Centers TX21, LLC owns and operates the diesel backup generators the Rogers Road campus.

106. Defendant VoltaGrid LLC is a Texas limited liability company.

107. VoltaGrid LLC is a "person" within the meaning of the Clean Air Act. 42 U.S.C. § 7602(e)

108. VoltaGrid LLC is an owner and operator of that data center campus. 42 U.S.C. § 7411(5).

109. In the alternative, VoltaGrid LLC owns and operates the power plants at the Omicron Drive and Rogers Road campuses.

## LEGAL BACKGROUND

### A. Clean Air Act: The NAAQS, New Source Review and Sham Permitting

110. Congress enacted the Clean Air Act to protect and enhance the quality of the Nation's air resources to promote public health and welfare. 42 U.S.C. § 7401(b)(1).

111. EPA establishes National Ambient Air Quality Standards ("NAAQS") for criteria pollutants, including ozone and carbon monoxide, to protect public health with an adequate margin of safety. 42 U.S.C. § 7409(b)(1); 40 C.F.R. Part 50.

112. Each state must develop a State Implementation Plan or SIP, setting forth how the NAAQS will be achieved and maintained within the state. 42 U.S.C. § 7410(a).

113. SIPs must include provisions regulating the construction of stationary sources sufficient to ensure achievement and maintenance of the NAAQS. 42 U.S.C. § 7410(a)(2)(C).

114. A stationary source is defined as any building, structure, facility, or installation that emits or may emit any air pollutant, including hazardous air pollutants ("HAPs"). 42 U.S.C. § 7412(a)(3); 40 C.F.R. §§ 51.165(a)(1)(i), 51.166(b)(5); 30 Tex. Admin. Code § 116.12(37).

115. Defendants' sources at the data center campuses are stationary sources as that term is defined in the above paragraph.

116. The Clean Air Act and its regulations include two sets of New Source Review preconstruction permitting provisions governing construction of new major stationary sources: the

Prevention of Significant Deterioration program, which applies to areas in attainment with the NAAQS and the Nonattainment New Source Review program, which applies in areas failing to attain NAAQS. 42 U.S.C. §§ 7470-7492; 42 U.S.C. §§ 7501-7515.

117. SIPs must include preconstruction permitting requirements for new or modified major sources of criteria pollutants implementing the Clean Air Act's New Source Review provisions. 42 U.S.C. §§ 7410(a)(2)(C), 7475, 7503; 40 C.F.R. §§ 51.165, 51.166.

118. SIPs must be submitted to and approved by EPA. 42 U.S.C. § 7407(a).

119. Once approved by EPA, SIP requirements are enforceable under the Clean Air Act by EPA and citizens. 42 U.S.C. §§ 7413, 7604.

120. All provisions of the Texas Administrative Code cited in the Complaint are part of the Texas SIP, which EPA has approved. EPA has approved all aspects of the Texas SIP relevant to the violations identified in this Complaint for the time frames relevant to this Complaint. *See* 40 C.F.R.§ 52.2270.

121. The Texas SIP includes regulations requiring authorization from TCEQ before constructing or modifying major and minor new sources of air pollution.

122. It is necessary to determine a source's "potential to emit" for purposes of determining whether a stationary source is major prior to construction. Potential to emit is defined as the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. 40 C.F.R. §§ 51.165(a)(1)(iii), 51.166(b)(4); 30 Tex. Admin. Code § 116.12(29).

123. A source is major if it emits or has the potential to emit criteria pollutants at rates that exceed thresholds specified by the Act and its implementing regulations.

124. In Bexar County, where the San Antonio data centers are located, a new stationary source that emits or has the potential to emit more than 50 TPY of VOC or NOx must successfully obtain a Nonattainment New Source Review preconstruction permit before beginning construction. 42 U.S.C. §§ 7502(c)(5), 7503; 30 Tex. Admin. Code §§ 116.12(19), 116.110(a)(1), 116.111(a)(2)(H), 116.150(b).

125. Nonattainment New Source Review permits in Bexar County may not be issued unless the owner or operator of a proposed major new source of ozone-forming pollutants secures emissions offsets, is in compliance with the Clean Air Act with regard to all major stationary sources it owns or operates in the state, demonstrates that the benefits of the proposed new major source significantly outweigh the environmental and social costs, and implements controls that achieve the Lowest Achievable Emission Rate ("LAER"). 42 U.S.C. § 7503(a); 30 Tex. Admin. Code § 116.150(b).

126. In Bexar County, a new stationary source that emits or has the potential to emit more than 250 TPY of carbon monoxide must successfully obtain a Prevention of Significant Deterioration preconstruction permit before beginning construction. 42 U.S.C. §§ 7475(a), 7479(1); 30 Tex. Admin. Code §§ 116.12(19), 116.110(a)(1), 116.111(a)(2)(I), 116.160.

127. Prevention of Significant Deterioration permits may not be issued unless the owner or operator presents a valid air-quality impacts analysis that demonstrates that emissions from the source will not cause or contribute to violations of any NAAQS and implements Best Available Control Technology ("BACT") for each regulated pollutant subject to preconstruction permitting review. 42 U.S.C. §§ 7475(a), 7479(3); 30 Tex. Admin. Code § 116.160(a).

128. Physical and/or operational limits on the capacity of a source to emit a regulated criteria pollutant, including air pollution control equipment and restrictions on hours of operation

or on the type or amount of material combusted, stored, or processed, are not part of the source's design unless a permit issued by a state authority, such as TCEQ, includes both legally and practicably enforceable requirements, including monitoring, reporting and recordkeeping, such that the permit is federally enforceable by EPA or citizens. 40 C.F.R. §§ 51.165(a)(1)(iii), 51.166(b)(4); 30 Tex. Admin. Code § 116.12(29); Requirements for the Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 54 Fed. Reg. 27,274, 27,280 (June 28, 1989).

129. Minor source authorizations and permits that lack legally and practicably enforceable requirements are not federally enforceable.

130. Provisions in minor source permits that are not federally enforceable do not restrict an otherwise major source's potential to emit below major-source thresholds.

131. All pollutant-emitting activities within the same industrial grouping that are located on contiguous or adjacent properties and are under common control constitute one stationary source. 40 C.F.R. §§ 51.165(a)(1)(i), (ii), (iv), 51.166(b)(1), (5), (6); 30 Tex. Admin. Code §§ 116.12(6), (19), (37). An owner or operator may not circumvent major New Source Review applicability by dividing a single major stationary source into nominally separate facilities.

132. Construction or modification projects at stationary source must be aggregated for purposes of New Source Review when they are "substantially related." Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NNSR): Aggregation; Reconsideration, 83 Fed. Reg. 57,324 (Nov. 15, 2018).

133. When properly aggregated, each of Defendants' data center campuses is a single stationary source of pollution.

134. An owner or operator may not construct and then operate a purportedly minor source pursuant to a minor source permit if it intended to operate the source at major source levels. U.S. Envtl. Prot. Agency, Limiting Potential to Emit in New Source Permitting at 10–16 (June 13, 1989). Such "sham permits" are void *ab initio*. *Id.* at 10; U.S. Envtl. Prot. Agency, New Source Review Workshop Manual: Prevention of Significant Deterioration and Nonattainment Area Permitting, at A.9 (draft Oct. 1990); Requirements for the Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 54 Fed. Reg. 27,281 (June 28, 1989).

135. The relevant inquiry for determining whether a minor source authorization is a "sham" in circumvention of New Source Review is whether the applicant genuinely intended to design, construct, and operate the source as a minor source.

136. The evaluation of whether a minor source permit is a "sham permit" is undertaken retrospectively, with attention given to post-permitting facts.

137. Sham permitting can be present when facts indicate that an owner or operator avoided major New Source Review permitting by obtaining minor source authorization(s) for individual components of a planned larger source which has the potential to emit criteria pollutants such as VOC, NOx and carbon monoxide, above major source thresholds.

**B. TCEQ's Minor Source Authorizations**

138. The Texas SIP prohibits construction of a new facility that may emit air contaminants unless the owner or operator obtains a case-by-case minor or major New Source Review permit, a flexible permit, or qualifies for expedited authorization under Texas's standard permit or Permit by Rule programs. 30 Tex. Admin. Code § 116.110.

139. With limited exceptions not relevant here, only case-by-case minor or major New Source Review preconstruction permits afford public participation opportunities such as public notice, comment, or the ability to request a hearing. 30 Tex. Admin. Code § 39.402(a).

140. A TCEQ standard permit establishes generic conditions and pollution control requirements for a particular source category.

141. TCEQ standard permits do not authorize construction of a new major source or major modifications to an existing major source. 30 Tex. Admin. Code § 116.610(b).

142. If a new source or modification to an existing source satisfies the conditions for claiming a standard permit established by the permit and by Texas's standard permit regulations, construction or modification of the source is authorized by the claimed standard permit.

143. Relevant to this Complaint, TCEQ developed a standard Air Quality Permit for Electric Generating Units ("EGU Standard Permit"), which was last amended on May 16, 2007.

144. The EGU Standard Permit "authorizes electric generating units that generate electricity for use by the owner or operator and/or generate electricity to be sold to the electric grid, and that meet all of the conditions listed" by the permit. Ex. B, Tex. Comm'n on Env't Quality, Air Quality Standard Permit for Electric Generating Units 1 (May 16, 2007).[2]

145. The EGU Standard Permit requires registration with TCEQ prior to construction. *Id.*

146. Registrations must include the following information: (1) the basis of emission estimates; (2) quantification of all emission increases and decreases associated with the project being registered; (3) sufficient information demonstrating that the registered project does not

[2] Available electronically at: https://www.tceq.texas.gov/assets/public/permitting/air/NewSourceReview/Combustion/egu_final_spermit.pdf [https://perma.cc/AEH8-4883].

involve construction of a new major source or a major modification to an existing major source; (4) information that describes efforts to minimize any collateral emissions increases resulting from the project; (5) a description of the project and related processes; and (6) a description of any equipment being installed. 30 Tex. Admin. Code § 116.611(a).

147. Representations contained in any registration for a standard permit, including the EGU Standard Permit, with regard to construction plans, operating procedures, pollution control methods, maximum emission rates, or monitoring and reporting sufficient to demonstrate compliance with such representations, become conditions upon which the stationary source must be constructed and operated. 30 Tex. Admin. Code § 116.615(2).

148. A Texas Permit by Rule is another type of minor source permit that establishes generic conditions and pollution control requirements for categories of minor projects that TCEQ has determined will not make a significant contribution of contaminants to the atmosphere. 30 Tex. Admin. Code § 106.1.

149. If a new source or modification to an existing source satisfies the conditions for claiming a Permit by Rule, construction or modification of the source becomes authorized. 30 Tex. Admin. Code §§ 106.4, 116.110(a)(4).

150. Permits by Rule do not authorize construction of a new major source or major modifications to an existing major source. 30 Tex. Admin. Code § 106.4(a)(2), (3).

151. An owner or operator of a new or modified source may certify and register maximum emission rates and other limits and controls for a project authorized by a Permit by Rule that are lower than the maximum emission rates established by 30 Tex. Admin. Code § 106.4, or that otherwise are not required. 30 Tex. Admin. Code § 106.6(a).

152. All representations regarding construction plans, operating procedures, maximum emission rates and other limits or controls, such as monitoring and reporting, in any certified Permit by Rule registration become conditions upon which the minor source of emissions shall be constructed and operated. 30 Tex. Admin. Code § 106.6(b).

153. Relevant to this Complaint, TCEQ has established a Permit by Rule for portable and emergency engines and turbines. 30 Tex. Admin. Code § 106.511.

154. Generators authorized by this Permit by Rule may only be used for portable, emergency, and/or standby service and the maximum operating hours of such equipment may not exceed 10 percent of the normal annual operating schedule of the primary equipment. 30 Tex. Admin. Code § 106.511.

155. The TCEQ regulations providing for the issuance and use of standard permits and Permits by Rule are part of the Texas SIP. 40 C.F.R. § 52.2270(c) (incorporating Texas's Chapter 106, Subchapter A – PBR General Requirements and Chapter 116, Subchapter F – Standard Permit Requirements into the Texas SIP).

## FACTUAL ALLEGATIONS

### Chronology of Defendants' Data Center Development and Defendants' Minor-Source Permitting Strategy to Avoid Major Source New Source Review

156. The Vantage Data Center group, which currently consists of hundreds of LLCs and other corporate forms that conduct operations across multiple countries, has been associated with the acquisition, construction and operation of data centers since 2010.

157. On September 24, 2018, EPA designated Bexar County as nonattainment for the 2015 8-hour ozone NAAQS.

158. Between January 5, 2023, and January 9, 2023, the Vantage Defendants registered with the Texas Secretary of State as foreign limited liability companies.

159. Vantage Data Centers TX11, LLC and Vantage Data Centers TX21, LLC originally registered as Vantage Data Centers TX1, LLC and Vantage Data Centers TX2, LLC, respectively.

160. On April 18, 2023, Vantage Data Centers TX2, LLC was granted a special warranty deed for the Rogers Road campus property.

161. On July 28, 2023, Vantage Data Centers TX1, LLC was granted a special warranty deed for the Omicron Drive campus property.

162. On October 12, 2023, Texas Governor Abbott submitted a publicly available request to the EPA Administrator to reclassify the San Antonio ozone nonattainment area from Moderate to Serious. Clean Air Act Reclassification of the San Antonio, Dallas-Fort Worth, and Houston-Galveston Brazoria Ozone Nonattainment Areas; TX, 89 Fed. Reg. 5,145 (January 26, 2024).

163. On information and belief, on or about October 12, 2023, the Vantage Defendants became aware that Governor Abbott's request to the EPA Administrator would result in EPA reclassifying San Antonio's ozone nonattainment area from Moderate to Serious.

164. On or about October 12, 2023, the Vantage Defendants were aware that reclassifying San Antonio's ozone nonattainment area from Moderate to Serious would lower the major source thresholds applicable to their planned development of data centers at the Omicron Drive and Rogers Road properties.

165. On October 30, 2023, Defendants Vantage Data Centers TX1, LLC and Vantage Data Centers TX2, LLC changed their names to Vantage Data Centers TX11, LLC and Vantage Data Centers TX21, LLC, respectively.

166. On or about November 22, 2023, Defendant Vantage Data Centers TX21, LLC registered with the Texas Department of Licensing and Registration to construct a three-story data

center building on the Rogers Road campus that would take up only a fraction of the Rogers Road campus property.

167. On or about December 15, 2023, Defendant Vantage Data Centers TX11, LLC registered with the Texas Department of Licensing and Registration to construct a two-story data center building that would take up only a fraction of the Omicron Drive campus property.

168. The Vantage Defendants, based on information and belief, sought minor source permits for one data center building on the Rogers Road campus and one data center building on the Omicron Drive campus while planning to construct additional data center infrastructure at each campus, including additional data center facilities and dedicated "behind-the-meter" power plants in case connection to the local power grid proved unviable.

169. By at least December 11, 2023, the Vantage Defendants lacked any guarantee or even hopeful assurances that San Antonio's public utility, CPS Energy, could supply power sufficient to operate the planned data centers at the Omicron Drive and Rogers Road campuses.

170. At this point, without a known power source, the Vantage Defendants were faced with material project delays.

171. On January 26, 2024, EPA published a proposed rule in the federal register to reclassify the San Antonio ozone nonattainment area from Moderate to Serious in accordance with Governor Abbott's October 12, 2023, request. Clean Air Act Reclassification of the San Antonio, Dallas-Fort Worth, and Houston-Galveston Brazoria Ozone Nonattainment Areas; TX, 89 Fed. Reg. 5,145 (Jan. 26, 2024).

172. On February 28, 2024, Defendant Vantage Data Centers TX21, LLC registered for a Permit by Rule to construct 33 diesel backup generators at the Rogers Road campus. Ex. C, Vantage Data Centers TX21, LLC Permit by Rule Registration 1 (Feb. 28, 2024).

173. This Permit by Rule registration was assigned permit number 175524 and project number 370964 by the TCEQ.

174. Defendant Vantage Data Centers TX21, LLC represented at the time that the data center building at Rogers Road would house 48 MW of IT infrastructure.

175. Defendant Vantage Data Centers TX21, LLC's Permit by Rule registration represented that the 33 diesel backup generators had the following potential to emit criteria pollutants and formaldehyde, which is both a Hazardous Air Pollutant, or HAP, and a VOC:

a. 99.5 tons per year NOx

b. 4.38 tons per year VOC

c. 22.5 tons per year CO

d. 2.10 tons per year particulate matter (PM)

e. 0.00141 tons per year formaldehyde

176. Defendant Vantage Data Centers TX21, LLC did not request or establish an alternative maximum emission limit, a limit on operating hours beyond those imposed by law in the claimed permit (876 hours per year per engine) or any other limits or controls to further restrain emissions from the diesel backup generators in its Permit by Rule registration for the Rogers Road campus.

177. On February 29, 2024, Defendant Vantage Data Centers TX11, LLC registered for a Permit by Rule to construct 22 diesel backup generators at the Omicron Drive campus. Ex. D, Vantage Data Centers TX11, LLC Permit by Rule Registration 1 (Feb. 29, 2024).

178. This Permit by Rule registration was assigned permit number 175523 and project number 370963 by TCEQ.

179. Defendant Vantage Data Centers TX11, LLC represented at the time that the data center building at Omicron Drive would house 32 MW of IT infrastructure.

180. Defendant Vantage Data Centers TX11, LLC's Permit by Rule registration represented that the 22 diesel backup generators had the following potential to emit criteria pollutants and formaldehyde:

a. 99.8 tons per year NOx.

b. 4.40 tons per year VOC

c. 22.6 tons per year CO

d. 2.11 tons per year particulate matter (PM)

e. 0.00141 tons per year formaldehyde

181. Defendant Vantage Data Centers TX11, LLC did not request or establish an alternative maximum emission limit, limit on operating hours beyond those imposed by law in the claimed permit (876 hours per year per engine), or any other limits or controls to further restrain the emissions from the diesel backup generators in its Permit by Rule registration at the Omicron Drive campus.

182. On June 20, 2024, EPA published its final rule reclassifying the San Antonio, Texas region as being in "serious" nonattainment area for ozone. The final rule became effective July 22, 2024. Clean Air Act Reclassification of the San Antonio, Dallas-Fort Worth, and Houston-Galveston-Brazoria Ozone Nonattainment Areas; TX, 89 Fed. Reg. 51,829 (Jun. 20, 2024).

183. At no point prior to July 22, 2024 had the Vantage Defendants secured electricity from CPS Energy sufficient to operate a 48 MW data center at the Rogers Road data center campus or a 32 MW data center at the Omicron Drive campus.

184. On September 20, 2024, Defendant VoltaGrid sought authorization under the TCEQ EGU Standard Permit to generate electricity to power the Omicron Drive Campus data center. Ex. E, VoltaGrid, LLC Standard Permit Registration SAT-1 (Sept. 20, 2024).

185. This EGU Standard Permit registration was assigned permit number 177637 and project number 380453 by TCEQ.

186. In its registration for authorization under the EGU Standard Permit, Defendant VoltaGrid stated that it would install eighty (80) new 3,310-kilowatt-electric Jenbacher J620 natural gas engines at the Omicron Drive campus to produce 264.8 megawatts (MW) of electricity. This project is generally referred to as the Omicron Drive power plant.

187. Defendant VoltaGrid represented in its EGU Standard Permit registration that the Omicron Drive power plant had the following potential to emit criteria pollutants and formaldehyde (as a HAP):

a. 49.97 tons per year NOx.

b. 24.29 tons per year VOC

c. 215.14 tons per year CO

d. 34.70 tons per year particulate matter (PM)

e. 31.54 tons per year formaldehyde.

188. Defendant VoltaGrid's September 2024 EGU Standard Permit registration potential to emit pollutants assumes each of the 80 new Jenbacher J620 natural gas engines would continuously achieve a 98 percent NOx control efficiency and a 95 percent VOC control efficiency.

189. Defendant VoltaGrid calculated its potential to emit formaldehyde in its 2024 EGU Standard Permit registration, identifying it as a hazardous air pollutant ("HAP").

190. Formaldehyde is both a HAP and a VOC.

191. Defendant VoltaGrid's September 2024 EGU Standard Permit registration failed to include over 30 TPY of formaldehyde emissions in its potential to emit VOC calculation.

192. Defendant VoltaGrid's September 2024 EGU Standard Permit registration does not represent, and the permit does not require or authorize, VoltaGrid to install add-on pollution controls to comply with registration emission limits and achieve control efficiencies as represented.

193. VoltaGrid's September 2024 EGU Standard Permit registration does not represent that it will conduct monitoring and reporting to ensure compliance with emissions limits and control efficiencies.

194. The emission limits and control efficiency representations contained in Defendant VoltaGrid's September 2024 EGU Standard Permit registration are based on representations from the gas engines' manufacturer, Jenbacher.

195. Jenbacher's representations as to emissions and control efficiency explicitly state that they are based on specified factors, variables and assumptions, and that they exclude from their emissions calculations and control efficiency certain VOC, including formaldehyde and non-carbon VOC weight.

196. Jenbacher's representations as to emissions and control efficiencies do not purport to constitute potential to emit calculations for purposes of New Source Review.

197. The use of Selective Catalytic Reduction to control NOx emissions from VoltaGrid's engines creates additional emissions, including fugitive emissions and emissions associated with startup, shutdown or low load operations. These emissions were not included in the vendor representations related to emissions and control efficiencies and they were not included

in Defendant VoltaGrid's potential to emit calculations in its September 2024 EGU Standard Permit registration.

198. Adding VoltaGrid's potential to emit formaldehyde (31.54 TPY) to the 24.29 TPY of other VOC potential emissions renders the power plant at the Omicron Drive campus a major source of ozone-forming pollutants (VOC), subject to major source Nonattainment New Source Review.

199. As represented by VoltaGrid's September 2024 EGU Standard Permit registration, the power plant under construction at the Omicron Drive campus has the potential to emit over 55.83 TPY of VOC. The major source threshold for VOC (as an ozone-forming pollutant) in San Antonio is 50 TPY. VoltaGrid is a major source VOC based on its own representations.

200. The emissions limits established by the September 2024 EGU Standard Permit registration are not federally enforceable and therefore NOx potential to emit for the Jenbacher engines must reflect uncontrolled emissions at maximum capacity.

201. The Omicron Drive power plant has the potential to emit more than 50 TPY of NOx, which exceeds the major source threshold for ozone in Bexar County.

202. The partnership between Vantage Data Centers and VoltaGrid LLC was publicly announced by Vantage on February 11, 2025.

203. On March 31, 2025, Defendant Vantage Data Centers TX11, LLC submitted a revised certified Permit by Rule registration notifying TCEQ it would construct an additional 64 diesel backup generators at the Omicron Campus, bringing the total from 22 to 86 generators. Ex. F, Vantage Data Centers TX11, LLC Permit by Rule Registration Revision (Mar. 31, 2025).

204. This revised Permit by Rule registration retained the original permit number (175523) and was assigned project number 391320 by TCEQ.

205. Although this revised registration to expand the data center footprint at the Omicron Drive Campus nearly tripled the amount of diesel backup generating capacity, Defendant Vantage Data Centers TX11, LLC represented that the additional 64 generators would not result in an increase of actual or potential NOx emissions.

206. The revised registration for Omicron Drive did not request or impose any source-specific enforceable limits on the number of hours per year the diesel backup generators could be operated.

207. On July 22, 2025, Defendant Vantage Data Centers TX21, LLC submitted a revised certified Permit by Rule registration notifying TCEQ that it would construct an additional 32 diesel backup generators at the Rogers Road Campus, bringing the total from 33 to 65 generators. Ex. G, Vantage Data Centers TX21, LLC Permit by Rule Registration Revision (June 27, 2025).

208. This revised Permit by Rule registration retained the original permit number (175524) and was assigned project number 394863 by TCEQ.

209. Although this revised registration to expand the data center footprint at the Rogers Road Campus nearly doubled the amount of diesel backup generating capacity, Defendant Vantage Data Centers TX21, LLC represented that the additional 32 diesel generators would not result in an increase of actual or potential NOx emissions.

210. The revised registration for Rogers Road did not request or impose any source-specific enforceable limits on the number of hours per year the diesel backup generators could be operated.

211. On September 30, 2025, Defendant VoltaGrid sought authorization under the EGU Standard Permit to install 16 Jenbacher engines with a capacity of 3,310-kilowatt-electric (kWe) each and 20 Jenbacher engines with a capacity of 4,810 kWe each at the Rogers Road Campus to

produce 148 MW of total electricity. Ex. H, VoltaGrid, LLC Standard Permit Registration SAT-2 (Sept. 30, 2025).

212. This is generally referred to as the Rogers Road power plant.

213. Defendant VoltaGrid represented in its EGU Standard Permit registration that the Rogers Road power plant had the following potential to emit criteria pollutants and formaldehyde (as a HAP):

a. 38.72 tons per year NOx.

b. 35.99 tons per year VOC

c. 61.72 tons per year CO

d. 26.19 tons per year particulate matter (PM)

e. 20.15 tons per year formaldehyde

214. The same deficiencies that plagued the potential to emit calculations at the Omicron Drive power plant exist at Rogers Road:

a. The omission of formaldehyde as a VOC that should have been included in the total VOC potential to emit calculation.

b. The failure to include the weight of non-carbon atoms in the total VOC potential to emit.

c. Potential to emit NOx reflected application of Selective Catalytic Reduction, which requires additional authorization and is not a federally enforceable requirement.

215. Defendant VoltaGrid's September 2025 EGU Standard Permit registration does not represent and the permit does not require or authorize VoltaGrid to install add-on pollution controls to comply with registration emission limits and achieve control efficiencies as represented.

216. VoltaGrid's registration does not represent that it will conduct monitoring and reporting to ensure compliance with emissions limits and control efficiencies.

217. The potential to emit VOCs from the power plant at the Rogers Road data center campus is 56.14 TPY using VoltaGrid's own certified representations. This exceeds the major source threshold for ozone in Bexar County.

218. Because the limits established by the September 2025 EGU Standard Permit registration are not federally enforceable, NOx potential to emit for the generating engines must reflect uncontrolled emissions at maximum capacity. The Rogers Road generating engines' potential to emit NOx exceeds the 50 TPY major source threshold.

219. On June 24, 2026, Defendant VoltaGrid applied to TCEQ to modify its EGU Standard Permit registration for the Omicron Drive power plant to account for a planned change in the type of natural gas-fired engines it planned to construct and operate and to account for the addition of two so-called "black start" diesel-powered units. Ex. I, VoltaGrid, LLC Standard Permit Registration SAT-1 Revision (June 24, 2026).

220. Defendant VoltaGrid represented in its EGU Standard Permit registration that the modified Omicron Drive power plant has the following potential to emit criteria pollutants and formaldehyde (as a HAP):

a. 49.91 tons per year NOx.

b. 46.84 tons per year VOC

c. 94.34 tons per year CO

d. 40.10 tons per year particulate matter (PM)

e. 33.40 tons per year formaldehyde

221. The same deficiencies that plagued the potential to emit calculations in VoltaGrid's previous Texas standard permit registrations persist in the modified Omicron Drive registration.

a. The omission of formaldehyde as a VOC that should have been included in the total VOC potential to emit calculation.

b. The failure to include the non-carbon weight of VOCs in the VOC potential to emit was another major omission

c. Potential to emit NOx reflected application of Selective Catalytic Reduction, which requires additional authorization and is not a federally enforceable requirement.

222. Because the limits in Defendant VoltaGrid's June 24, 2026 EGU Standard Permit registration are not federally enforceable, the potential emissions from the uncontrolled engines operated at maximum capacity constitute the potential to emit NOx.

223. The potential to emit NOx (an ozone-forming pollutant) from the Omicron Drive power plant is above the 50 TPY NOx major source threshold applicable to San Antonio's "serious" ozone nonattainment status.

## CLAIMS FOR RELIEF

### Claim One

### Vantage Data Centers Management Company, LLC and Vantage Data Center TX11, LLC Circumvented New Source Review Preconstruction Permitting Requirements at the Omicron Drive Data Center Campus

224. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully restated herein.

225. The Omicron Drive campus is located at 14270 Omicron Drive, San Antonio, Texas 78245, in Bexar County.

226. Under information and belief, Vantage Data Centers Management Company, LLC was and remains an integral decision-maker related to all decisions asserted in this Claim.

227. Vantage Data Centers TX11 acquired properties substantially larger than required for the footprint of the facilities described in its February 2024 Permit by Rule registration for the Omicron Drive campus.

228. The Vantage Defendants named in this claim never intended to operate the Omicron Drive campus as represented in Vantage Data Centers TX11, LLC's Permit by Rule registration.

229. From the outset, the Vantage Defendants named in this claim planned and acquired the Omicron Drive property to develop the data center campus in a way that included multiple data center buildings and room for additional construction activities.

230. The "project" as described in the February 2024 Permit by Rule registration for the Omicron Drive campus fails to reflect or disclose this known and planned buildout that under information and belief, the Vantage Defendants knew would substantially increase the potential to emit criteria pollutants and HAPs.

231. After registering for a Permit by Rule for the diesel backup generators to support the Omicron Drive data center campus as described in February 2024, the Vantage Defendants revised the certified Permit by Rule registration to authorize construction of two additional data center buildings supported by additional emergency backup generators.

232. The Vantage Defendants' post-February 2024 additions to the Omicron Drive campus were additional phases of the same development that were substantially known at the time of the February 2024 Permit by Rule registration.

233. The Clean Air Act and the Texas SIP prohibit owners and operators of new stationary sources from obtaining minor source permits for NOx, VOC and CO on a piecemeal basis to avoid major New Source Review.

234. The minor source permits obtained by the Vantage Defendants are void *ab initio* and they are constructing and/or operating an unauthorized major source of criteria pollutants in violation of New Source Review, which is a violation of both the Clean Air Act and the Texas SIP and subjects the Vantage Defendants to the relief requested in this Complaint.

235. These violations are continuing and will continue unless the Vantage Defendants are ordered by the court or enter a binding judicial settlement to come into continuous compliance with the New Source Review requirements identified herein.

**Claim Two**

**Vantage Data Centers Management Company, LLC and Vantage Data Center TX21, LLC Circumvented New Source Review Preconstruction Permitting Requirements at the Rogers Road Data Center Campus**

236. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully restated herein.

237. The Rogers Road campus is located at 5207 Rogers Road, San Antonio, Texas 78251, in Bexar County.

238. Under information and belief, Vantage Data Centers Management Company, LLC was and remains an integral decision-maker related to all decisions asserted in this Claim.

239. Vantage Data Centers TX21 acquired properties substantially larger than required for the footprint of the facilities described in its February 2024 Permit by Rule registration for the Rogers Road campus.

240. The Vantage Defendants named in this claim never intended to operate the Rogers Road campus as represented in Vantage Data Centers TX21, LLC's February 2024 Permit by Rule registration.

241. From the outset, the Vantage Defendants named in this claim planned and acquired the Rogers Road property to develop the data center campus in a way that included multiple data center buildings and room for additional construction activities.

242. The "project" as described in the February 2024 Permit by Rule registration for the Rogers Road campus fails to reflect or disclose this known and planned buildout that under information and belief, the Vantage Defendants knew would result in a substantial increase in the potential to emit criteria pollutants and HAPs.

243. After registering for a Permit by Rule for diesel backup generators to support the construction at the Rogers Road data center campus as described in February 2024, the Vantage Defendants revised its certified Permit by Rule registration to authorize construction of an additional data center building supported by additional emergency backup generators.

244. The Vantage Defendants' post-February 2024 additions to the Rogers Road campus were additional phases of development that were substantially known at the time of the February 2024 Permit by Rule registration.

245. The Clean Air Act and the Texas SIP prohibit owners and operators of new stationary sources from obtaining minor source permits for NOx, VOC and CO on a piecemeal basis to avoid major New Source Review.

246. The minor source permits obtained by the Vantage Defendants are void *ab initio* and they are constructing and or operating an unauthorized major source of criteria pollutants in

violation of New Source Review, which is a violation of both the Clean Air Act and the Texas SIP and subjects the Vantage Defendants to the relief requested in this Complaint.

247. These violations are continuing and will continue unless the Vantage Defendants are ordered by the court or enter a binding judicial settlement to come into continuous compliance with the New Source Review requirements identified herein.

**Claim Three**

**Unauthorized Construction and Operation of the Omicron Drive Campus Without a Nonattainment New Source Review Permit for Ozone Precursors**

248. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though restated in full herein.

249. The power plant and the data center facilities at the Omicron Drive campus are an integrated, single source of emissions subject to aggregation for purposes of New Source Review pursuant to both the Clean Air Act and the Texas SIP.

250. Vantage Data Centers TX11, LLC owns the parcel of land on which the Omicron Drive data center facilities are being constructed and/or operated.

251. VoltaGrid leases property on the Omicron Drive campus for the natural-gas-fired power plant dedicated to serving the Omicron Drive data center facilities.

252. The Omicron Drive campus is at least partially operational based on Defendants' own statements and records.

253. Because the VoltaGrid power plant is a support facility for Vantage's data center operations, they share the same "industrial grouping." Requirements for Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 45 Fed. Reg. 52,676, 52,695 (August 7, 1980).

254. The Vantage data center facilities and VoltaGrid power plant at Omicron Drive are located on contiguous or adjacent property.

255. All pollutant-emitting activities within the same industrial grouping that are located on contiguous or adjacent properties and are under common control constitute one "building, structure, facility, or installation" that must be aggregated as a single stationary source. 40 C.F.R. §§ 51.165(a)(1)(i),(ii), 51.166(b)(5), (6); 30 Tex. Admin. Code §§ 116.12(6), (37).

256. Projects must be aggregated for purposes of New Source Review when they are "substantially related." Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NNSR): Aggregation; Reconsideration, 83 Fed. Reg. 57,324 (Nov. 15, 2018).

257. During normal, non-emergency operations, the VoltaGrid power plant supplies all the electricity required to operate the Omicron Drive data center facilities.

258. The electricity generated by the VoltaGrid power plant at Omicron Drive is not and will not be sold to the electric grid.

259. Defendant VoltaGrid obtained an EGU Standard Permit to construct the Omicron Drive power plant, a permit available only to owners and operators constructing electricity generation for their own use or for sale to the grid.

260. The Omicron Drive power plant serves no purpose other than generating all the electricity required to operate the Omicron Drive data center campus.

261. The power plant is a support facility for the Omicron Drive data center campus.

262. The Vantage data center facilities and the VoltaGrid power plant at Omicron Drive are under the common control of the same person or persons, or a partnership, agreement, arrangement, or common enterprise among and between Vantage Data Centers Management Company, Defendant Vantage Data Centers TX11, LLC and Defendant VoltaGrid LLC.

263. The Vantage data center facilities and the VoltaGrid power plants at each campus are subject to a partnership agreement.

264. The Defendants named in this claim are constructing and/or operating the Omicron Drive data center campus despite having the potential to emit 50 TPY or more of NOx and 50 TPY or more of VOC.

265. NOx and VOC are ozone precursors separately regulated for purposes of Nonattainment New Source Review applicability.

266. The Omicron Drive campus is an unauthorized new major source of ozone-forming pollutants because the Defendants named in this claim failed to obtain a Nonattainment New Source Review permit before beginning construction.

267. The named Defendants' construction and/or operation of the Omicron Drive campus without New Source Review authorization in a serious ozone nonattainment area is in violation of the Clean Air Act and the Texas SIP and subjects the named Defendants to the relief requested in this Complaint. 42 U.S.C. § 7503, and 7604(a)(3); 30 Tex. Admin. Code §§ 116.110, 116.111(a)(2)(H), and 116.150(b).

268. These violations are continuing and will continue unless the Defendants named in this claim are ordered by the court or enter a binding judicial settlement to come into continuous compliance with the New Source Review requirements identified herein.

269. In the alternative, should the Court determine that the Omicron Drive data center campus is not an integrated, single major source subject to New Source Review, Defendants Vantage Data Centers Management Company, LLC and Vantage Data Centers TX11, LLC are constructing and/or operating a new major stationary source of NOx and VOC without the required

Nonattainment New Source Review permit, subjecting the Vantage Defendants named in this paragraph to the relief requested in this Complaint.

270. Likewise if the Court determines that the Omicron Drive data center campus is not a single stationary source, Defendant VoltaGrid LLC is constructing and/or operating a power plant, which constitutes a new major stationary source of NOx and VOC without the required Nonattainment New Source Review permit, subjecting Defendant VoltaGrid to the relief requested in this Complaint.

**Claim Four**

**Unauthorized Construction and Operation of the Rogers Road Campus Without a Nonattainment New Source Review Permit for Ozone Precursors**

271. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though restated in full herein.

272. The power plant and the data center facilities at the Rogers Road campus are an integrated, single source of emissions subject to aggregation for purposes of New Source Review pursuant to both the Clean Air Act and the Texas SIP.

273. Vantage Data Centers TX21, LLC owns the parcel of land on which the Rogers Road data center facilities are being constructed and/or operated.

274. VoltaGrid leases property on the Rogers Road campus for the natural-gas-fired power plant dedicated to serving the Rogers Road data center facilities.

275. The Rogers Road campus is at least partially operational based on Defendants' own statements and records.

276. Because the VoltaGrid power plant is a support facility for Vantage's data center operations, they share the same "industrial grouping." 45 Fed. Reg. 52,695.

277. The Vantage data center facilities and VoltaGrid power plant at Rogers Road are located on contiguous or adjacent property.

278. All pollutant-emitting activities within the same industrial grouping that are located on contiguous or adjacent properties and are under common control constitute one "building, structure, facility, or installation" that must be aggregated as a single stationary source. 40 C.F.R. §§ 51.165(a)(1)(i),(ii), 51.166(b)(5), (6); 30 Tex. Admin. Code §§ 116.12(6), (37).

279. Projects must be aggregated for purposes of New Source Review when they are "substantially related." 83 Fed. Reg. 57,324.

280. During normal, non-emergency operations, the VoltaGrid power plant supplies all the electricity used to operate the Rogers Road data center facilities.

281. The electricity generated by the VoltaGrid power plant at Rogers Road is not and will not be sold to the electric grid.

282. Defendant VoltaGrid obtained an EGU Standard Permit to construct the Rogers Road power plant, a permit available only to owners and operators constructing electricity generation for their own use or for sale to the grid.

283. The Rogers Road power plant serves no purpose other than generating dedicated electricity for the Rogers Road data center campus.

284. The power plant is a support facility for the Rogers Road data center campus.

285. The Vantage data center facilities and the VoltaGrid power plant at Rogers Road are under the common control of the same person or persons, or a partnership, agreement, arrangement, or common enterprise among and between Vantage Data Centers Management Company, Vantage Data Centers TX21, LLC and Defendant VoltaGrid LLC.

286. The Vantage data centers facilities and the VoltaGrid power plants at each campus are subject to a partnership agreement.

287. The Defendants named in this claim are constructing and/or operating the Rogers Road data center campus despite having the potential to emit 50 TPY or more of NOx and 50 TPY or more of VOC.

288. NOx and VOC are ozone precursors separately regulated for purposes of Nonattainment New Source Review applicability.

289. The Rogers Road campus is an unauthorized new major source of ozone-forming pollutants because the named Defendants failed to obtain a Nonattainment New Source Review permit before beginning construction.

290. The named Defendants' construction and/or operation of the Rogers Road campus without New Source Review authorization in a serious ozone nonattainment area is in violation of the Clean Air Act and the Texas SIP and subjects the named Defendants to the relief requested in this Complaint. 42 U.S.C. §§ 7503, 7604(a)(3); 30 Tex. Admin. Code §§ 116.110, 116.111(a)(2)(H), and 116.150(b).

291. In the alternative, should the Court determine that the Rogers Road data center campus is not an integrated, single major source subject to New Source Review, Vantage Data Centers Management Company, LLC and Vantage Data Centers TX21, LLC are constructing and/or operating a new major stationary source of NOx and VOC without the required Nonattainment New Source Review permit, subjecting the Vantage Defendants named in this paragraph to the relief requested by this Complaint.

292. Likewise, if the Court determines that the Rogers Road data center campus is not a single stationary source, Defendant VoltaGrid LLC is constructing and/or operating a power plant,

which constitutes a new major stationary source of NOx and VOC without the required Nonattainment New Source Review permit, subjecting Defendant VoltaGrid to the relief requested in this Complaint.

**Claim Five**

**Unauthorized Construction and Operation of the Omicron Drive Campus Without a PSD Permit for Carbon Monoxide**

293. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully restated herein.

294. For the reasons in support of aggregation and NSR circumvention previously pleaded, the Omicron Drive data center campus is a new single major source of carbon monoxide (CO) because it has the potential to emit more than 250 TPY of CO.

295. The major source threshold for carbon monoxide in San Antonio, Texas, located in Bexar County, is 250 TPY because the county is in attainment for CO.

296. Defendants Vantage Data Center Management Company, LLC, Vantage Data Centers TX11, LLC and VoltaGrid LLC were required but failed to obtain a Prevention of Significant Deterioration permit before beginning construction of the Omicron Drive data center campus.

297. The named Defendants' construction of the Omicron Drive campus without a Prevention of Significant Deterioration permit violates the Clean Air Act and the Texas SIP and subjects the named Defendants to the relief requested in this Complaint. 42 U.S.C. §§ 7475(a), and 7604(a)(3), and 30 Tex. Admin. Code §§ 116.110, 116.111(a)(2)(I), and 116.160(a).

298. These violations are continuing and will continue unless the named Defendants are ordered by the court or enter a binding judicial settlement to come into continuous compliance with the New Source Review requirements identified herein.

299. In the alternative, if the Court determines that the Omicron Drive data center facilities and power plant are not a single major source, Vantage Data Centers Management Company, LLC and Vantage Data Centers TX11, LLC are constructing and/or operating a new major stationary source of CO at the Omicron Drive data center campus without the required Prevention of Significant Deterioration permit, subjecting the Vantage Defendants named in this paragraph to the relief requested in this Complaint.

300. In the alternative, if the Court determines that the Omicron Drive data center facilities and power plant are not a single major source, VoltaGrid LLC is constructing and/or operating a new major stationary source of CO without the required Prevention of Significant Deterioration permit, subjecting Defendant VoltaGrid to the relief requested in this Complaint.

**Claim Six**

**Unauthorized Construction and Operation of the Rogers Road Campus Without a PSD Permit for Carbon Monoxide**

301. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully restated herein.

302. For the reasons in support of aggregation and NSR circumvention previously pleaded, the Rogers Road data center campus is a new single major source of carbon monoxide (CO) because it has the potential to emit more than 250 TPY of CO.

303. The Defendants named in this claim were required but failed to obtain a Prevention of Significant Deterioration permit before beginning construction of the Rogers Road data center campus.

304. The named Defendants' construction of the Rogers Road campus without a Prevention of Significant Deterioration permit violates the Clean Air Act and the Texas SIP and

subjects the named Defendants to the relief requested in this Complaint. 42 U.S.C. §§ 7475(a), and 7604(a)(3), and 30 Tex. Admin. Code §§ 116.110, 116.111(a)(2)(I), and 116.160(a).

305. These violations are continuing and will continue unless the named Defendants are ordered by the court or enter a binding judicial settlement to come into continuous compliance with the New Source Review requirements identified herein.

306. In the alternative, if the Court determines that the Rogers Road data center facilities and power plant are not a single major source, Vantage Data Centers Management Company, LLC and Vantage Data Centers TX21, LLC are constructing and/or operating a new major stationary source of CO at the Rogers Road data center campus without the required Prevention of Significant Deterioration permit, subjecting the Vantage Defendants named in this paragraph to the relief requested in this Complaint.

**Claim Seven**

**Operation of the Rogers Road Diesel Back-Up Generators in Violation of the Clean Air Act, Texas SIP, and Minor-Source Authorization**

307. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully restated herein.

308. Vantage Data Centers Management Company, LLC and Vantage Data Centers TX21, LLC own and/or operate the Rogers Road data center campus or at a minimum, the data center facilities located at the Rogers Road data center campus.

309. The diesel backup generators at the Rogers Road data center campus are authorized to provide power to the data centers under very limited circumstances, primarily during emergencies such as an outage at the collocated power plant.

310. These generators are not authorized to operate as the primary source of power for the Rogers Road data center campus while the natural-gas power plant is being constructed or before the natural-gas power plant becomes operational.

311. Vantage Data Centers Management Company, LLC and Vantage Data Centers TX21, LLC operated and under information and belief continue to operate the Rogers Road diesel backup generators as a primary source of power for the data center.

312. Vantage Defendants' ongoing operation of the diesel backup generators as a primary power source violates the Clean Air Act, the Texas SIP, and the applicable minor source Permit by Rule authorization and subjects the Vantage Defendants to the relief requested in this Complaint. 30 Tex. Admin. Code §§ 106.6, 106.511; Tex. Health & Safety Code § 382.085(a).

313. These violations are continuing and will continue unless the Vantage Defendants are ordered by the court or enter a binding judicial settlement to come into continuous compliance with the requirements identified herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Public Citizen and Sierra Club respectfully request that this Court:

A. Declare that Defendants have violated and are in violation of the Clean Air Act and the Texas SIP by constructing and/or operating the Omicron Drive Campus and the Rogers Road Campus without required Nonattainment New Source Review permits and without required Prevention of Significant Deterioration permits;

B. Declare that Vantage Data Centers Management Company, LLC and Vantage Data Centers TX21, LLC have violated and continue to violate the Clean Air Act, the Texas SIP, and the applicable minor-source authorization by operating the Rogers Road diesel backup generators as a primary power source;

C. Enjoin Defendants from continuing construction and/or operation of the Omicron Drive Campus and the Rogers Road Campus unless and until Defendants obtain all required Clean Air Act and Texas SIP major-source preconstruction permits and comply with all applicable permit terms and conditions;

D. Enjoin Vantage Data Centers Management Company, LLC and Vantage Data Centers TX21, LLC from operating the diesel backup generators as a primary power source at the Rogers Road Campus;

E. Order Defendants to apply for and obtain all required Clean Air Act and Texas SIP Nonattainment New Source Review and Prevention of Significant Deterioration permits before construction or operation of the Omicron Drive and Rogers Road campuses resumes.

F. Order Defendants to mitigate the harm caused by their unlawful construction and operation of major sources of emissions, especially unauthorized emissions of ozone-forming pollutants given that San Antonio is in a serious nonattainment area for ozone.

G. Assess appropriate civil penalties against Defendants for violations of the Clean Air Act and the Texas SIP;

H. Award Plaintiffs their costs of litigation, including expert witness costs, as well as reasonable attorney fees pursuant to 42 U.S.C. § 7604(d);

I. Retain jurisdiction over this matter to ensure Defendants' compliance with the Clean Air Act, the Texas SIP, and this Court's orders; and

J. Grant such other and further relief as the Court deems just and proper.

Dated: September 21, 2026

Respectfully submitted,

/s/ *Gabriel Clark-Leach*
Gabriel Clark-Leach (TX Bar No. 24069516)
Environmental Integrity Project
98 San Jacinto Blvd., Suite 400
Austin, Texas 78701
gclark-leach@environmentalintegrity.org
Phone: 202-263-4440

Kenneth J. Rumelt (VT Bar No. 4801)*
Environmental Integrity Project
888 17th St., NW, Suite 810
Washington, D.C. 20006
krumelt@environmentalintegrity.org
Phone: 202-888-2707

*Attorneys for Plaintiffs*

* Seeking admission *pro hac vice*