**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **PUBLIC CITIZEN and SIERRA CLUB**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**VANTAGE DATA CENTERS MANAGEMENT COMPANY, LLC, VANTAGE DATA CENTERS TX11, LLC, VANTAGE DATA CENTERS TX21, LLC, and VOLTAGRID LLC**<br><br>**Defendants.** | **No. 5:26-cv-06032-JKP-ESC** |

**<u>PLAINTIFFS' AMENDED OPPOSED MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND AND SUMMARY OF THE ARGUMENT .......... 2

I. Standard of Review .......... 4

II. Relevant Statutory and Regulatory Framework .......... 4

III. ARGUMENT .......... 7

A. Plaintiffs Have Standing. .......... 7

1. Plaintiffs' Members Face an Actual or Imminent Injury from Defendants' Unlawful Construction and Operation of the Data Center Campuses .......... 8

2. Plaintiffs' Members' Injuries in Fact are Fairly Traceable to Defendants' Unlawful Actions .......... 10

3. Plaintiffs' Members' Injuries are Redressable .......... 12

4. Member Injuries are Germane to Plaintiffs' Organizational Purposes and Do Not Require Their Participation .......... 12

B. The Court has statutory jurisdiction over this Clean Air Act citizen suit. .......... 13

C. Plaintiffs are Likely to Succeed on the Merits Because Defendants Constructed and are Operating Major Stationary Sources Without Required NNSR Permits .......... 13

1. Each Campus Constitutes a Single Major Stationary Source of NOx and VOC. .......... 13

2. Each VoltaGrid Power Plant Independently Qualifies as a Major Source of VOC. .......... 16

D. Plaintiffs' Members Face a Likely Threat of Irreparable Injury. .......... 17

E. The Balance of Harms Weighs in Plaintiffs' Favor. .......... 19

F. The Public Interest Strongly Favors an Injunction .......... 20

G. Waiver of Injunction Bond is Appropriate .......... 21

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Cases**

*Anibowei v. Morgan*,
70 F.4th 898 (5th Cir. 2023) .................... 17

*Beame v. Friends of the Earth*,
434 U.S. 1310 (1977).................... 17

*Burlington N. R.R. v. Bair*,
957 F.2d 599 (8th Cir. 1992) .................... 20

*Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*,
188 F.4th 384 (5th Cir. 2026) .................... 8, 9

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) .................... 4

*Cmtys. for a Better Env't v. Cenco Ref. Co.*,
179 F. Supp. 2d 1128 (C.D. Cal. 2001), *aff'd*, 35 F. App'x 508 (9th Cir. 2002) .......... 17

*Cmtys. for a Better Env't v. Cenco Ref. Co.*,
180 F. Supp. 2d 1062 (C.D. Cal. 2001) .................... 8

*In re Commonwealth Oil Ref. Co.*,
805 F.2d 1175 (5th Cir. 1986) .................... 20, 21

*Corrigan Dispatch Co. v. Casa Guzman, S.A.*,
569 F.2d 300 (5th Cir. 1978) .................... 22

*Est. of Parker v. Miss. Dep't of Pub. Safety*,
140 F.4th 226 (5th Cir. 2025) .................... 11

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000).................... 11, 12

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944).................... 4

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
804 F.2d 1390 (5th Cir. 1986) .................... 17

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977).................... 8

*La. Env't Action Network v. EPA,*
382 F.3d 575 (5th Cir. 2004) .......................................................................... 5

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................................... 8, 11, 12

*Massachusetts v. EPA*,
549 U.S. 497 (2007)........................................................................... 8, 11, 12

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
116 F.4th 488 (5th Cir. 2024) ......................................................................... 8

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*,
73 F.3d 546 (5th Cir. 1996) ............................................................................ 8

*Sierra Club v. U.S. Dep't of Agric., Rural Utils. Serv.*,
841 F. Supp. 2d 349 (D.D.C. 2012) .............................................................. 17

*S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*,
165 F.4th 356 (5th Cir. 2026) ......................................................................... 8

*State v. U.S. Dep't of Transp.*,
No. 2:25-CV-00848-TL, 2026 WL 183584 (W.D. Wash. Jan. 23, 2026) ..................... 17

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
207 F.3d 789 (5th Cir. 2000) ........................................................................ 12

*United States v. City of Painesville*,
644 F.2d 1186 (6th Cir. 1981) ......................................................................... 4

*United States v. EES Coke Battery, LLC*,
820 F. Supp. 3d 600 (E.D. Mich. 2026)............................................................. 9

*United States v. Gear Box Z Inc.*,
526 F. Supp. 3d 522 (D. Ariz. 2021) ....................................................... 17, 21

*United States v. Oakland Cannabis Buyers' Coop.*,
532 U.S. 483 (2001)........................................................................................ 20

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*,
No. 2:17-cv-00032-RJS-DBP, 2020 WL 4282148 (D. Utah Mar. 6, 2020), *aff'd in part and remanded on other grounds*, 21 F.4th 1229 (10th Cir. 2021)................................ 21

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)..................................................................................... 4, 17

*Wis. Heritages, Inc. v. Harris*,
476 F. Supp. 300 (E.D. Wis. 1979)........................................................................ 22

**Statutes**

42 U.S.C. § 7401(a)(2) ............................................................................................ 21
42 U.S.C. § 7401(b)(1) .............................................................................................. 4
42 U.S.C. § 7409(b)(1) .............................................................................................. 5
42 U.S.C. § 7413(a) .................................................................................................. 5
42 U.S.C. § 7470(1) ................................................................................................ 21
42 U.S.C. § 7470(3) ................................................................................................ 21
42 U.S.C. § 7475(a) ................................................................................................ 21
42 U.S.C. § 7502(c)(5) .............................................................................................. 6
42 U.S.C. § 7503(a) ............................................................................................ 6, 21
42 U.S.C. § 7503(a)(5) ............................................................................................ 20
42 U.S.C. § 7511a(c) ................................................................................................ 6
42 U.S.C. § 7511a(f) ................................................................................................. 6
42 U.S.C. § 7604(a) .................................................................................................. 5
42 U.S.C. § 7604(a)(3) ............................................................................................ 13
42 U.S.C. § 7604(b)(1) ............................................................................................ 13
42 U.S.C. § 7604(f)(4) ............................................................................................... 5

**Regulations**

40 C.F.R. pt. 50.......................................................................................................... 5
40 C.F.R. § 51.100(s)................................................................................................ 16
40 C.F.R. § 51.165 ..................................................................................................... 6
40 C.F.R. § 51.165(a)(1)(iii)........................................................................................ 6
40 C.F.R. § 51.165(a)(1)(xix) .................................................................................... 16
40 C.F.R. § 51.165(i) ................................................................................................ 10
40 C.F.R. § 51.166(b)(4) ............................................................................................ 6
40 C.F.R. § 52.2270 .................................................................................................... 5

30 Tex. Admin. Code ch. 116 ..................................................................................... 5
30 Tex. Admin. Code § 39.402(b)(2) .......................................................................... 7
30 Tex. Admin. Code § 101.1(116) ........................................................................... 16
30 Tex. Admin. Code § 106.511 ................................................................................. 6
30 Tex. Admin. Code § 116.12(6) ........................................................................ 5, 14
30 Tex. Admin. Code § 116.12(19) ............................................................................ 6
30 Tex. Admin. Code § 116.12(29) ............................................................................ 6
30 Tex. Admin. Code § 116.12(37) ...................................................................... 5, 14
30 Tex. Admin. Code § 116.110(a) ............................................................................ 6
30 Tex. Admin. Code § 116.110(a)(2)(A) ................................................................ 14
30 Tex. Admin. Code § 116.150 ................................................................................. 6
30 Tex. Admin. Code § 116.150(a) ......................................................................... 5, 6

30 Tex. Admin. Code § 116.150(b) .......... 5, 7
30 Tex. Admin. Code § 116.150(d) .......... 7
30 Tex. Admin. Code § 116.160(a) .......... 5
30 Tex. Admin. Code § 116.615(2) .......... 15

**Federal Register**

Clean Air Act Reclassification of San Antonio, Dallas-Fort Worth, and Houston-Galveston Brazoria Ozone Nonattainment Areas; TX, 89 Fed. Reg. 51,829, 51,843 (June 20, 2024) .......... 2

Requirements for Preparation, Adoption, & Submittal of Implementation Plans; Approval & Promulgation of Implementation Plans, 45 Fed. Reg. 52,676 (Aug. 7, 1980) .......... 14

**Other Authorities**

William L. Wehrum, Assistant Adm'r, Off. of Air & Radiation, U.S. Env't Prot. Agency, *Letter to Patrick McDonnell, Sec'y, Pa. Dep't of Env't Prot., Regarding Source Determination for Meadowbrook Energy LLC* (Apr. 30, 2018) .......... 5, 14

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2954 (3d ed. 2026) .......... 22

## INTRODUCTION

Preliminary relief is necessary to protect Plaintiffs and their members from irreparable harm during the pendency of this lawsuit. Plaintiffs Public Citizen and Sierra Club have members whose health or their children's health will be harmed by Defendants, VoltaGrid LLC and three Vantage Data Centers affiliates, unless they are enjoined by this Court from further unauthorized construction and operation of major sources of harmful pollution in violation of the Clean Air Act and Texas law. Defendants are constructing behind-the-meter power plants and industrial scale diesel-fired backup generation to serve two artificial intelligence data center campuses in San Antonio without complying with the Clean Air Act's New Source Review program. New Source Review is a preconstruction permitting program created by Congress that is applicable to major new sources of criteria pollutants – a set of pollutants prevalent throughout the country that have significant impacts on health and welfare. This program is intentionally stringent and directs EPA to protect American air quality from degradation in areas that already are meeting the federal health-based national ambient air quality standards ("NAAQS") and to take stringent measures to improve air quality and achieve attainment of the NAAQS in areas with poor air quality.

The pollutants at issue in this Motion are volatile organic compounds ("VOCs") and nitrogen Oxides ("NOx"), which are regulated under the Clean Air Act's New Source Review program as precursors to the criteria pollutant ozone. Bexar County, including San Antonio, is in "serious" nonattainment area for ground-level ozone, meaning that air quality fails to comply with federal health-based ambient air quality standards. Defendants' data center campuses are major sources of ozone-forming pollution and, unless required by this Court to comply with the Clean Air Act, will contribute to unhealthy air quality in the area.

## BACKGROUND AND SUMMARY OF THE ARGUMENT

Defendants Vantage Data Centers Management Company, LLC, Vantage Data Centers TX11, LLC, Vantage Data Centers TX21, LLC (collectively "Vantage") and VoltaGrid LLC ("VoltaGrid") are constructing and operating data center campuses that include industrial-scale back-up diesel generators and dedicated power plants. They are located at 14720 Omicron Drive and 5207 Rogers Road, San Antonio, Texas.

Defendants' strategy to avoid New Source Review permitting entailed seeking multiple, piecemeal "minor" source permits and authorizations from the Texas Commission on Environmental Quality ("TCEQ"). The materials submitted for these minor source permits and authorizations misrepresent each campus' potential to emit VOC, NOx and CO as below the relevant major source thresholds.[1] Their strategy fails for several reasons identified in Plaintiffs' Complaint; however, Plaintiffs' Motion presents two of those reasons, which demonstrate likelihood of success on the merits and focus on Defendants' failure to undergo New Source Review for ozone-forming pollutants, NOx and VOC.[2]

First, the power plants and diesel generators are not separate sources under New Source Review. The data center campuses are the result of a partnership, publicly announced by Vantage, and formed to cement this business venture.[3] These campuses fall within a distinct market segment

---

[1] VoltaGrid sought and obtained minor source authorization for both campuses under Texas' 2007 Standard Permit for Electric Generating Units. Vantage Data Centers TX11 registered for a Permit by Rule for the diesel back-up generators at the Omicron Drive campus. Vantage Data Centers TX21 registered for Permit by Rule authorization for the Rogers Road campus diesel generators. These types of TCEQ permits provide no opportunity for public participation.

[2] Plaintiffs' complaint includes additional claims, including failure to undergo Prevention of Significant Deterioration preconstruction permitting for CO, and the procedural harms associated with this failure.

[3] *See Vantage Data Centers and VoltaGrid Establish Partnership to Deploy More Than One Gigawatt of Power Generation*, Vantage Data Ctrs. (Feb. 2025), https://vantage-

known as wholesale hyperscale colocation, where companies like Defendants build, own, and operate the physical shell, including power delivery, while their tenants own and run their own networking equipment inside.[4]

VoltaGrid sought minor source authorization for its gas-fired power plants under a TCEQ standard permit available only to owners or operators who generate electricity for their own use or for sale to the grid. Because VoltaGrid will not sell electricity to the grid, its eligibility for that permit depends on its status as owner or operator of the data centers consuming the electricity. However, when calculating the potential to emit pollutants needed to determine major source status, VoltaGrid excluded emissions from the diesel backup generators for each campus, masking the fact that each campus exceeds major source thresholds when the potential emissions from Defendants' diesel back-up generators and the power plant gas-fired engines are combined. The combined potential to emit ozone-forming pollutants from the power plants and diesel back-up generators (NOx and VOC) puts VoltaGrid and Vantage well over major source thresholds at both campuses.[5] The unavoidable conclusion is that construction and operation of the two San Antonio data center campuses is occurring without major New Source Review preconstruction authorization in a serious ozone nonattainment area.

Defendants' attempt to circumvent major New Source Review permitting fails for a second, independent reason: each gas-fired power plant itself is a major source, even excluding the diesel

---

dc.com/news/vantage-data-centers-and-VoltaGrid-establish-partnership-to-deploy-more-than-one-gigawatt-of-power-generation/ (last visited Sept. 19, 2026).

[4] Joshua Mitchell, *Vantage Data Centers Weighs $100 Billion IPO, Largest in Data Center History*, TECHTIMES (Aug. 13, 2026), https://www.techtimes.com/articles/324411/20260813/vantage-data-centers-weighs-100-billion-ipo-largest-data-center-history.htm [https://perma.cc/M4GP-K6M5].

[5] NOx and VOC are precursors to ground-level ozone formation and their potential to emit is calculated separately for purposes of major New Source Review thresholds.

back-up generators' potential to emit. At both campuses, the power plants' potential to emit VOC exceeds the 50 tons per year ("TPY") nonattainment major source threshold for ozone precursors. VoltaGrid's claim that potential to emit VOC at each campus is below 50 TPY improperly excludes formaldehyde, a toxic VOC. Correcting for this error indisputably raises the potential to emit VOC above the major source threshold at both campuses. VOC totals from the power plants alone trigger the need for major New Source Review.

## I. STANDARD OF REVIEW

To obtain a preliminary injunction, a party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (setting forth elements). When an injunction is sought pursuant to a federal statute, a court's exercise of its equitable discretion is "conditioned by the necessities of the public interest which Congress has sought to protect." *United States v. City of Painesville*, 644 F.2d 1186, 1193 (6th Cir. 1981) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944)). In enacting the Clean Air Act, Congress determined that "the public interest required that substantial measures be taken to combat the deleterious effects of air pollution." *Id.* at 1193.

## II. RELEVANT STATUTORY AND REGULATORY FRAMEWORK

Congress enacted the Clean Air Act to protect health and welfare from air pollution. 42 U.S.C. § 7401(b)(1). To that end, the EPA establishes NAAQS, including ozone and carbon monoxide. Primary NAAQS must protect public health with an adequate margin of safety. 42 U.S.C. § 7409(b)(1); 40 C.F.R. pt. 50. Texas implements the Clean Air Act through an EPA-approved state implementation plan ("Texas SIP"), including preconstruction permitting requirements that are federally enforceable through the Act's citizen suit provision. *See* 42 U.S.C.

§§ 7413(a), 7604(a), (f)(4); *La. Env't Action Network v. EPA*, 382 F.3d 575, 579 (5th Cir. 2004); 40 C.F.R. § 52.2270; 30 Tex. Admin. Code ch. 116. New Source Review requires a major stationary source to obtain the applicable preconstruction permit before beginning construction. 30 Tex. Admin. Code §§ 116.160(a) (Prevention of Significant Deterioration), 116.150(a), (b) (Nonattainment New Source Review).

A "stationary source" is any building, structure, facility, or installation that emits, or may emit, a pollutant regulated under the Clean Air Act. The data center campuses are stationary sources. 30 Tex. Admin. Code § 116.12(37). A "building, structure, facility, or installation," in turn, encompasses pollutant-emitting activities that (1) belong to the same industrial grouping, (2) are located on contiguous or adjacent properties, and (3) are under the control of the same person or persons under common control. 30 Tex. Admin. Code § 116.12(6). These criteria are evaluated on a case-by-case basis to determine whether multiple activities comprise a single source consistent with the "common sense notion of a plant," rather than separate sources created through artificial source splitting to avoid major source status.[6]

Major source status depends on a source's "potential to emit," meaning the maximum capacity of the source to emit a pollutant under its physical and operational design. 40 C.F.R. §§ 51.165(a)(1)(iii), 51.166(b)(4); 30 Tex. Admin. Code § 116.12(29). A physical or operational limitation, "including air pollution control equipment," counts toward that design only if the limitation "is federally enforceable." 40 C.F.R. § 51.165(a)(1)(iii); 30 Tex. Admin. Code § 116.12(29). In "serious" ozone nonattainment areas like Bexar County, a new stationary source is

---

[6] *See* Letter from William L. Wehrum, Assistant Adm'r, Off. of Air & Radiation, U.S. Env't Prot. Agency, to Patrick *McDonnell, Sec'y, Pa. Dep't of Env't Prot., Regarding Source Determination for Meadowbrook Energy* LLC, attach. at 3, 9 n.21 (Apr. 30, 2018) (hereinafter "Meadowbrook Letter"), https://www.epa.gov/sites/default/files/2018-05/documents/meadowbrook_2018.pdf [https://perma.cc/9D2W-N6FB].

subject to Nonattainment New Source Review preconstruction and operating permit requirements if it has the "potential to emit" 50 TPY or more of NOx or VOC, which are ozone precursors. 42 U.S.C. §§ 7502(c)(5), 7503(a), 7511a(c), (f); 30 Tex. Admin. Code §§ 116.12(19), 116.150(a).

Nonattainment New Source Review prohibits construction of a new major source unless: (1) the applicant demonstrates that the benefits of locating a project in a nonattainment area significantly outweigh the project's social and environmental costs; (2) the project's source offsets new emissions of the same nonattainment pollutants by securing enforceable pollutant reductions from existing sources in the nonattainment area; (3) the source uses the best controls regardless of cost to reduce emissions of nonattainment pollutants; and (4) that all major stationary sources owned or operated by the applicant in the state are complying or on a compliance schedule with all applicable Clean Air Act emission limitations and standards. 42 U.S.C. § 7503(a); 40 C.F.R. § 51.165; 30 Tex. Admin. Code § 116.150.

Sources that fall below major source thresholds still require a minor New Source Review permit before construction begins. 30 Tex. Admin. Code § 116.110(a). Relevant here are the TCEQ Air Quality Standard Permit for Electric Generating Units ("EGU Standard Permit"), and the Permit by Rule for Portable and Emergency Engines and Turbines. 30 Tex. Admin. Code § 106.511. The EGU Standard Permit is only available for sources that generate electricity "for use by the owner or operator and/or generate electricity to be sold to the electric grid." Ex. A, EGU Standard Permit at 1.[7] Neither "minor" source permit requires public notice and comment before applicants receive authorization. 30 Tex. Admin. Code § 39.402(b)(2), (3).

[7] Also available electronically at: https://www.tceq.texas.gov/assets/public/permitting/air/NewSourceReview/Combustion/egu_final_spermit.pdf [https://perma.cc/FXC9-YBQR].

## III. ARGUMENT

Defendants are constructing and operating two major sources of air pollution without the public health and participation safeguards of major New Source Review. As proposed, these campuses have the potential to emit thousands of tons per year of pollutants that exacerbate existing ozone nonattainment (smog), barraging neighbors with a constant stream of harmful pollutants. Plaintiffs' members include individuals who live within 0.4 miles of Defendants' campuses, and who suffer from respiratory illnesses such as asthma and pulmonary fibrosis, heart conditions, and whose children have asthma and still-developing lungs. Defendants' unlawful construction and imminent full-scale operations compound existing air quality burdens and place Plaintiffs' members at short-term and long-term risk of adverse health effects.

Preliminary relief is necessary to protect Plaintiffs and their members from irreparable harm during the pendency of this lawsuit. Plaintiffs and their members were never notified about what they would soon be facing until long after Defendants broke ground. Defendants' circumvention of NNSR cut the public out of the decisionmaking process and thwarted pollution control requirements necessary to improve (not just to maintain) poor air quality in the area. 30 Tex. Admin. Code § 116.150(b), (d)(1)–(4).

### A. Plaintiffs Have Standing.

An organization has associational standing to file suit where (1) at least one member would otherwise have standing, (2) the interests at stake in the litigation are germane to the organization's purposes, and (3) neither the claims asserted nor the relief requested requires an individual member's participation in the suit. *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 188 F.4th 384, 392 (5th Cir. 2026) (ultimately citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). An organization's member has standing where the member faces (1) an actual or imminent injury in fact that (2) can be traced to the defendant's

conduct and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Denial of a procedural right to protect concrete interests also is a cognizable injury, with relaxed standards for redressability and immediacy. *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 503 (5th Cir. 2024). "Some possibility" that enforcing the procedural right could lead to reconsideration is sufficient. *Id.* (citing *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). Plaintiffs must also identify "some concrete interest that is affected by the deprivation, but the plaintiff need not establish with any certainty that the procedural defect will cause harm." *Id.* (cleaned up). Plaintiffs "need only show" that the procedures are "designed to protect its members' threatened concrete interests." *S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*, 165 F.4th 356, 368 (5th Cir. 2026) (cleaned up).

### 1. Plaintiffs' Members Face an Actual or Imminent Injury from Defendants' Unlawful Construction and Operation of the Data Center Campuses

A threatened injury is sufficient to satisfy the injury in fact requirement. *Id.* at 366. The injury "need not be large, an identifiable trifle will suffice." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996) (cleaned up). Consistent with that standard, even modest exposure to air pollution presents a cognizable injury because "breathing even slightly polluted air entails a health risk." *Cmtys. for a Better Env't v. Cenco Ref. Co.*, 180 F. Supp. 2d 1062, 1075 (C.D. Cal. 2001). Aesthetic and recreational harms from "regional haze" and reduced "outdoor activities," as well as potential physical harm in the form of "respiratory symptoms" caused by increased air pollution, each constitute a cognizable injury. *United States v. EES Coke Battery, LLC*, 820 F. Supp. 3d 600, 626 (E.D. Mich. 2026).

The Fifth Circuit's recent decision in *Citizens for Clean Air & Clean Water in Brazoria County* supports Plaintiffs' actual or imminent injury. There, a homeowner living approximately

1.5 miles from a proposed source of pollution satisfied the injury in fact requirement based on a declarant's concern that the challenged fossil fuel infrastructure project would "increase the risk" of harm to the declarant's property, potentially pollute the declarant's water well, and interfere with recreational opportunities at specific locations the declarant intended to use. *Citizens for Clean Air*, 188 F.4th at 393. The threatened pollution and resulting risks to Plaintiffs' members in this case are at least as concrete and particularized as in that case.

Plaintiffs' member declarations establish concrete, imminent, and particularized injuries in fact from Defendants' data center campuses and their emissions. For example, Eric Ponce is a member of Public Citizen and a disabled veteran. Ex. B, Ponce Decl. ¶¶ 5–7. He lives approximately 0.4 miles from the Omicron Drive facility and suffers from severe asthma, which requires ongoing medical treatment and has required emergency room treatment and hospitalization. *Id.* ¶¶ 2, 8–10. He regularly uses his yard and pool, and walks in his neighborhood, but is concerned that breathing additional pollution from Defendants' emissions will trigger an asthma attack or make breathing more difficult. *Id.* ¶¶ 12–14. Defendants' emissions will force him indoors and diminish his use and enjoyment of his home and neighborhood. *Id.* ¶ 14.

David Pan is a 76-year-old Sierra Club member who lives approximately 1.5 miles from the Rogers Road campus and suffers from idiopathic pulmonary fibrosis and has a family history of cardiovascular disease. Ex. C, Pan Decl. ¶¶ 1, 3–4, 13, 15. He still makes use of parks, trails, and other activities near his home. *Id.* ¶ 11. However, poor air quality causes him coughing, breathlessness, and fatigue during everyday activities. *Id.* ¶¶ 18, 20. He is concerned that additional emissions from Rogers Road data center will cause additional days with poor air quality and force him to spend less time outdoors, both because of his concern and at the advice of physicians. *Id.* ¶¶ 12, 20.

Dr. Allison Abplanalp lives approximately 0.8 miles from the Rogers Road campus. Ex. D, Am. Abplanalp Decl. ¶ 5. Wesley Cunningham lives approximately one-half mile from the Omicron Drive campus. Ex. E, Am. Cunningham Decl. ¶ 2. Both of these Public Citizen members have their own respiratory issues, but both also have children who suffer from asthma or other breathing problems. Ex. D, Am. Abplanalp Decl. ¶¶ 20–21; Ex. E, Am. Cunningham Decl. ¶¶ 7–8, 10. Mr. Cunningham has a son whose asthma is treated with a nebulizer and has become severe enough to require surgery scheduled for January 2027. Ex. E, Am. Cunningham Decl. ¶¶ 6, 8, 10–11, 15. Dr. Abplanalp has two children who have been hospitalized for reactive airway disease. Since September 2026, she has seen heat shimmer rising from the direction of the long row of VoltaGrid trailers at the Rogers Road campus. Ex. D, Am. Abplanalp Decl. ¶¶ 21, 33–35. These Public Citizen members fear that emissions from Defendants' data center campuses will harm their children and force them to reduce the time they and their children ordinarily spend recreating. Ex. D, Am. Abplanalp Decl. ¶¶ 24–25, 40; Ex. E, Am. Cunningham Decl. ¶¶ 14–16.

Plaintiffs' members had no opportunity to participate in the air permitting process before Defendants began constructing the data center campuses. *See*, *e.g.*, Ex. B, Ponce Decl. ¶¶ 19–22; Ex. C, Pan Decl. ¶¶ 21, 27–28; Ex. D, Am. Abplanalp Decl. ¶¶ 12, 45–46. Federal law guarantees those rights through the Nonattainment New Source Review program. 40 C.F.R. § 51.165(i). By circumventing major New Source Review, Defendants injured the members' concrete interests in protecting their health from air pollution.

**2. Plaintiffs' Members' Injuries in Fact are Fairly Traceable to Defendants' Unlawful Actions**

A plaintiff must show a causal connection between the injury and the conduct complained of such that the injury is "fairly traceable" to the defendant's challenged actions. *Lujan*, 504 U.S. at 560. This requirement imposes a less demanding burden than proximate causation and does not

require plaintiffs to prove that the defendant's conduct is the exclusive source of the injury. *Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 236–37 (5th Cir. 2025). Plaintiffs need only demonstrate that the defendant's actions contribute to or increase the risk of the harm they experience in a manner that is neither remote nor wholly speculative. *Massachusetts*, 549 U.S. at 523–24; *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181–83 (2000).

Here, Plaintiffs' members' concerns are based on their proximity to the data center campuses and the thousands of tons of potential pollutants the campuses will emit annually while running 24 hours a day, 365 days a year if relief is not granted. *See* Exhibits B–H (member standing declarations). Their concerns are neither remote nor speculative; pollutants emitted from Defendants' campuses contribute to and increase the risk of harm to their health and well-being, and that of their families. *See* Ex. I, Am. Suh Decl. ¶¶ 19, 22, and Section III.D below (irreparable harm).

Specialized video validates these concerns. On October 4, 2026, exhaust plumes were recorded using a camera that detects pollution invisible to the naked eye, including VOCs, from twelve operating stacks at the Omicron Drive power plant leaving the plant's southern property line and moving over the Hidden Canyons and Hidden Bluffs subdivisions. Ex. P, Doty Rep. at 4, 6. At Rogers Road, a combined plume from nine operating VoltaGrid trailer-mounted generators was recorded leaving the property and crossing State Highway 151 toward Northwest Vista College and Christus Santa Rosa Hospital, 1,500 to 2,000 feet or more from the sources, with no other emission source upwind. *Id.* at 7, 11–12.[8] Plaintiffs' members live near these sources and

[8] The video survey was conducted by a certified Level III thermographer. Ex. P, Doty Rep. at 13. The videos are available online through the following link and will be provided to the Court on a USB thumb drive or similar upon request: https://tinyurl.com/532kabpy.

travel these roads, and Dr. Abplanalp uses medical facilities next to the Rogers Road campus. *See* Ex. B, Ponce Decl. ¶ 2; Ex. E, Am. Cunningham Decl. ¶ 2; Ex. D, Am. Abplanalp Decl. ¶¶ 8, 36.

**3. Plaintiffs' Members' Injuries are Redressable**

A plaintiff must demonstrate that it is likely that the injury will be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 561. It is enough that the relief sought would lessen the challenged emissions or deter future violations, thereby reducing the harm suffered by plaintiffs. *Laidlaw*, 528 U.S. at 185–86; *Massachusetts*, 549 U.S. at 525–26. Article III does not require proof that the requested relief will solve the problem in its entirety. Incremental relief that reduces the plaintiff's injury is sufficient. *Id.*; *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 793 (5th Cir. 2000) (holding injunctive relief could redress injuries even though it would not prevent all pollutant discharges affecting the plaintiff).

Plaintiffs' members' injuries are redressable if the Court grants Plaintiffs' requested relief. The Nonattainment New Source Review permitting process will redress procedural injuries by providing Plaintiffs' members notice, opportunity to comment, and other public participation safeguards through which they review detailed information about Defendants' projects and advocate for stringent emissions controls, offsets, and the possibility of permit denial. The process will also almost certainly result in a reduction in the amount of pollution Defendants are authorized to emit. As explained in Plaintiffs' member declarations, any of these outcomes would redress their Article III injuries.

**4. Member Injuries are Germane to Plaintiffs' Organizational Purposes and Do Not Require Their Participation**

Member injuries described above are germane to Public Citizen's and Sierra Club's organizational purposes. Each organization seeks to protect their members' interests and the public from harmful air pollution, ensure polluters comply with applicable environmental laws, and work

to safeguard and encourage public participation in matters affecting human health and the environment. *See* Ex. K, Weissman Decl. ¶¶ 4–6; Ex. L, Olinger Decl. ¶ 4; Ex. M, Goodrich Decl. ¶¶ 3, 5, 7–8. No member's individual participation is required in this litigation.

### B. The Court has statutory jurisdiction over this Clean Air Act citizen suit.

The Clean Air Act authorizes citizens to commence a civil action against any person who proposes to construct or constructs a new major emitting facility without the appropriate New Source Review permit. 42 U.S.C. § 7604(a)(3). For certain claims, Plaintiffs must provide Defendants, and others, with at least 60 days' notice before filing suit. *Id.* § 7604(b)(1).[9] Here, Plaintiffs provided notice on July 22, 2026, and filed suit after 60 days. Therefore, this Court has jurisdiction over Plaintiffs' claims.

### C. Plaintiffs are Likely to Succeed on the Merits Because Defendants Constructed and are Operating Major Stationary Sources Without Required NNSR Permits.

Plaintiffs are likely to succeed on the merits because Defendants' own certified representations to the Texas Commission on Environmental Quality establish that they are constructing and operating major stationary sources without Nonattainment New Source Review preconstruction and operating permits required by the Act and the Texas SIP.[10]

#### 1. Each Campus Constitutes a Single Major Stationary Source of NOx and VOC.

Based on Defendants' own minor source permit registrations, each data center campus is a major stationary source comprised of diesel backup generators and a natural gas power plant: they

---

[9] Notice is not required for the 42 U.S.C. § 7604(a)(3) claims at issue in this Motion. Plaintiffs provided notice to allow Defendants and relevant government agencies to address Defendants' violations within the same 60-day period required for other Clean Air Act citizen suit claims.

[10] Plaintiffs allege that Defendants' certified registrations drastically underrepresent potential emissions from primary and backup generators at each location. Even accepting Defendants' emissions estimates as accurate, each site qualifies as a major source and triggers Nonattainment New Source Review permitting requirements.

are located on contiguous or adjacent properties, belong to the same primary industrial grouping, and are under common control. 30 Tex. Admin. Code § 116.12(6), (37). The backup generators and power plant at each location are located on a single contiguous piece of property. Ex. N, SAT-1 Initial Registration at pdf 34 ("Voltagrid will own and operate the generators to produce electricity for an adjacent facility."); Ex. O, SAT-2 Registration at pdf 34 (same). Because VoltaGrid's natural gas generators are support facilities for Vantage's data centers, the industrial grouping for the primary operation "encompasses both primary and support facilities." Requirements for Preparation, Adoption, & Submittal of Implementation Plans; Approval & Promulgation of Implementation Plans, 45 Fed. Reg. 52,676, 52,695 (Aug. 7, 1980); Meadowbrook Letter, attach. at 10 n.23. VoltaGrid's application for the EGU Standard permit for the power plants establishes that the power plants are subject to common control with the backup diesel generators under a common owner or operator. Specifically, the EGU Standard Permit only authorizes "electric generating units that generate electricity *for use by the owner or operator and/or generate electricity to be sold to the electric grid*[.]" Ex. A, EGU Standard Permit at 1 (emphasis added).[11] VoltaGrid's power plants exist to provide primary power to the data centers. They do not sell power to the grid.[12] VoltaGrid's status as an owner or operator of the data centers it powers is consistent with the EGU Standard Permit it obtained, the self-described partnership

---

[11] *See supra* note 8.

[12] Either VoltaGrid is an owner and/or operator of the data centers or the construction of the power plants to provide electricity to the data centers is unauthorized and violates the Texas SIP. 30 Tex. Admin. Code §§ 116.110(a)(2)(A) (requiring person to obtain a permit or to satisfy the conditions of a Texas standard permit before "construct[ing] any new facility[.]"); 116.615(2) ("Any change in condition such that a person is no longer eligible to claim a standard permit . . . requires proper authorization under § 116.110 of this title[.]").

between the Defendants, and Vantage's business model of leasing data center campuses as a package deal – complete with electric power – to technology company tenants.[13]

VoltaGrid's permitting history in Georgia supports this analysis. There, VoltaGrid applied to build a 90-megawatt, 33-engine Jenbacher J620 plant to supply power to an adjacent data center owned by another company. Ex. Q, Ga. EPD Narrative at 1–2. The Georgia Environmental Protection Division ("EPD") initially treated the two as separate sources. *Id.* at 1. After public comment (which was not available in Texas), EPD obtained a copy of the contract between VoltaGrid and the data center owner and reversed course. It determined, based on the contract, that VoltaGrid's power plant functions as a support facility for the data center and that both were under common control. *Id.* at 16; *see id.* at 15. VoltaGrid did not contest that determination. Ex. R, Letter from Korby Bracken, VoltaGrid LLC, to Steve Allison, Ga. Env't Prot. Div., Response to Comments on Draft Air Quality Permit No. 4911-217-0080-S-01-0, at 1 (Aug. 2, 2026).

Because the power plant and diesel generators at each location constitute a single stationary source, potential emissions from both these units must be combined to determine Nonattainment New Source Review applicability for each campus. Combining the diesel and power plant potential to emit values that Defendants certified in authorizations and applications to TCEQ demonstrate each campus is a major source of NOx because each exceeds the 50 TPY threshold. This alone is sufficient to trigger Nonattainment New Source Review. Plaintiffs are therefore likely to prevail on their claims that Defendants' ongoing construction and operation of generating equipment without the required Nonattainment New Source Review preconstruction permits at each location violates the Clean Air Act and the Texas SIP.

[13] *See supra* notes 4–5.

### 2. Each VoltaGrid Power Plant Independently Qualifies as a Major Source of VOC.

VoltaGrid's certified EGU Standard Permit registrations for both campuses also demonstrate the gas-fired power plants alone are major stationary sources. VoltaGrid represents that its Omicron Drive power plant has the potential to emit 46.8 TPY of VOC and 33.4 TPY of formaldehyde, and that its Rogers Road power plant has the potential to emit 35.99 TPY of VOC and 20.15 TPY of formaldehyde. Assuming that VoltaGrid's calculations accurately reflect the plant's "maximum capacity . . . to emit a pollutant under its physical and operational design," VoltaGrid's calculations establish that each power plant's potential to emit VOC exceeds the 50 TPY major source threshold. Ex. J, Am. Powers Decl. ¶¶ 42–44, 67–70 & tbls. 9–11.[14]

While VoltaGrid quantified formaldehyde emissions and reported them separately as a hazardous air pollutant, it did not include formaldehyde emissions in its VOC totals even though formaldehyde is a VOC that must be counted for purposes of major source applicability. 40 C.F.R. §§ 51.100(s), 51.165(a)(1)(xix); 30 Tex. Admin. Code § 101.1(116); Ex. J, Am. Powers Decl. ¶¶ 55–57. By correcting this one error, Defendants' own reported totals establish that the power plants at each campus are major stationary sources of VOC because they exceed the 50 TPY threshold. Thus, Plaintiffs are likely to succeed on the merits whether each campus is treated as a single stationary source or the power plants are treated as separate stationary sources.

VoltaGrid calculated its engines' potential to emit VOC using manufacturer-guaranteed emission rates that expressly exclude formaldehyde. Ex. J, Am. Powers Decl. ¶¶ 58–64. Those emission rates only account for nonmethane, nonethane hydrocarbons, which the vendor clarifies excludes all VOC compounds with fewer than three carbon atoms, except ethylene. Formaldehyde

[14] Plaintiffs allege that Defendants' calculations are incorrect but accept them solely for purposes of this portion of the argument. *See* Ex. J, Am. Powers Decl. ¶¶ 60 n.45, 69–70.

($CH_2O$) only has one carbon atom and is excluded from the emission factor VoltaGrid used to calculate VOC PTE for SAT-1 and SAT-2. *Id.*

**D. Plaintiffs' Members Face a Likely Threat of Irreparable Injury.**

A party seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Plaintiffs "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (cleaned up) (quoting *Humana, Inc. v. Avram A. Jacobson*, *M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986)).

Irreparable harm is "obvious" where "emissions of harmful pollutants damage human health and the environment." *United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522, 528 (D. Ariz. 2021) (finding irreparable harm from sale of products that illegally circumvent diesel engine emissions controls); *see also Sierra Club v. U.S. Dep't of Agric., Rural Utils. Serv.*, 841 F. Supp. 2d 349, 358–59 (D.D.C. 2012) (finding irreparable harm posed by pollution from proposed power plant expansion); *Cmtys. for a Better Env't v. Cenco Ref. Co.*, 179 F. Supp. 2d 1128, 1148 (C.D. Cal. 2001), aff'd, 35 F. App'x 508 (9th Cir. 2002) (finding irreparable harm where applicable New Source Review requirements would lower emissions of air pollutants). "Increased air pollution constitutes irreparable harm, especially where it has a disproportionately detrimental effect on individuals with preexisting health conditions." *State v. U.S. Dep't of Transp.*, No. 2:25-CV-00848-TL, 2026 WL 183584, at *25 (W.D. Wash. Jan. 23, 2026) (citing *Beame v. Friends of the Earth*, 434 U.S. 1310, 1314 (1977)). Consistent with the preventative New Source Review framework, an injunction halting unlawful construction and operation in this case is necessary to protect Plaintiffs' members from irreparable harm. *See Cenco*, 179 F. Supp. 2d at 1148 (issuing a preliminary injunction halting construction or operation of major source without first obtaining major New Source Review permit).

Without injunctive relief, Defendants will continue to emit, and increasingly emit as construction continues, NOx, VOCs, formaldehyde (a toxic VOC), and other harmful pollutants in a serious ozone nonattainment area, subjecting Plaintiffs' members to ongoing health risks throughout the pendency of this case. Plaintiffs' members are among the vulnerable populations that EPA and the scientific literature identify as most vulnerable to adverse health impacts from these pollutants.

Both power plants were operating on October 4, 2026, and their emission plumes were crossing into nearby neighborhoods and toward a hospital. Ex. P, Doty Rep. at 4, 6–7, 12; *see* Ex. D, Am. Abplanalp Decl. ¶¶ 32–36. At Rogers Road, Defendants were operating trailer-mounted engine units with no visible evidence of emissions controls equipment. Ex. J, Am. Powers Decl. ¶¶ 31–35 & figs. 1–6; Ex. P, Doty Rep. at 7. Nothing in VoltaGrid's registrations discloses trailer-mounted engines; they describe a "Permanent" rather than "Temporary" facility and list no trailer-mounted units. Ex. N at 8–9; Ex. O at 8–9, 38. Thus, these are either registered engines, apparently operating without emissions controls, or they are additional engines that were never authorized. Without controls, a J620 emits about 6.48 pounds per hour of NOx, 2.48 of VOC, and 2.10 of formaldehyde. Ex. J, Am. Powers Decl. tbl. 6a. In comparison, VoltaGrid's Rogers Road registration assumes 0.195, 0.156, and 0.10 pounds per hour per engine. Ex. O at 38–39. Each uncontrolled engine therefore emits roughly 33 times the NOx, 16 times the VOC, and 21 times the formaldehyde that VoltaGrid represented.

Dr. Helen Suh, a widely-recognized expert in public health who has served as a charter member of the EPA Clean Air Scientific Advisory Committee (CASAC), which provides independent scientific advice to EPA on NAAQS, and who has served on CASAC panels for $NO_2$, ozone, and particulate matter, opines that Defendants' data center campuses will emit substantial

quantities of NOx, VOCs (formaldehyde), particulate matter, and contribute to formation of ground-level ozone. Ex. I, Am. Suh Decl. ¶¶ 18–19. Based on scientific literature and her expertise in air pollution and its impact on public health, she concludes that Defendants' data centers will increase exposure to these and other harmful air pollutants and associated health risks in surrounding communities. *Id.* ¶ 19. These risks include respiratory and cardiovascular disease, impaired lung development in children, cancer, increased emergency department visits and hospital admissions, and premature death. *Id.* ¶¶ 20, 24. Populations at the greatest risk of harm include children, older adults, and people with asthma, lung and cardiovascular disease. *Id.* ¶ 21. Dr. Suh also explains that the scientific evidence has not identified a threshold level for $NO_2$, the most significant form of NOx, ozone, PM2.5, or formaldehyde below which additional exposure poses no risk. *Id.* ¶ 20.

Because Bexar County is already in serious nonattainment for ozone, Dr. Suh opines that any resulting increase in ozone from Defendants' NOx and VOC emissions would only add to existing ozone-related health risks when reductions are needed to bring the area into attainment with air quality standards. *Id.* ¶ 23. She opines that the health consequences of additional exposures to these pollutants can be "serious and, in some cases, lasting or irreversible." *Id.* ¶ 24. In sum, Defendants' data center campuses will impose additional avoidable health risks on Plaintiffs' members, particularly elderly members, members with existing vulnerabilities and children. Enjoining further construction and operation until Defendants undergo major New Source Review will protect Plaintiffs' members from these risks and help bring air quality closer to attaining the ozone NAAQS. *Id.* ¶¶ 95–96.

**E. The Balance of Harms Weighs in Plaintiffs' Favor.**

The balance of harms weighs strongly in Plaintiffs' favor. *See*, *e.g.*, *In re Commonwealth Oil Ref. Co.,* 805 F.2d 1175, 1190 (5th Cir. 1986) (balance of harms weighs in favor of enforcing

environmental laws). Plaintiffs' members face a substantial risk of irreparable harm from exposure to unlawful pollution over the many months or years needed to resolve this case. They should not be forced to bear those risks in their homes, schools, churches and neighborhoods while Defendants circumvent major New Source Review requirements that may have prevented construction in the first place.

This Court should not credit any self-inflicted hardship Defendants may claim against the health of vulnerable populations that Congress sought to protect. *Cf. Burlington N. R.R. v. Bair*, 957 F.2d 599, 601–02 (8th Cir. 1992) ("Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits." (citation omitted)); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (courts should not "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited."). Nonattainment New Source Review tips the balance in Plaintiffs' favor, requiring that the benefits of constructing a new major source in a nonattainment area "significantly outweigh" its societal costs. 42 U.S.C. § 7503(a)(5). Defendants rushed to start constructing their data center campuses under a strategy designed to avoid major New Source Review. As sophisticated, well-capitalized companies, Defendants knowingly assumed the risks their plan would face.

### F. The Public Interest Strongly Favors an Injunction

Congress established a clear prohibition against constructing major new sources of air pollution in nonattainment areas to ensure public health and welfare are protected. Courts in this circuit and elsewhere recognize that enforcement of the Clean Air Act is in the public's interest, consistent with Congress' design. *Commonwealth Oil*, 805 F.2d at 1190 ("Enforcement of the environmental laws is in the public interest."); *Gear Box Z Inc.*, 526 F. Supp. 3d at 529 ("Congress

enacted the CAA to combat air pollution, which itself is a declaration of public policy"); *see also Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, No. 2:17-cv-00032-RJS-DBP, 2020 WL 4282148, at *27 (D. Utah Mar. 6, 2020), aff'd in part and remanded on other grounds, 21 F.4th 1229 (10th Cir. 2021) (concluding that "the public interest is served by permanently enjoining Defendants from further CAA violations because the CAA serves the public interest").

Congress determined that air pollution poses "mounting dangers to the public health and welfare," 42 U.S.C. § 7401(a)(2), and enacted New Source Review to "protect public health and welfare" and to preserve air quality notwithstanding economic growth. *Id.* § 7470(1), (3). Congress therefore required major sources to undergo rigorous evaluation *before beginning construction*, not merely remedy it after the fact. *Id.* §§ 7475(a), 7503(a).

This framework matters because Nonattainment New Source Review permitting shapes a source's emissions for decades to come. For nonattainment pollutants, Congress imposed the strictest framework, reflecting its presumption that new major sources should not be built where the air quality is already insufficiently protective of human health. *Id.* § 7503(a)(5). When new sources circumvent major New Source Review, people like Plaintiffs' members who live, work, recreate, and whose children attend school nearby are stripped of fundamental health-based protections afforded by law. Should this Court determine the Defendants, or even just VoltaGrid, are constructing major new sources of ozone-forming pollutants in an ozone nonattainment area, outside the major New Source Review framework, Plaintiffs respectfully urge that preliminary relief must follow to bring the ongoing harm to a halt.

**G. Waiver of Injunction Bond is Appropriate**

The amount of security required pursuant to Rule 65(c) is a matter for the Court's discretion. *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978). The Court "may elect to require no security at all." *Id.* Numerous courts have waived injunction bonds

in environmental enforcement cases, *see*, *e.g.*, *Wis. Heritages, Inc. v. Harris*, 476 F. Supp. 300, 302 (E.D. Wis. 1979) (collecting cases), or set nominal bond amounts in public interest litigation. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2954 (3d ed. 2026). Once the requirements for a preliminary injunction are cleared, imposing a substantial injunction bond would only deter congressionally authorized and meritorious claims to protect public health. This Court should exercise its discretion to waive security.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that the Court enter a preliminary injunction prohibiting Defendants from constructing, commissioning, or operating the power plants at the Omicron and Rogers Road campuses pending adjudication on the merits. Alternatively, should the Court permit continued operation during the pendency of this action, Plaintiffs request an order requiring VoltaGrid to operate only engines equipped with continuously functioning SCR and oxidation-catalyst controls and prohibiting operation of any non-compliant engine. Plaintiffs further request an order limiting Vantage's diesel generators at both campuses to emergency operation and required testing only and prohibiting their use to replace electrical generation from any VoltaGrid plant enjoined by the Court.

Dated: November 2, 2026

Respectfully submitted,

/s/ *Kenneth J. Rumelt*

Gabriel Clark-Leach (TX Bar No. 24069516)
Environmental Integrity Project
98 San Jacinto Blvd., Suite 400
Austin, Texas 78701
gclark-leach@environmentalintegrity.org
Phone: 202-263-4440

Kenneth J. Rumelt (VT Bar No. 4801)*
Environmental Integrity Project
888 17th St., NW, Suite 810
Washington, D.C. 20006
krumelt@environmentalintegrity.org
Phone: 202-888-2707

*Attorneys for Plaintiffs*

* Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on November 2, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

/s/ *Kenneth J. Rumelt*
Kenneth J. Rumelt