**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

PUBLIC CITIZEN and
SIERRA CLUB,

*Plaintiffs,*

v.

VANTAGE DATA CENTERS
MANAGEMENT COMPANY, LLC,
VANTAGE DATA CENTERS TX11, LLC,
VANTAGE DATA CENTERS TX21, LLC,
and VOLTAGRID LLC,

*Defendants.*

No. 5:26-cv-06032-JKP-ESC

**VANTAGE'S RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

BACKGROUND ..... 4

A. Statutory and Regulatory Background ..... 4

B. Factual Background ..... 5

a. Vantage develops the Omicron and Rogers properties and secures TCEQ authorization for backup power. ..... 5

b. CPS delays grid power, prompting Vantage to turn to VoltaGrid. ..... 5

c. Vantage and VoltaGrid separately secure TCEQ authorizations. ..... 6

d. The separately authorized facilities begin operations. ..... 6

LEGAL STANDARD ..... 7

ARGUMENT ..... 7

I. Plaintiffs have not demonstrated a substantial threat of irreparable injury. ..... 8

A. Plaintiffs' evidence does not establish irreparable harm to their members. ..... 8

1. Plaintiffs must show irreparable harm to their members, not merely an incremental increase in emissions. ..... 8

2. Plaintiffs' expert declaration does not identify likely harm to any Plaintiff member. ..... 9

3. Plaintiffs' members express only subjective fears, and do not show likely irreparable harm. ..... 11

B. Expert air-quality impact analysis confirms that the permitted facilities' contributions of the pollutants at issue will not cause irreparable harm. ..... 12

C. Plaintiffs' delay defeats their claim of irreparable harm. ..... 14

II. Plaintiffs have shown no likelihood of success on the merits. ..... 16

A. Vantage's data centers and VoltaGrid's generating facilities are separate stationary sources. ..... 16

1. Vantage's and VoltaGrid's operations are not part of the same industrial grouping. ..... 17

2. Vantage's and VoltaGrid's facilities are not subject to common control. ..... 18

a. Neither VoltaGrid nor Vantage has power to dictate the other's permitting and compliance decisions. ..... 18

b. VoltaGrid's standard permits do not establish common control. ..... 20

c. VoltaGrid's experience with different facilities in another state does not establish common control. .................................... 22

B. Plaintiffs' claims fail at the threshold. ................................................................ 22

III. The remaining factors weigh against a preliminary injunction. ...................................... 23

A. Vantage's concrete harms far outweigh Plaintiffs' members' speculative and generalized concerns. ........................................................................ 23

B. An injunction would disserve the general public's interest. ................................ 26

IV. Any injunction must be conditioned on Plaintiffs posting an adequate bond.................. 28

# GLOSSARY

| | |
|---|---|
| **CAA** | Clean Air Act |
| **CO** | Carbon monoxide |
| **EPA** | Environmental Protection Agency |
| **NAAQS** | National Ambient Air Quality Standards |
| **NOx** | Nitrogen Oxides, including nitrogen dioxide ($NO_2$) and nitric oxide (NO) |
| **Omicron** | Vantage data center facilities at 14720 Omicron Drive, referred to in permit documents as "TX1" |
| **$PM_{2.5}$** | Fine particulate matter |
| **Rogers** | Vantage data center facilities at 5207 Rogers Road, referred to in permit documents as "TX2" |
| **SIL** | Significant Impact Level |
| **SIPs** | State Implementation Plans |
| **TCEQ** | Texas Commission on Environmental Quality |
| **TX11** | First data center building at Omicron, which has operated on VoltaGrid power since October 2025 |
| **TX12** | Second data center building at Omicron, which is currently under construction and will be powered by VoltaGrid |
| **TX21** | First data center building at Rogers, which is currently in operation and powered by a combination of CPS bridge power and temporary VoltaGrid power |
| **TX22** | Second data center building at Rogers, which is currently under construction and will be powered by VoltaGrid |
| **Vantage** | Vantage Data Centers Management Company, LLC, Vantage Data Centers TX11, LLC, and Vantage Data Centers TX21, LLC |
| **VOCs** | Volatile Organic Compounds |
| **VoltaGrid Omicron Generating Facility** | VoltaGrid power generation facility located at 14720 Omicron Drive, referred to in permit documents as "SAT-1" |
| **VoltaGrid Rogers Generating Facility** | VoltaGrid power generation facility located at 5207 Rogers Road, referred to in permit documents as "SAT-2" |

## INTRODUCTION

Texas has an established process that regulates whether and how data center facilities can be built. Vantage followed that process. It disclosed its facilities to the regulator, obtained the authorizations the regulator required, and then invested years of work and billions of dollars in reliance on those authorizations.

Nevertheless, before any merits adjudication, Plaintiffs ask this Court to immediately enjoin the construction or operation of facilities required to continue powering two operating data centers. That outcome exposes Vantage to tens of millions of dollars in potential customer claims, risks damage to over [redacted] worth of equipment, puts over 1,000 people out of work, and chokes off millions in state and local tax revenue. To Vantage's knowledge, no court has ever granted such relief in a Clean Air Act ("CAA") citizen suit. Plaintiffs' quarrel is with the *regulator's* permitting process, yet the relief they seek would punish *Vantage* for following it. Having complied with the established process, Vantage should not now face the inequitable and unprecedented result of having its operations shut down or impeded on a summary record.

* * *

Vantage develops and operates data center campuses. Ex. 1, Harvey Decl. ¶ 4. Much like a commercial landlord, Vantage builds, owns, and operates the physical buildings and supporting infrastructure, and leases that space to a customer, which installs and runs its own computing equipment inside. *Id.* VoltaGrid is a separate, unaffiliated company that provides power and infrastructure services. *Id.* ¶ 5.

This case concerns two locations in San Antonio: one at Omicron Drive and the other at Rogers Road. At each location, there are two Vantage data center buildings, one operating and one under construction. One VoltaGrid power generation facility at each location serves or will serve as the buildings' primary power source, and Vantage equips each building with backup generators.




Vantage disclosed its proposed backup generators and their maximum potential emissions to the Texas Commission on Environmental Quality ("TCEQ") and obtained the authorizations TCEQ requires. VoltaGrid independently obtained its own TCEQ authorizations.

Plaintiffs' action is an after-the-fact attack on TCEQ's permitting process and decisions. Plaintiffs ask this Court to preliminarily enjoin "Defendants from constructing, commissioning, or operating the power plants at the Omicron and Rogers Road campuses."[1] Dkt. 35 at 28.[2] To justify the "extraordinary and drastic remedy" of a preliminary injunction, Plaintiffs must *clearly* carry their burden on every factor. *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (citation omitted). Even after amending their motion, Plaintiffs still fall far short of meeting that standard.

---

[1] Elsewhere, Plaintiffs frame their request more broadly, asserting that Defendants should generally be enjoined from further construction and operation. Dkt. 35 at 7, 25; Dkt. 1 at 50. Under either formulation of the requested relief, Plaintiffs fail to carry their burden.

[2] For docket entries, Vantage cites to the page numbers shown in the ECF header.

*First*, Plaintiffs cannot show a substantial threat of irreparable injury. They rely on an overbroad presumption of irreparable harm from any incremental increase in emissions. Courts, however, "must carefully distinguish between injury to the [plaintiff] and injury to the environment," *Ctr. for Biological Diversity v. U.S. Dep't of Transp.*, 180 F.4th 796, 803 (5th Cir. 2026) (citation omitted), and "may not presume irreparable harm" from alleged environmental-law violations, *W. Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 178 F.4th 102, 116 (4th Cir. 2026). The facts here show why: expert air-quality impact analysis confirms that, even if the Court were to combine emissions from Defendants' separately permitted facilities, there is no likelihood of irreparable harm to Plaintiffs' members. The impact of those emissions falls well below levels the Environmental Protection Agency ("EPA") or TCEQ considers meaningful. And Plaintiffs' yearslong delay in seeking relief further confirms that they face no urgent harm.

*Second*, Plaintiffs are not likely to succeed on the merits. As to Vantage, Plaintiffs' motion rests on a single merits theory: Vantage's backup generators and VoltaGrid's generating facilities are alleged to be a single, aggregated emissions source. They are not for two independent reasons. First, Vantage's and VoltaGrid's facilities do not belong to the same industrial grouping under federal standards. Second, under EPA's "Meadowbrook" guidance on source aggregation, which Plaintiffs themselves cite, Dkt. 35 at 5 n.6, Vantage's and VoltaGrid's emissions units are not under common control. The two companies are independent, and their agreements make them independently responsible for maintaining compliance for their own units. Moreover, Plaintiffs' suit independently fails on threshold grounds. *See* Dkt. 41, Mot. to Dismiss.

*Third*, the balance of harms and public interest weigh decisively against an injunction. Any marginal increment added to the existing regional ozone burden—an increment still *below* EPA's own significance thresholds—is dwarfed by the harm that shutting down or impeding ongoing

operations would inflict on Vantage, its customer, and the many people and businesses that rely on Vantage's facilities. Those harms would cascade: damaged equipment, stranded capital, contractual exposure, a potential default, and lasting damage to Vantage's reputation. An injunction would also override TCEQ's permitting process, telling every developer that complying with TCEQ's permitting process offers no protection against an after-the-fact shutdown.

## BACKGROUND

### A. Statutory and Regulatory Background

Under the CAA, EPA establishes national ambient air quality standards ("NAAQS"). *See* 42 U.S.C. §§ 7408–7409. Subject to EPA review and approval, states adopt state implementation plans ("SIPs") to implement, maintain, and enforce the NAAQS. *See id.* § 7410; *see also Ohio v. EPA*, 603 U.S. 279, 283 (2024). EPA-approved SIPs take on "the force and effect of federal law." *Sierra Club v. La. Dep't of Env't Quality* ("*LDEQ*"), 100 F.4th 555, 564 (5th Cir. 2024).

SIPs must include preconstruction permitting requirements for new or modified "major" stationary sources that meet emissions thresholds for certain pollutants. *See* 42 U.S.C. §§ 7410(a)(2)(C), 7475, 7503; 40 C.F.R. §§ 51.165-.166. Those requirements' stringency depends on whether the area meets the NAAQS; if it does not, the CAA's Nonattainment New Source Review provisions apply. *See* 42 U.S.C. §§ 7501-7515. States may also require permits for minor sources that fall below the major New Source Review thresholds. *See id.* § 7410(a)(2)(C).

Texas's EPA-approved SIP regulations are set forth in 40 C.F.R. § 52.2270. TCEQ administers Texas's SIP and ensures Texas's compliance with the NAAQS. *See* Tex. Health & Safety Code Ann. § 382.011.

### B. Factual Background

#### a. Vantage develops the Omicron and Rogers properties and secures TCEQ authorization for backup power.

1. In 2023, Vantage bought the properties at Omicron Drive and Rogers Road. *See* Exs. 2–3; *see also* Ex. 1, Harvey Decl. ¶ 6. Before construction, Vantage reached a tentative agreement with San Antonio's public electric utility, CPS Energy, for the planned data centers' power needs. *See* Ex. 4 at 1; Ex. 5 at 1; Dkt. 1-8 at 4–5; Ex. 1, Harvey Decl. ¶ 7. Vantage had begun construction at both sites by December 2023. Dkt. 1-2 at 6, 16, 18; Dkt. 1 ¶¶ 166–67; Ex. 6, Davis Decl. ¶ 4.

2. Because data centers require uninterrupted power, Ex. 1, Harvey Decl. ¶ 8, Vantage in February 2024 submitted Permit by Rule registrations to TCEQ to install and operate diesel backup generators. *See* Dkts. 1-4, 1-5; *see also* Tex. Health & Safety Code Ann. § 382.05196; 30 Tex. Admin. Code ("T.A.C.") §§ 106.1–.50, .511. TCEQ acknowledged the permits' emissions certifications[3] on February 29, 2024. *See* Exs. 7–8; *see also* Ex. 1, Harvey Decl. ¶ 9.

#### b. CPS delays grid power, prompting Vantage to turn to VoltaGrid.

3. After Vantage had begun construction, CPS informed Vantage that full-scale grid power could be delayed until 2032 for Rogers and 2035 for Omicron. Ex. 1, Harvey Decl. ¶ 10. The delay compelled Vantage to search for an alternative power solution. *Id.* ¶ 11. Vantage found that solution in VoltaGrid, which could construct generating facilities years before grid power would become available under CPS's new timeline. *Id.* ¶ 11.

4. Vantage thus entered into arm's length agreements with VoltaGrid to supply power to Omicron and Rogers. *See id.* ¶ 21; Exs. 9–10; Ex. 44. Under those agreements, VoltaGrid—and

---

[3] While 30 T.A.C. § 106.511 does not require registration, Vantage registered its generators to establish federally enforceable emissions limits below New Source Review thresholds. *See* Dkt. 1-7 at 4, 12, 14; Dkt. 1-8 at 4, 13, 15; *see also* 30 T.A.C. § 106.6.

VoltaGrid alone—is responsible for maintaining air permits for its generating facilities. Ex. 9 (PGA Ex. C §§ 3.1–3.2); Ex. 10 (same); Ex. 1, Harvey Decl. ¶ 18.

**c. Vantage and VoltaGrid separately secure TCEQ authorizations.**

5. VoltaGrid obtained TCEQ authorization to construct and operate the Omicron Generating Facility in October 2024. Ex. 11.[4] As VoltaGrid's preliminary-injunction opposition explains, VoltaGrid met with TCEQ staff for a pre-application consultation, during which TCEQ determined that VoltaGrid's generating facility was a separate source from Vantage's existing data center and should therefore be permitted separately. *See generally* VoltaGrid Response to Amended Motion for Preliminary Injunction.

6. In March and June 2025, Vantage submitted revised Permit by Rule registrations to increase the number of permitted backup generators at both Rogers and Omicron. Dkt. 1-7; Dkt. 1-8. TCEQ acknowledged the emissions certifications in the revised Omicron Permit by Rule in May 2025, Ex. 12, and in the revised Rogers Permit by Rule in July 2025, Ex. 13.

7. In November 2025, VoltaGrid obtained TCEQ authorization to construct and operate the Rogers Generating Facility. Ex. 14.

8. In July 2026, VoltaGrid obtained TCEQ authorization of an amended permit registration for the Omicron Generating Facility. Ex. 15. In October 2026, VoltaGrid submitted clarifications to the TCEQ record regarding its formaldehyde emissions. *See* Dkt. 35-10 ¶ 65.

**d. The separately authorized facilities begin operations.**

9. Vantage's first data center building at Omicron (TX11) has operated on approximately 50 MW of power from VoltaGrid's Omicron Generating Facility since October 2025. Ex. 6, Davis

[4] Public records are authenticated in the Declaration of Liane Noble. Ex. 46.

Decl. ¶ 2. Vantage's second data center building at Omicron (TX12) remains under construction, using minimal temporary power for construction and commissioning. *Id.* ¶ 4.

10. Vantage's first data center building at Rogers (TX21) operates with CPS bridge power capable of supporting approximately 24 MW of IT load—a partial, stopgap supply—and additional power from temporary trailer-mounted engines operated by VoltaGrid.[5] *Id.* ¶ 3. Vantage's second data center building at Rogers (TX22) remains under construction, using minimal temporary power for construction and commissioning. *Id.* VoltaGrid's Rogers Generating Facility remains under construction and is not yet operating. *Id.*

## LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Anibowei*, 70 F.4th at 902 (citation omitted). The movant must clearly show: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, *and* (4) that granting the preliminary injunction will not disserve the public interest. *Id.* at 902, 905.

## ARGUMENT

Plaintiffs are not entitled to a preliminary injunction in any form, much less the novel

---

[5] VoltaGrid's temporary trailer-mounted engines are owned and operated by VoltaGrid and are distinct from the TCEQ-permitted "power plants" Plaintiffs seek to enjoin. Dkt. 35 at 28. VoltaGrid alone is responsible for those units' compliance. *See* 42 U.S.C. §§ 7411(a)(3), 7602(z) (distinguishing nonroad engines from stationary sources); 40 C.F.R. §§ 1048.1(a), (c), 1068.1(a)(10), 1068.30 (governing nonroad engines). VoltaGrid's operation of those units thus provides no basis for granting Plaintiffs' preliminary-injunction request against Vantage. *See, e.g.*, *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) ("[T]he movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin.").

preliminary relief of shuttering operating facilities,[6] because they have not met their burden on any of the preliminary-injunction factors.

## I. Plaintiffs have not demonstrated a substantial threat of irreparable injury.

"A movant cannot be granted a preliminary injunction unless it can establish that it will suffer irreparable harm without an injunction." *Tesoro Refining & Mktg. Co. v. AK Inc*., No. 5:25-cv-1787, 2026 WL 173234, at *2 (W.D. Tex. Jan. 22, 2026) (Pulliam, J.). Plaintiffs cannot carry that burden for three reasons. First, Plaintiffs rely on a premise that courts have squarely rejected—that any incremental increase in emissions is presumptively irreparable. Second, although Vantage need not disprove harm, expert analysis shows that the air-quality impact of Defendants' relevant emissions falls below levels either EPA or TCEQ considers meaningful. Third, Plaintiffs' yearslong delay in seeking relief defeats any claim of irreparable harm.

### A. Plaintiffs' evidence does not establish irreparable harm to their members.

On irreparable harm, Plaintiffs primarily rely on (1) a generalized literature review, and (2) member declarations expressing subjective fears. *See* Dkt. 35 at 23–25; Dkt. 35-9; Dkt. 35-10. This fails to show any injury, much less an irreparable one. *Ortega v. TriSmart Solar, LLC*, No. 5:25-cv-865, 2026 WL 1954919, at *2 (W.D. Tex. May 19, 2026) (Pulliam, J.).

#### 1. <u>Plaintiffs must show irreparable harm to their members, not merely an incremental increase in emissions.</u>

Plaintiffs suggest that "[i]ncreased air pollution" necessarily "constitutes irreparable harm." Dkt. 35 at 23 (quoting *State v. U.S. Dep't of Transp.*, No. 2:25-cv-848, 2026 WL 183584, at *25 (W.D. Wash. Jan. 23, 2026)). That does not suffice under established law. Rather, "courts

---

[6] *Communities for a Better Environment v. Cenco Refining Co.*, 179 F. Supp. 2d 1128 (C.D. Cal. 2001), *aff'd*, 35 F. App'x 508 (9th Cir. 2002), blocked the restart of a refinery idle for six years; it did not shut down an operating facility. *Id.* at 1132–37, 1142–48.

must carefully distinguish between injury to the petitioner and injury to the environment." *Ctr. for Biological Diversity*, 180 F.4th at 803 (citation omitted). Any harm must be to the specific movant (or its members), not the general public. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Chemours*, 178 F.4th at 114. Moreover, courts "may not presume irreparable harm" solely from an alleged environmental violation. *Chemours*, 178 F.4th at 115–16. Plaintiffs thus cannot carry their burden by showing that pollution can harm people generally. They must show that *these* emissions will likely harm *these* members absent a preliminary injunction.[7] *See Anibowei*, 70 F.4th at 902; *see also Ctr. for Biological Diversity*, 180 F.4th at 803–06.

2. <u>Plaintiffs' expert declaration does not identify likely harm to any Plaintiff member.</u>

Plaintiffs rely on Dr. Helen Suh's literature review of the general health effects of pollutants.[8] *See* Dkt. 35-9. Dr. Suh does not (1) model concentrations of pollutants where any of Plaintiffs' members live or gather; (2) calculate any individual's exposure; (3) perform any site-specific risk assessment; or (4) account for background levels or other sources of pollutants in the

---

[7] Plaintiffs' out-of-circuit precedents are inapposite. *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1313–14 (1977) (carbon monoxide "over five times the federal health standards" (citation omitted)); *U.S. Dep't of Transp.*, 2026 WL 183584, at *1, *25 (related to nationwide program, not emissions from particular facilities); *United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522, 528 (D. Ariz. 2021) (EPA enforcement action where defendant did not contest environmental harm); *Sierra Club v. USDA*, 841 F. Supp. 2d 349, 358–59 (D.D.C. 2012) (post-merits remedial decision based on unrebutted "specific, detailed estimates" of emissions and harms). *Compare Cenco*, 179 F. Supp. 2d at 1148 (granting a preliminary injunction without "a showing that environmental harm is immediate"), *with Anibowei*, 70 F.4th at 902 (threatened injury must be "likely" and "imminent" (citation modified)).

[8] Like Dr. Suh, Plaintiffs' declarant Bill Powers does not measure, model, or predict the emissions Plaintiffs' members will actually experience. Instead, he merely calculates an alternative "potential to emit" for Defendants' sources by ***ignoring*** any permit operating or control limits that he personally deems not federally enforceable. Dkt. 35-10 ¶¶ 16, 22, 26–29, 36, 45, 47–54, 69–71. Potential-to-emit is a theoretical, worst-case screening metric for regulatory permitting purposes, not evidence of actual emissions or irreparable harm. *See id.* ¶ 45.

area. Instead, Dr. Suh asserts that several of Plaintiffs' members "live and spend time near" the data centers, from which she concludes that they "will be exposed." *Id.* ¶ 83. Dr. Suh never attempts to show that *these* emissions will *likely* harm these members, or that an injunction is necessary to prevent imminent, irreparable harm. And proximity to the data centers cannot fill that gap. *See Ctr. for Biological Diversity*, 180 F.4th at 805–06 (individual residing near project lacked Article III injury where he identified "no Project-specific emission" and did not "explain how the Project is likely to worsen his pulmonary condition").

As *Chemours* demonstrates, neither Dr. Suh's premise that no exposure is "without health risk," Dkt. 35-9 ¶¶ 20, 83, 92, nor Bexar County's ozone nonattainment designation, Dkt. 35 at 25, establishes irreparable harm. In *Chemours*, the Fourth Circuit vacated a preliminary injunction for failure to establish irreparable harm where, as here, the plaintiff's expert asserted only that incremental emissions, leading to potential incremental increased exposure, would "increase[] the risk" of harm by "some uncertain amount." 178 F.4th at 117. "As a matter of law," that risk was not "irreparable harm" because it "made harm likelier, not more likely than not." *Id.* And the expert "couldn't opine on the harm [the specific plaintiff] would suffer." *Id.* at 118–19. Dr. Suh's opinions share that defect: she says only that the declarants face "increased risk," Dkt. 35-9 ¶ 83, and never attempts to show that any individual will more likely than not be harmed by Defendants' emissions. *Cf. infra* Argument § I.B (Defense expert's site-specific impact analysis).

Plaintiffs' equation of potential exposure with irreparable harm also conflicts with the CAA's basic structure. Congress directed EPA to set the NAAQS at levels "requisite to protect the public health" with "an adequate margin of safety," 42 U.S.C. § 7409(b)(1)—not at "zero-risk" levels, as Dr. Suh acknowledges, Dkt. 35-9 ¶¶ 55–56 (citation omitted). Where an area exceeds the NAAQS, the CAA responds through state planning and permitting, not by deeming every new

incremental emission an irreparable injury, regardless of the emissions' amount or significance. *See* 42 U.S.C. §§ 7502–7503. If unquantified potential pollutant exposures sufficed for irreparable harm, *any* plaintiff near *any* emissions source could show irreparable harm, and preliminary injunctions would become the norm rather than an "extraordinary remedy." *Winter*, 555 U.S. at 24. That application of the CAA would not only be impractical and devastating for economic development, but it would also be unprecedented and plainly incorrect.

Plaintiffs' new optical-gas-imaging evidence (Dkt. 35 at 17–18; Dkt. 35-16)—not featured in their original motion (Dkt. 6)—adds nothing to their irreparable-harm arguments. While eye catching, the images and videos merely confirm that VoltaGrid facilities are operating and thus have emissions. *See* Dkt. 35 at 17–18, 24. That is noncontroversial. Plaintiffs' own expert concedes that "optical gas imaging does not quantify concentrations of individual pollutants or establish the exposures experienced by nearby residents." Dkt. 35-9 ¶ 91; *accord* 40 C.F.R. pt. 60, app. K § 1.3 (optical-gas-imaging protocol "help[s] determine the presence and location of leaks and is not currently applicable for use in direct emission rate measurements"). The only evidence regarding emission impacts is the testimony of Defendants' expert that the separately permitted facilities at each location have no meaningful effect on regional air quality. *See infra* Argument § I.B.

3. Plaintiffs' members express only subjective fears, and do not show likely irreparable harm.

Plaintiffs' member declarations do not close the gap. The members express fears about what Defendants' emissions *could* do, but none offers evidence that those emissions *will likely* harm them before final judgment. *See* Dkt. 35-4 ¶ 24 ("concerned" about "breath[ing] in something harmful"); *accord* Dkt. 35-2 ¶ 14; Dkt. 35-3 ¶¶ 24–25; Dkt. 35-5 ¶ 11; Dkt. 35-7 ¶ 15. Such speculative fears do not establish irreparable harm. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

Several declarations acknowledge causes of health conditions other than Defendants' emissions. *See* Dkt. 35-5 ¶¶ 3, 7 (began suffering from allergies at least "five years" ago, before Defendants' construction began); Dkt. 35-6 ¶ 10 (toxic exposure during prior military service); Dkt. 35-7 ¶ 7 ("fires in Mexico"); Dkt. 35-8 ¶ 10 (blaming symptoms on general "air pollution and the environmental quality in San Antonio"). Plaintiffs offer no way to isolate what, if anything, Defendants' facilities add. They have not clearly shown that any member is likely to suffer imminent, irreparable harm. *See Anibowei*, 70 F.4th at 902.

**B. Expert air-quality impact analysis confirms that the permitted facilities' contributions of the pollutants at issue will not cause irreparable harm.**

While Vantage does not need to disprove irreparable harm, site-specific expert evidence confirms that it is not present here. Plaintiffs describe VOCs and NOx as "[t]he pollutants at issue in [their] Motion." Dkt. 35 at 7. But Plaintiffs provide no modeling or competent evidence of the air-quality impact of VOCs and NOx emissions from the particular facilities at issue here. Defendants' expert witness, Dr. Roberto Gasparini, *did* conduct a highly conservative analysis of whether the *combined* emissions of the permitted facilities (which should *not* be combined for permitting purposes) would have a meaningful effect on regional air quality. *See* Ex. 16, Gasparini Decl. ¶¶ 26–49. His conclusion—the only competent evidence in the record on this question—is that they do not. *Id.* ¶¶ 48–49.

For NOx and VOCs—which are precursors to the creation of ground-level ozone—Dr. Gasparini used EPA's Modeled Emission Rates for Precursors ("MERP") guidance to assess the potential impact of Defendants' permitted facilities on regional ozone formation. *See id.* ¶¶ 26–28; *see also* Ex. 17. Dr. Gasparini concluded that the combined emissions from Defendants' permitted facilities would result in an increase in regional ozone concentrations well below the EPA-established significant impact level ("SIL") for ozone of 1 part per billion. Ex. 16, Gasparini

Decl. ¶¶ 29–40. EPA explains that changes in ambient concentrations below a SIL are "indistinguishable from the inherent variability in the measured atmosphere and may be observed even in the absence of the increased emissions from a new or modified source"; therefore, they "are not meaningful." Ex. 18 at 11; *accord* Ex. 16, Gasparini Decl. ¶ 33 ("SILs … represent[] a statistically insignificant change in air quality."); *LDEQ*, 100 F.4th at 565 (similar); *see also United States v. EES Coke Battery, LLC*, No. 22-11191, 2025 WL 2623431, at *4 (E.D. Mich. Sept. 11, 2025) ("[T]estimony [regarding SILs] is relevant to assessing … the potential harm to human health and the environment resulting from [the defendant's] emissions.").

Dr. Gasparini's analysis is highly conservative. His ozone impacts analysis considers not only the individual emissions of Defendants' facilities, but also their combined emissions, even though those emissions are authorized under four separate permits. Ex. 16, Gasparini Decl. ¶¶ 32–40. He also assumed that all permitted facilities are currently operating (which they are not) and will emit the maximum amounts of VOCs and NOx authorized under their permits. *Id.*; *see also id.* ¶¶ 29–31 (discussing other conservative assumptions). Even with his conservative assumptions, Dr. Gasparini concluded that the air-quality impact of the "pollutants at issue in [Plaintiffs'] Motion," Dkt. 35 at 7, is insignificant. *See* Ex. 16, Gasparini Decl. ¶¶ 48–49.

Dr. Gasparini also performed a highly conservative site-specific air dispersion analysis (in accordance with EPA and TCEQ guidelines) of Defendants' combined formaldehyde emissions at Omicron and Rogers to evaluate each location's potential impact on human health. *See* Ex. 16, Gasparini Decl. ¶¶ 41–47. He concluded that, even if Vantage's and VoltaGrid's permitted emissions units at each location were combined (which they should not be) and were assumed to operate continuously all year at full load (which they do not), the maximum modeled formaldehyde impacts at Omicron and at Rogers would be "approvable under TCEQ air permitting guidelines."

*Id.* ¶¶ 42, 47. Those guidelines "consider[] many factors to determine whether there is the potential for risk to human health or welfare." Ex. 45 at 1; *see also* Ex. 19 at 11 (discussing TCEQ's effects screening levels). Accordingly, as measured against TCEQ's guidance, the impacts of Defendants' worst-case formaldehyde emissions would not warrant further regulatory scrutiny, much less implicate any health concerns for even Vantage's next door neighbors.

These expert findings are fatal to Plaintiffs' efforts to establish irreparable harm. A change in air quality that cannot be distinguished from natural variation or a change that would be approvable by TCEQ without further inquiry under unrealistically conservative assumptions cannot be shown to pose a substantial threat of irreparable injury to any of Plaintiffs' members, nor can it outweigh the harm of shutting down or impeding ongoing operation of two data centers. *See infra* Argument § III.

**C. Plaintiffs' delay defeats their claim of irreparable harm.**

Plaintiffs' yearslong delay in seeking relief defeats their claim of irreparable injury. "Undue delay in seeking a preliminary injunction tends to negate the contention that the feared harm will truly be irreparable" and indicates a lack of "urgency to the request for injunctive relief." *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-cv-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017) (citations omitted). Courts in this Circuit have denied preliminary relief based on delays far shorter than Plaintiffs' delay here. *See Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (three-month delay); *Embarcadero*, 2017 WL 5588190, at *3–5 (delays of five to ten months); *BeatStars, Inc. v. Space Ape Ltd.*, 624 F. Supp. 3d 681, 689 (W.D. Tex. 2022) (nine-month delay).

At least two of Plaintiffs' declarants admit they knew about these projects two years ago. One "noticed construction at the Rogers Road site in approximately late 2024" and "had heard they were building a data center when construction started in 2024." Dkt. 35-4 ¶ 12. Another "first

noticed construction at the Omicron data center a little over two years ago." Dkt. 35-6 ¶ 8. Plaintiffs also monitor TCEQ permitting and have alerted members to data center impacts "[o]ver the past two years." Dkt. 35-13 ¶¶ 5, 7; Dkt. 35-11 ¶ 7; *see also* Ex. 20.

The Omicron and Rogers projects have been public for years. Construction proceeded in public view and was reported as early as December 2023. *See, e.g.*, Exs. 21–22. Vantage announced the "partnership" with VoltaGrid on which Plaintiffs' motion relies in February 2025. Dkt. 35 at 8 n.3; Ex. 23. Indeed, a website maintained by Plaintiffs' counsel (the Environmental Integrity Project) includes information regarding VoltaGrid's permits, with "Status Last Checked" dates of November 12, 2025, for the Rogers Generating Facility and January 9, 2026, for the Omicron Generating Facility, indicating awareness of the facilities by at least those dates.[9] *See* Exs. 24–25. In January and March 2026, Vantage published in the local newspaper notice of its draft federal operating permits for its Omicron and Rogers facilities.[10] Exs. 26A–B. Plaintiffs' own counsel requested public meetings on those permits in February and April 2026. Exs. 27A-B.

Plaintiffs, however, waited until July 22, 2026, to send their notice of intent to sue under 42 U.S.C. § 7604(b)(1)—roughly 31 months after construction began, 17 months after the "partnership" announcement, and more than five months after their first federal-operating-permit meeting request. *See* Dkt. 1-2. Further, Plaintiffs waited until September 21, 2026, to file suit and move for a preliminary injunction.

Plaintiffs offer no explanation for the delay. As they acknowledge, no pre-suit notice was even required for "the 42 U.S.C. § 7604(a)(3) claims at issue in th[eir] Motion." Dkt. 35 at 19 n.9;

---

[9] Permitting records have been available to Plaintiffs through the TCEQ Records Online database and TCEQ's Central Registry from the date the permits were obtained by Defendants.

[10] A federal operating permit is distinct from the preconstruction permits at issue here and may be obtained after operations commence. *See* 42 U.S.C. §§ 7661–7661f; 40 C.F.R. § 60.2967.

*see also* 42 U.S.C. § 7604(b)(1). Yet Plaintiffs waited while construction proceeded and both Omicron and Rogers began operations. Even after suing, Plaintiffs further delayed a preliminary-injunction decision by amending their motion six weeks later. *See* Dkt. 35. Having stood by for months or years while the status quo at Omicron and Rogers took shape, Plaintiffs cannot now claim irreparable harm absent a preliminary injunction.

## II. Plaintiffs have shown no likelihood of success on the merits.

Plaintiffs also cannot show a substantial likelihood of success on the merits because (1) Defendants' facilities at each location are not a single "major stationary source," and (2) as explained in Defendants' Motion to Dismiss (Dkt. 41), Plaintiffs' claims fail at the threshold.

### A. Vantage's data centers and VoltaGrid's generating facilities are separate stationary sources.

Plaintiffs' claims primarily rely on the incorrect premise that Defendants' facilities at each location are a single "major stationary source" that required a major New Source Review permit before construction, rather than the separate minor sources TCEQ permitted. *See* Dkt. 35 at 19–21. Under the CAA, separate facilities count as a single "stationary source" only if they "belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control)." 40 C.F.R. § 51.165(a)(1)(i)–(ii)(A); *accord* 30 T.A.C. § 116.12(6), (37). TCEQ applied that test and determined that Defendants' facilities are separate sources. *See supra* Factual Background ¶ 5.

Therefore, Plaintiffs must overcome TCEQ's separate-source determination. *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 480–81 (6th Cir. 2004) (explaining that whether facilities are "a single 'major stationary source'" is "an issue committed by the Clean Air Act to state resolution" (citation omitted)); Ex. 30 at 6 ("[S]tates … retain the discretion to determine whether specific entities are under common control."). Because Vantage's and VoltaGrid's facilities do not belong

to the same industrial grouping and are not under the control of the same person, Defendants and TCEQ correctly treated them as separate sources for permitting purposes.

1. Vantage's and VoltaGrid's operations are not part of the same industrial grouping.

Plaintiffs fail the source-aggregation test's first prong because Vantage's and VoltaGrid's relevant operations do not belong to the same industrial grouping. EPA's source definition rule delineates between industrial groups, as indicated by two-digit Standard Industrial Classification ("SIC") codes. *See* 40 C.F.R. § 51.165(a)(1)(ii)(A) ("Pollutant emitting activities shall be considered as part of the same industrial grouping if they belong to the same *Major Group* (*i.e.*, which have the same two-digit code) as described in the *Standard Industrial Classification Manual, 1972*, as amended by the 1977 Supplement . . . ."). The code for Vantage's data-center operations is "73: Business Services," while VoltaGrid's power-generation operations fall under code "49: Electric, Gas, and Sanitary Services." *See, e.g.*, Dkt. 1-6 at 50; Ex. 28, TCEQ Site Info Record for Omicron (noting "SIC Code"). TCEQ thus correctly determined their facilities are separate stationary sources.

Contrary to Plaintiffs' contention, VoltaGrid's generating facility is not a "support facility" encompassed within the same industrial grouping as Vantage's data-center operations. Dkt. 35 at 20. The preambulatory rulemaking language Plaintiffs cite, *id.*, does not expand the rule's text. Instead, it contextualizes the SIC Manual's "auxiliary establishment" concept, which EPA necessarily adopted when it chose the SIC Manual as its test for this prong of its stationary source definitional rule.[11] An auxiliary establishment is a facility "primarily engaged in performing

[11] The Meadowbrook guidance Plaintiffs cite with respect to their support-facility claim, *see* Dkt. 35 at 14, aligns with this reading of EPA's preambulatory rulemaking language. Ex. 30 at 10 n.23 (discussing "[a]uxiliary establishments" (citation omitted)).

supporting services for other establishments *of the same company*." Ex. 29, 1972 Standard Industrial Classification Manual, Exec. Office of the President, Office of Mgmt. and Budget, at 583 (U.S. Govt. Printing Office 1972) (emphasis added). Vantage's backup generators are support facilities for Vantage's data center. VoltaGrid's generating facility is not.

2. <u>Vantage's and VoltaGrid's facilities are not subject to common control.</u>

Vantage's and VoltaGrid's facilities also do not qualify as a single source for the independent reason that they are not subject to common control.

a. <u>Neither VoltaGrid nor Vantage has power to dictate the other's permitting and compliance decisions.</u>

Under EPA's source-aggregation guidance in its "Meadowbrook Letter," which Plaintiffs themselves cite, Dkt. 35 at 5 n.6, control means "the power or authority of one entity to *dictate* decisions of the other that could affect the applicability of, or compliance with, relevant air pollution regulatory requirements." Ex. 30 at 6 (emphasis modified). EPA's "fact-specific" control inquiry asks whether one entity has the power to "dictate decisions" of the other in a way that "effectively removes the autonomy of the controlled entity to decide whether or how to pursue a particular course of action." *Id.* at 6–7. Mere "ability to influence" does not suffice, nor does a mutually beneficial or interdependent relationship. *Id.* at 7, 10. The inquiry focuses only on those "operations that could affect the applicability of, or compliance with, [air] permitting requirements," such as installing pollution controls, constructing emissions units, or deciding how those units operate. *Id*. at 8–9. Courts consider the parties' contracts in assessing common control. *See Phillips Petroleum Co. v. TCEQ*, 121 S.W.3d 502, 506 (Tex. App.–Austin 2003, no pet.).

Here, Vantage and VoltaGrid are distinct, unaffiliated businesses whose arm's length Master Tolling Agreements for Power Generation ("PGAs") confirm that neither company can dictate the other's air-permitting or compliance decisions:

[redacted]

Consistent with the PGAs, Vantage has never dictated VoltaGrid decisions that "could affect the applicability of, or compliance with, [air] permitting requirements," Ex. 30 at 8–10, such as installing pollution controls, constructing emissions units, or deciding how those units operate, Ex. 1, Harvey Decl. ¶ 19. Nor has VoltaGrid ever dictated such decisions to Vantage. *Id.*

EPA has warned against holding entities responsible for "actions over which they have no power or authority," Ex. 30 at 7; *accord id.* at 5 n.14. That is exactly the inequity Plaintiffs invite here. Aggregation would make Vantage answerable in enforcement for permitting and compliance decisions that belong to VoltaGrid alone, and that Vantage has no authority to make, change, or veto. The same is true for VoltaGrid.

Plaintiffs' reliance on a press release announcing a "partnership," Dkt. 35 at 8 & n.3, 20–21, is unavailing: the companies' relationship is an arm's length commercial agreement, not a legal

partnership or joint venture. *See* Exs. 9–10 (PGA Sch. 3, § 21); Tex. Bus. Orgs. Code §§ 152.051-.052; *Ingram v. Deere*, 288 S.W.3d 886, 894 (Tex. 2009). Similarly, "Vantage's business model of leasing data center campuses … complete with electric power," Dkt. 35 at 20–21, does not distinguish Vantage from any other commercial landlord that obtains power from a third-party provider responsible for its own air-regulatory decisionmaking. Indeed, as explained above, Vantage originally entered into term sheets with CPS to power these data centers. *See supra* Factual Background ¶ 1; Ex. 4 at 1; Ex. 5 at 1. Under that model, Vantage would still have been leasing its data centers "complete with electric power," yet no one could reasonably contend that Vantage exercises control over CPS's power generation.

b. <u>VoltaGrid's standard permits do not establish common control.</u>

Rather than apply the Meadowbrook test for common control, Plaintiffs primarily rely on prefatory language in the TCEQ Electric Generating Unit Standard Permits that VoltaGrid obtained. That prefatory language states that the permit "authorizes electric generating units that generate electricity for use by the owner or operator and/or generate electricity to be sold to the electric grid." Dkt. 35 at 20 (emphasis omitted) (quoting Dkt. 35-1 at 2). Because VoltaGrid does not sell power to the grid, Plaintiffs reason, VoltaGrid must be "an owner or operator of the data centers it powers." *Id.* at 9, 20–21. That reasoning fails because the standard permit's prefatory language does not speak to the issue of common control.

Plaintiffs conflate two distinct questions: whether a facility is eligible for a particular minor-source authorization, and whether two sets of emissions units are under the "control" of one entity for source-aggregation purposes. The permit's prefatory language says nothing about source aggregation, which turns on whether one entity has "the power or authority … to dictate decisions of the other that could affect the applicability of, or compliance with, relevant air pollution

regulatory requirements." Ex. 30 at 6 (emphasis omitted). Plaintiffs provide no authority for bootstrapping a permit applicability inquiry into a test for "control."

Plaintiffs do not identify a single condition in the Standard Permit empowering VoltaGrid to dictate how Vantage permits, operates, or complies with requirements for its facilities—or vice versa. Nor could they: a TCEQ permit is evidence only of the permittee's control over the equipment that permit covers. *See* 30 T.A.C. § 116.610(a) (standard permits authorize a "project," meaning "a facility or a group of facilities submitted *under the same registration*" (emphasis added)). VoltaGrid's permit only authorizes VoltaGrid's engines, *see, e.g.*, Ex. 11, while Vantage's backup generators are separately and independently authorized under its own Permit by Rule registrations, *see* Dkt. 35 at 8 n.1.

VoltaGrid's own registrations confirm as much. VoltaGrid stated that, in accordance with the Electric Generating Unit Standard Permit, it "self-consume[s] power" it generates. Dkt. 35-14 at 2; Ex. 31. It also told TCEQ that it "will own and operate [its] generators to produce electricity for an adjacent facility." Dkt. 35-14 at 34; Dkt. 35-15 at 34; *see also* Dkt. 35-14 at 2 (identifying the adjacent facility as a "datacenter"); Ex. 31 (same). By describing the data center as an "adjacent" facility that it merely supplies, VoltaGrid treated its engines and the data centers as distinct operations, not a single commonly controlled source. TCEQ accepted that characterization, authorizing VoltaGrid's engines under the Electric Generating Unit Standard Permit as a separate source. *See* Ex. 11; Ex. 14. In making that highly fact-dependent separate-source determination, TCEQ acted well within its "discretion to determine whether specific entities are under common control." Ex. 30 at 6; *see also Ellis*, 390 F.3d at 480–81 (source-aggregation questions are "committed by the Clean Air Act to state resolution").

c. VoltaGrid's experience with different facilities in another state does not establish common control.

Plaintiffs also contend that "VoltaGrid's permitting history in Georgia" supports a common-control finding here. Dkt. 35 at 21. "[D]eterminations of common control," however, "are fact-specific" and must "be made by permitting authorities on a case-by-case basis." Ex. 30 at 6. A single-source finding by a different state, under a different regulatory regime, on different facts, involving a different data-center site with a different owner, under a different contract, hardly indicates that TCEQ somehow erred in its fact-specific separate-source determination here.[12]

**B. Plaintiffs' claims fail at the threshold.**

Plaintiffs also cannot establish a likelihood of success on the merits because of the two threshold defects set out in Defendants' Motion to Dismiss (Dkt. 41), which Vantage incorporates by reference here. First, Plaintiffs lack a cause of action because they are suing in a representative capacity on behalf of their members, whereas 42 U.S.C. § 7604(a) only authorizes a plaintiff to sue "on his own behalf." *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.6 (1998). Second, if § 7604 authorizes Plaintiffs' effort to enforce the CAA, it violates the Vesting and Take Care Clauses of Article II of the Constitution and the private nondelegation doctrine, at least as applied to Plaintiffs' representative-capacity claims here. *See, e.g.*, *Nat'l Horsemen's Benevolent*

[12] Plaintiffs' alternative theory—that each VoltaGrid generating facility independently exceeds the applicable VOCs threshold once formaldehyde is counted, Dkt. 35 at 22–23—turns entirely on VoltaGrid's own Electric Generating Unit Standard Permit registrations and emissions calculations for units Vantage does not own, operate, or control. Accordingly, this theory cannot support an injunction against Vantage. *See E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021) ("[A]n injunction cannot … exceed the legal basis of the lawsuit." (citation omitted)); *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (explaining that an injunction is "overbroad if it is not narrowly tailored to remedy the specific action which gives rise to the order" (citation modified)). Nonetheless, Vantage agrees that Plaintiffs' argument fails for the reasons articulated in VoltaGrid's opposition.

*& Protective Ass'n v. Black*, 178 F.4th 224, 236–48 (5th Cir. 2026), *cert. pending*, Nos. 26-199, 26-201, 26-332, 26-335, 26-430.

## III. The remaining factors weigh against a preliminary injunction.

The Court also "must balance the competing claims of injury" and weigh the effect on each party and the countervailing public harm that Plaintiffs ignore. *Winter*, 555 U.S. at 24 (citation omitted). Plaintiffs cannot show that their members' injuries outweigh harms to Defendants and others. *See Anibowei*, 70 F.4th at 902.

### A. Vantage's concrete harms far outweigh Plaintiffs' members' speculative and generalized concerns.

Plaintiffs ask the Court to enjoin the construction, commissioning, or operation of generating facilities required to continue powering approximately 86 MW of operating customer load. Dkt. 35 at 28; *see also* Ex. 1, Harvey Decl. ¶ 14. There is no adequate, sustainable substitute for that power. Permit restrictions prevent Vantage's backup generators from replacing VoltaGrid's generating facilities for an extended period.[13] *See, e.g.*, 30 T.A.C. § 106.511. Further, grid supply for IT load is limited to approximately 24 MW at Rogers. Ex. 1, Harvey Decl. ¶ 15. An injunction against VoltaGrid's generating facilities would shut down or impede ongoing operations at Vantage's data centers.[14] *See id.* ¶ 16. This, in turn, would inflict massive, cascading harms on Vantage, its customer (the data centers' tenant), and that tenant's own customers.

---

[13] The Court should thus reject as unnecessary Plaintiffs' request for "an order limiting Vantage's diesel generators at both campuses to emergency operation and required testing only and prohibiting their use to replace electrical generation from … VoltaGrid." Dkt. 35 at 28. As a practical matter, Vantage's backup generators cannot replace VoltaGrid's generating facilities if the Court enjoins those facilities from operating. Further, an order allowing only "emergency operation and required testing," *id.*, would prohibit other permissible modes of operation that do not involve replacing electrical generation from VoltaGrid's facilities—e.g., operations required during maintenance of existing generators or commissioning of new generators.

[14] Consistent with the broad request in Plaintiffs' complaint that the Court "[e]njoin Defendants from continuing construction and/or operation of the Omicron Drive Campus and the Rogers Road

First, the data centers must operate continuously to maintain cooling and critical support systems. *See* Exs. 32–33 (TX-1 & TX-2 Service Orders § 6.4; *id.* Ex. A §§ 6.1.2–6.1.3, 6.4, 20.8.6; *see also id.* Ex. A § 19.6.3); Ex. 34, Strauven Decl. ¶ 7. The buildings house sensitive technology equipment. Ex. 6, Davis Decl. ¶ 6. That equipment must be kept within a specified temperature and humidity range, using control systems that cannot function without power. *Id.* ¶¶ 6–7.

As conditions drift outside the required range, it is increasingly likely that condensation will form inside the buildings and on the equipment itself. *Id.* ¶ 7. That condensation can permanently damage the equipment and potentially void its warranties. *Id.* The value of Vantage-supplied equipment alone totals [redacted], not even accounting for the (likely much larger) value of the contractor-supplied equipment and customer's equipment in the buildings. Ex. 34, Strauven Decl. ¶ 16.

Second, an injunction would strand an enormous investment. Vantage has deployed approximately [redacted] through October 2026. *Id.* ¶ 15. An injunction that forces the data centers to shut down would prevent that capital from being put to use.

Third, the harm extends to the buildings still under construction. A broad injunction against any "further construction and operation" activities at the campuses, Dkt. 35 at 25, would stop construction work on two data-center buildings outright. Even an order limited to VoltaGrid's generating facilities would effectively halt that work, because continued investment in buildings without a reliable power supply would not be commercially viable. That halt, in turn, would require demobilizing contractors and crews and necessitate outlays to secure and preserve partially

---

Campus," Dkt. 1 at 50, Vantage here generally does not attempt to account for the speculative prospect—which may be unavailable in practice—that the one data center building currently operating with a mix of power from CPS and VoltaGrid (TX21) might be able to use CPS power to continue partial operations.

completed work. Ex. 6, Davis Decl. ¶ 19. Vantage would also face potential delay or idle-fee claims from contractors and vendors. *Id.* Even if the injunction were later lifted, Vantage would incur cost and delay to remobilize, re-staff, and recommission equipment, and may be unable to rehire the same in-demand contractors and workforce. *Id*. Besides termination, a shutdown would leave Vantage unable to commence collecting rent on buildings, even as it continues to carry equity and debt costs and absorbs demobilization, remobilization, and increased capital costs. Ex. 34, Strauven Decl. ¶¶ 10–11. Courts weigh precisely these harms in declining injunctive relief. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) (declining to enjoin where the developers stood to lose millions); *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 726–27 (E.D. Tex. 2020) (weighing "increased construction costs" and daily "idle-fee[s]").

Fourth, an injunction would jeopardize Vantage's revenue stream and long-term contractual commitments. Vantage's customer currently pays [redacted] for the Omicron TX11 and Rogers TX21 buildings. Ex. 34, Strauven Decl. ¶ 6. A prolonged loss of power could expose Vantage to claims for [redacted]. *Id.* ¶¶ 8–9. Worse, a prolonged shutdown risks [redacted]. *Id.* ¶ 12. A [redacted] in turn could result in a claimed [redacted]. *Id.* ¶ 18. [redacted] and producing significant losses that Vantage could not mitigate or recover. *Id.* Although Vantage would vigorously contest any such claims, the injunction would imperil Vantage's contracts and potentially force it into disputes with its customer and lenders. *Id.* ¶¶ 12, 18; *see Save RGV v. Space Expl. Techs. Corp.*,

No. 1:24-cv-148, 2024 WL 5357188, at *4 (S.D. Tex. Nov. 21, 2024) (weighing injunction's threat to "significantly delay and possibly destroy" defendant's contracts).

Fifth, beyond these contractual exposures, an injunction would also inflict reputational harm that no bond or later judgment could repair. [redacted] A court-ordered shutdown of two operating data centers would undermine Vantage's reputation as a reliable provider, damage its customer relationship, and impair Vantage's ability to win future business. *Id.* ¶ 13; *see WorldVue Connect Global, LLC v. Szuch*, 155 F.4th 472, 486 (5th Cir. 2025) (recognizing reputational harm to company whose customer agreements required 24/7 support).

In sum, Vantage has identified myriad harms that are concrete, supported by record evidence and site-specific analysis, and highly likely to occur if an injunction issues. Plaintiffs' asserted harms, by contrast, rest on generalized fears about pollution, not on any showing that these emissions will likely and irreparably harm their members. *See supra* Argument § I. The balance of harms thus weighs decisively against an injunction.

**B. An injunction would disserve the general public's interest.**

The injunction Plaintiffs seek would ill serve the general public's interest. First, shutting down construction and operations at the data centers would cost the San Antonio community a substantial number of skilled jobs. Approximately 500 skilled general-contractor and subcontractor workers are building part of the Rogers location, approximately 750 are building a portion of the Omicron facility, and approximately 40–50 personnel permanently work in the operating data center buildings. Ex. 6, Davis Decl. ¶ 5. Halting construction and operations would idle these workers, and many may not return if the injunction is later lifted. *Id.* ¶ 19; *see W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (lost jobs are "properly weighed

… against" environmental harms); *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009) (recognizing "the public interest in maintaining nineteen jobs").

Second, the data centers generate millions in annual tax revenue, funding local schools, infrastructure, and public services. Ex. 34, Strauven Decl. ¶¶ 19–22. Idling the data center locations and halting construction would jeopardize that revenue stream.

Third, a shutdown would disrupt essential information-technology services for end users who have no part in this dispute. *See id.* ¶ 23. The essential nature of data centers was recognized during the COVID-19 pandemic, when Vantage itself was deemed an essential service provider because of the importance of cloud storage and IT infrastructure, and its data centers continued operating. *Id.*; *see also* Ex. 35; Ex. 36. Indeed, when Bexar County ordered that "all businesses operating within Bexar County are required to cease all activities" in March 2020, it exempted "IT Services," defined as "businesses and activity necessary to maintain internet and telecommunications systems, including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services." Ex. 37 §§ I.2, I.2(i)(b)(vi); *see also id.* § I.2(i)(b)(iv); *Diesel Barbershop, LLC v. State Farm Lloyds*, 479 F. Supp. 3d 353, 355 (W.D. Tex. 2020). Vantage's buildings and cooling systems, on which its customer's computing equipment relies, are precisely that kind of essential infrastructure.

Fourth, a shutdown would undermine the CAA's cooperative-federalism scheme by second-guessing TCEQ's acceptance of the permitting approach Plaintiffs challenge and TCEQ's determination that Vantage's backup generators and VoltaGrid's generating facilities are separate minor sources. The public has a strong interest in a permitting system whose decisions can be relied on. An order shutting down facilities that followed the process, on a preliminary record and

before any merits adjudication, would chill the very investment that permitting is meant to channel. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013) (public interest weighed against enjoining a project that would "cast[] doubt" on statutory permitting process).

## IV. Any injunction must be conditioned on Plaintiffs posting an adequate bond.

If the Court grants the unprecedented relief Plaintiffs seek, it should require them to post bond. *See* Fed. R. Civ. P. 65(c); *see also* 42 U.S.C. § 7604(d) (applying bond requirement to CAA citizen suits). Rule 65(c) "contains no … exception" for purported public-interest litigation and "states flatly" that security is required. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010). Failure to require the posting of a bond constitutes grounds for reversal of an injunction. *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990).

Here, the bond amount should at least cover [redacted]. Ex. 34, Strauven Decl. ¶¶ 8–9. However, because Vantage's total harms exceed even this estimate, *see id.* ¶¶ 10–11, the Court should hold a separate hearing and permit supplemental briefing on the bond amount before any injunction takes effect.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Amended Motion for Preliminary Injunction.

Dated: November 16, 2026

Respectfully submitted,

*/s/ Christopher V. Popov*
Christopher V. Popov
Texas State Bar No. 24032960
VINSON & ELKINS L.L.P.
845 Texas Avenue, Suite 4700
Houston, TX 77002
Telephone: (713) 758-2636
Facsimile: (713) 615-5033
Email: cpopov@velaw.com

Patrick D. Traylor
Texas State Bar No. 791811
Joshua S. Johnson (admitted *pro hac vice*)
Texas State Bar No. 24070002
VINSON & ELKINS L.L.P.
2200 Pennsylvania Ave. NW
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6544
Facsimile: (202) 639-6604
Email: ptraylor@velaw.com
Email: joshjohnson@velaw.com

Liane Noble
Texas State Bar No. 24079059
VINSON & ELKINS L.L.P.
200 W. 6th Street, Suite 2500
Austin, TX 78701
Telephone: (512) 542-8429
Facsimile: (512) 236-3256
Email: lnoble@velaw.com

**ATTORNEYS FOR DEFENDANTS VANTAGE DATA CENTERS MANAGEMENT COMPANY, LLC, VANTAGE DATA CENTERS TX11, LLC, AND VANTAGE DATA CENTERS TX21, LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 16, 2026, a **redacted** version of this filing and its exhibits was filed with the Court and served on all counsel of record via the Court's CM/ECF system, and an **unredacted** copy of this filing and its exhibits was filed under seal and served on all counsel of record.

*/s/ Liane Noble*
Liane Noble