**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| PUBLIC CITIZEN and SIERRA CLUB, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| VANTAGE DATA CENTERS | § | No. 5:26-cv-06032-JKP-ESC |
| MANAGEMENT COMPANY, LLC, | § | |
| VANTAGE DATA CENTERS TX11, LLC, | § | |
| VANTAGE DATA CENTERS TX21, LLC, | § | |
| and VOLTAGRID LLC, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES ........ iii**

**INTRODUCTION ........ 1**

**ARGUMENT ........ 3**

**I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE EACH DATA CENTER CAMPUS IS A MAJOR STATIONARY SOURCE SUBJECT TO NONATTAINMENT NEW SOURCE REVIEW ........ 3**

**A. VoltaGrid's Power Plants are Major Sources of VOC (Volatile Organic Compounds). ........ 3**

**B. The Trailer-Mounted Engines are "Stationary sources" Under the Clean Air Act Whose Emissions Count Towards the Rogers Road Potential to Emit ........ 5**

**C. Each Campus is a Single Stationary Source. ........ 7**

**1. The VoltaGrid power plants and Vantage's data centers belong to the same industrial grouping. ........ 8**

**2. VoltaGrid is an owner/operator of the data centers it is electrifying, or it does not qualify for the EGU Standard Permit. ........ 10**

**3. Each campus is under common control, same as the Georgia Environmental Protection Division (EPD) found pursuant to materially similar contracts. . 13**

**II. PLAINTIFFS' EVIDENCE DEMONSTRATES IRREPARABLE INJURY ........ 14**

**A. Plaintiffs' Members Face a Significant Threat of Irreparable Harm ........ 14**

**B. Gasparini is Not Qualified to Testify About Health Impacts. ........ 18**

**C. Gasparini's Modeling Results are Unreliable. ........ 19**

**D. Plaintiffs' Actions are Timely ........ 20**

**III. The Balance of Hardships and Public Interest Favor Relief. ........ 23**

**A. Defendants' Claimed Harms are Economic and Self-Inflicted ........ 23**

**B. The Public Interest Favors Enforcing the Act. ........ 25**

**C. No More Than a Nominal Bond is Warranted. ........ 26**

**IV. THIS SUIT DOES NOT COLLATERALLY ATTACK A STATE-ISSUED PERMIT ........ 27**

**Conclusion ..................................................................................................................... 28**

# TABLE OF AUTHORITIES

**Cases**

*ADT, LLC v. Capital Connect, Inc.*,
145 F. Supp. 3d 671 (N.D. Tex. 2015) ............ 20

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ............ 23

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014) ............ 22

*Ball v. LeBlanc*,
792 F.3d 584 (5th Cir. 2015) ............ 17

*Bd. of Regents of the Univ. of Hous. Sys. v. Hous. Coll. of L., Inc.*,
214 F. Supp. 3d 573 (S.D. Tex. 2016) ............ 24

*Boire v. Pilot Freight Carriers, Inc.*,
515 F.2d 1185 (5th Cir. 1975) ............ 20, 23

*Brazos Elec. Power Coop., Inc. v. Tex. Comm'n on Env't Quality*,
576 S.W.3d 374 (Tex. 2019) ............ 11

*Citizens for Pa.'s Future v. Ultra Res., Inc.*,
898 F. Supp. 2d 741 (M.D. Pa. 2012) ............ 28

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
636 F.2d 1084 (5th Cir. Unit B 1981) ............ 26

*City of Seabrook v. EPA*,
659 F.2d 1349 (5th Cir. 1981) ............ 25

*CleanCOALition v. TXU Power*,
536 F.3d 469 (5th Cir. 2008) ............ 27, 28

*In re Commonwealth Oil Ref. Co.*,
805 F.2d 1175 (5th Cir. 1986) ............ 25

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
843 F.2d 600 (1st Cir. 1988) ............ 23

*Corley v. United States*,
556 U.S. 303 (2009) ............ 11

*Ctr. for Biological Diversity v. U.S. Dep't of Transp.*,
180 F.4th 796 (5th Cir. 2026) .......... 18

*Daily Instruments Corp. v. Heidt*,
998 F. Supp. 2d 553 (S.D. Tex. 2014) .......... 20

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) .......... 15

*Guillory v. Domtar Indus. Inc.*,
95 F.3d 1320 (5th Cir. 1996) .......... 19

*Harris v. Bd. of Supervisors*,
366 F.3d 754 (9th Cir. 2004) .......... 15

*Helling v. McKinney*,
509 U.S. 25 (1993) .......... 15

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
804 F.2d 1390 (5th Cir. 1986) .......... 15

*Kaepa, Inc. v. Achilles Corp.*,
76 F.3d 624 (5th Cir. 1996) .......... 26

*Lakedreams v. Taylor*,
932 F.2d 1103 (5th Cir. 1991) .......... 23

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) .......... 15, 17

*Lower Laguna Madre Found., Inc. v. Tex. Nat. Res. Conservation Comm'n*,
4 S.W.3d 419 (Tex. App.—Austin 1999, no pet.) .......... 11

*Luminant Generation Co. v. EPA*,
675 F.3d 917 (5th Cir. 2012) .......... 25

*Nucor Steel-Ark. v. Big River Steel, LLC*,
93 F. Supp. 3d 983 (E.D. Ark. 2015) .......... 27

*Opulent Life Church v. City of Holly Springs*,
697 F.3d 279 (5th Cir. 2012) .......... 20

*Sierra Club v. Energy Future Holdings Corp.*,
No. W-12-CV-108, 2014 WL 12539733 (W.D. Tex. Feb. 10, 2014) .......... 28

*Sierra Club v. U.S. Army Corps of Eng'rs*,
645 F.3d 978 (8th Cir. 2011) .......... 24

*Sierra Club, Lone Star Chapter v. FDIC*,
992 F.2d 545 (5th Cir. 1993) .......... 19

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
207 F.3d 789 (5th Cir. 2000) .......... 18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 15

*United States v. Gear Box Z Inc.*,
526 F. Supp. 3d 522 (D. Ariz. 2021) .......... 23

*Voigt v. Coyote Creek Mining Co.*,
No. 1:15-cv-00109, 2016 WL 3920045 (D.N.D. July 15, 2016) .......... 27, 28

*W. Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC*,
178 F.4th 102 (4th Cir. 2026) .......... 15, 16

*Weiler v. Chatham Forest Prods., Inc.*,
392 F.3d 532 (2d Cir. 2004) .......... 27

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .......... 17

*WildEarth Guardians v. Extraction Oil & Gas, Inc.*,
457 F. Supp. 3d 936 (D. Colo. 2020) .......... 26

*Wilson v. Woods*,
163 F.3d 935 (5th Cir. 1999) .......... 19

**Statutes**

42 U.S.C. § 7502(c)(5) .......... 3
42 U.S.C. § 7503(a) .......... 3, 25
42 U.S.C. § 7604(a)(3) .......... 27, 28
42 U.S.C. § 7604(d) .......... 26
42 U.S.C. § 7607(b) .......... 28
42 U.S.C. § 7661d(b) .......... 28

**Regulations**

40 C.F.R. § 1068.30 .......... 7
40 C.F.R. § 1068.31(e)(1) .......... 7

40 C.F.R. § 51.165(a)(1) .......... 3, 7, 8
40 C.F.R. § 81.344 .......... 17
30 Tex. Admin. Code § 106.4(a) .......... 25
30 Tex. Admin. Code § 116.12 .......... 3, 7, 8, 9
30 Tex. Admin. Code § 116.110(a) .......... 3
30 Tex. Admin. Code § 116.150 .......... 3, 25
30 Tex. Admin. Code § 116.610(b) .......... 25
30 Tex. Admin. Code § 116.615 .......... 21

**Federal Register**

Requirements for Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 45 Fed. Reg. 52,676 (Aug. 7, 1980) .......... 8, 9

Control of Air Pollution; Determination of Significance for Nonroad Sources and Emission Standards for New Nonroad Compression-Ignition Engines at or Above 37 Kilowatts, 59 Fed. Reg. 31,306 (June 17, 1994) .......... 7

**Other Authorities**

Fed. R. Evid. 702 .......... 19

Letter from Kathleen Cox, EPA Region 3, to Troy D. Breathwaite, Va. DEQ (Jan. 10, 2012) .......... 9

Letter from Richard R. Long, EPA Region 8, to Julie Wrend, Colo. Dep't of Pub. Health & Env't, Re: Single Source Determination for Coors/TriGen (Nov. 12, 1998) .......... 9

Letter from Robert B. Miller, EPA Region 5, to William Baumann, Wis. DNR (Aug. 25, 1999) .......... 10

TCEQ, Air Quality Standard Permit for Electric Generating Units: Summary Document (June 2001) .......... 12

## INTRODUCTION

Defendants have gone to great lengths to circumvent the Clean Air Act's public health protections and public participation requirements to cash in on the artificial intelligence boom. For them, time is money and nothing should get in the way of that. For Plaintiffs and their members, what matters is a daily existence free of plumes of carcinogens and other pollutants from Defendants' data center campuses. They had no warning of what Defendants were building or any information on the seriousness and magnitude of the pollution when construction began. And, without the Court's intervention, they have no choice but to breathe that pollution day and night without relief, https://tinyurl.com/pn8mht7t (video).

The video linked above is from Defendants' Rogers Road data center campus. It shows Defendants powering data center operations with nine unpermitted trailer-mounted engines without pollution controls. To Plaintiffs' knowledge, Defendants never disclosed these trailers to TCEQ or the public, even though each one has the potential to emit ***up to 33 times as much pollution as the units*** VoltaGrid described in an air permit registration package to TCEQ.[1] This kind of bait and switch and disregard for the well-being of their neighbors is driving the overwhelming public backlash of data centers.

Defendants respond to the trailer and other issues with incomplete, incorrect, and misleading deflections, or evidence that support Plaintiffs motion. **First,** Defendants claim that the trailer-mounted units are "non-road" engines. That is plainly wrong under the law. The trailer units run a data center just like the registered "permanent" engines that will replace them. The law treats them as "stationary sources" that must be regulated as such. **Second,** Defendants' "proof" that

---

[1] ECF No. 35-10 at 15 (tbl. 6a); ECF No. 35-15 at 38–39; ECF No. 35 at 24.

there is "no likelihood of irreparable harm" (Vantage Resp. 7)[2] is anything but. Among other things, it lacks support from a public health expert, ignores uncontrolled emissions from the trailer-mounted engines, ignores two major pollutants, and assumes continuous optimal operation of emissions controls that Defendants have no incentive to maintain. **Third,** the contracts Defendants offer to show the data centers and power plants are separate minor sources actually help prove "common control" and the need to treat each campus as one facility. **Fourth,** VoltaGrid offers misleading and objectively false assertions about formaldehyde to obscure the fact that its power plants are major sources of VOC. **Fifth**, Defendants ask the Court to saddle Plaintiffs' members and neighbors with their harmful emissions because the potential losses from their high-stakes gamble on outsmarting federal law that protects public health trump the well-being of ordinary people who will not share in their winnings. And these are not the only problems with Defendants' response.

Defendants' should never have started constructing their data center campuses, let alone begun operating, without first ensuring, ***in a public process,*** that this nation's Clean Air Act requirements were met, including the real likelihood the projects may not be viable as conceived. Plaintiffs respectfully ask this Court to protect their members by granting the requested injunctive relief consistent with Congress' design.

[2] "Vantage Resp." refers to the Vantage Defendants' Response to Plaintiffs' Amended Motion for Preliminary Injunction, ECF No. 47, and "VoltaGrid Resp." refers to VoltaGrid's Response, ECF No. 46. Pin cites to these and all other filings are to the page numbers in the ECF header.

# ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE EACH DATA CENTER CAMPUS IS A MAJOR STATIONARY SOURCE SUBJECT TO NONATTAINMENT NEW SOURCE REVIEW

### A. VoltaGrid's Power Plants are Major Sources of VOC (Volatile Organic Compounds).

Potential to emit is "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design." 40 C.F.R. § 51.165(a)(1)(iii); 30 Tex. Admin. Code § 116.12(29). It is determined before construction, because a major source must obtain a major permit before it begins building. 42 U.S.C. §§ 7502(c)(5), 7503(a); 30 Tex. Admin. Code §§ 116.110(a), 116.150(a). The question is therefore what preconstruction design information shows about the maximum capacity of the SAT-1 and SAT-2 engines. The only such information is VoltaGrid's own calculations, based on vendor guaranteed emission rates. Those calculations show that each plant's potential to emit VOC exceeds the major source threshold. ECF No. 35-14 at 35 (Derivation of Criteria Pollutant Emission Factors), 40–41 (Emission Calculations), 43 (Vendor Guarantee); ECF No. 35-15 at 35, 38–42, 44-47; Ex. S, SAT-1 Amendment Review Record at PDF pages 21–22, 29–32;[3] ECF No. 35-10 ¶¶ 57–62, 67 & tbls. 10A, 11.

VoltaGrid concedes that manufacturer guarantee VOC rates did not include formaldehyde. It contends, however, that it applied a "20-25% safety factor" to capture "all VOC emissions . . . including formaldehyde." VoltaGrid Resp. 22–23.

With respect to SAT-1, Korby Bracken, VoltaGrid's Senior Director of Health, Safety and Environment, states "the conservative safety margin" at SAT-1 "accounts for formaldehyde emissions." ECF No. 46-1 ¶ 8. But no SAT-1 registration applies *any* safety margin for VOC. The

---

[3] Plaintiffs' reply exhibits continue the lettering of the exhibits to their Amended Motion (ECF Nos. 35-1 to 35-18, Exs. A–R), beginning with Exhibit S.

initial registration used Jenbacher's guarantee emission rate for NMNEHC VOC, which excludes formaldehyde, with no margin.[4] ECF No. 35-14 at 35, 40, 43. The same registration represented formaldehyde emissions of 0.09 lb/hr per engine, or 31.54 tons per year for the plant, but VOC emissions of only 0.07 lb/hr per engine, or 24.29 tons per year. *Id.* at 40–41. A VOC total that included formaldehyde could not be smaller than formaldehyde alone. The TCEQ read it the same way: "Formaldehyde is not included in VOC's." ECF No. 46-1 at 39. The operative registration also calculates NMNEHC VOC without any margin. Ex. S at 19-22 & 21 n.1, 29-34. The factual predicate for VoltaGrid's argument regarding SAT-1's VOC safety margin is simply untrue.

For SAT-2, VoltaGrid did include a 30 percent margin on top of Jenbacher's guaranteed rates for NMNEHC VOC. ECF No. 35-15 at 38 (J620 Criteria Emission Calculations), 40 (J624 Criteria Emission Calculations), 42 (Vendor Guarantees). Bracken now says this margin "accounted for formaldehyde emissions in the overall VOC emissions." ECF No. 46-1 ¶ 14. It did not for two reasons: First, VoltaGrid applied the same 30 percent margin to every criteria pollutant, VOC, NOx, CO, PM, SO2, *and to formaldehyde itself*. ECF No. 35-15 at 42. VoltaGrid calculated formaldehyde separately, at 20.15 tons per year. *Id*. at 37 (SAT-2 Total Potential Emissions), 39 (J620 HAP Emissions), 41 (J624 HAP Emissions). Second, the margin is too small. A margin applied to formaldehyde cannot account for formaldehyde as a component of VOC. The 30 percent margin adds 8.3 tons per year of VOC, less than half the formaldehyde VoltaGrid represented. ECF No. 35-15 at 37. Bracken's other explanation, that the margin is "a significant buffer to account for engine variability," fits the record. ECF No. 46-1 ¶ 14. The not-to-exceed values are half-hour averages that apply only at 85 to 100 percent stable load, "not for transient load events in Island

[4] The statement is also incorrect because the vendor guarantee definition of NMNEHC VOC shows VOC calculated as carbon and not propane. Ex. S at 29, 32.

mode," and only after the aftertreatment system reaches operating temperature. ECF No. 35-15 at 44 & n.4, 45 n.5, 47 & nn.4–5. Jenbacher also warns of "an expected upward drift" in emissions as deposits build up. *Id.* at 45 n.6, 48 n.6. A margin for those conditions for all criteria pollutants reflects the engines' maximum emissions given their physical and operational design. It is not spare room for a missed pollutant.

Next, VoltaGrid contends that source testing on J620 engines at SAT-1 show VOC "far below the 50 TPY major source threshold[.]" VoltaGrid Resp. 23. This is wrong, but it does not matter because SAT-1's 40 J624 engines alone make it a major source. VoltaGrid has not provided any test results for J624 gensets at either site. It calculated J624 VOC using the vendor guarantee emission rate that it admits excludes formaldehyde, with no margin. Ex. S at 21 & n.1, 32; VoltaGrid Resp. 22–23 ("[T]he manufacturer-guarantee rates did not include formaldehyde in the VOC emissions rates . . . ."); ECF No. 35-10 ¶¶ 59–60 & tbl. 10A. Its Table 29 form likewise shows that post-control VOC emission rates exclude formaldehyde. Ex. S at 27; ECF No. 35-10 ¶ 64. NMNEHC VOC emissions from the SAT-1 J624s, excluding formaldehyde are represented at 36.74 tons per year. Ex. S at 21 (Emission Calculations); ECF No. 46-1 at 139. Maximum formaldehyde emissions from these engines were calculated at 25.05 tons per year. Ex. S at 22 (HAP Emissions Calculations); ECF No. 46-1 at 139 (Emissions Summary and Permitting Thresholds). Thus, the SAT-1 J624 engines' potential to emit total VOC (including NMNEHC VOC and formaldehyde) is 61.79 tons per year. It does not matter what the SAT-1 J620s will emit. SAT-1 is a major source of VOC.

### B. The Trailer-Mounted Engines are "Stationary sources" Under the Clean Air Act Whose Emissions Count Towards the Rogers Road Potential to Emit.

VoltaGrid applied for an EGU standard permit authorizing construction of a power plant consisting of sixteen J620 and twenty J624 generating engines to authorize a power plant

supporting Vantage's Rogers Road data center. ECF No. 35-15 at 5. To date, only ten J620 engines have been installed in permanent enclosures and these engines are not yet operating. ECF No. 46-1 ¶ 17. To allow operation of Vantage's data center before the power plant described in VoltaGrid's application is complete, VoltaGrid brought nine or more trailer-mounted generating engines onto the Rogers Road campus and began running them without pollution controls. Vantage Resp. 11 & n.5; VoltaGrid Resp. 18; ECF No. 35-10 ¶¶ 30, 33–35 & figs. 3–6. The engines appear to be the same kind registered under VoltaGrid's standard permit: Jenbacher J620s. ECF No. 35-10 ¶¶ 33–34 & n.18.[5] They have no visible emissions controls, *id.* ¶ 35, and VoltaGrid does not deny that they are uncontrolled.

VoltaGrid did not mention the trailers in its October 8, 2026 "clarification" materials sent to TCEQ, filed four days after Plaintiffs' infrared camera recorded nine of them running. ECF No. 46-1 at 397-398; ECF No. 35-16 at 8. Nor do its two declarations mention them. *See* ECF No. 46-1 at 2–9; ECF No. 46-3. No one would have known, including this Court and the TCEQ, but Plaintiffs caught them using FLIR imaging. Having been caught in the act running unauthorized generating engines, VoltaGrid says they are exempt from the Clean Air Act's preconstruction permitting requirements for stationary sources, and that the Court should not require VoltaGrid to operate them with pollution controls. VoltaGrid Resp. 18.

VoltaGrid's trailer-mounted Generators are not exempt from Clean Air Act requirements for stationary sources and VoltaGrid is looking for a loophole. It calls the trailer-mounted engines "temporary, nonroad engines" that are "expressly excluded" from the definition of stationary source. VoltaGrid Resp. 18. Yet these engines will be used to power Vantage's data center and will

[5] Plaintiffs are seeking expedited discovery on the trailer-mounted units and other fact issues raised in Defendants' responses.

be replaced by permanent engines and enclosures currently under construction, and are therefore "stationary sources" under the law. A portable engine is a nonroad engine only if it does not "remain[] or will remain at a location for more than 12 consecutive months." 40 C.F.R. § 1068.30 (definition of "nonroad engine," ¶¶ (1)(iii), (2)(iii)). When "any engine (or engines) . . . replaces an engine at a location and . . . is intended to perform the same or similar function as the engine replaced," the regulation directs: "include the time period of both engines in calculating the consecutive time period." *Id.* ¶ (2)(iii). An engine that "is used or will be used" at a single location for 12 months or longer "ceased to be a nonroad engine when it was placed in that location." 40 C.F.R. § 1068.31(e)(1). The replacement provision "is designed to ensure that where an internal combustion engine is necessary for the operation of a stationary facility, the replacement of one particular engine with another would not prevent the engines from being included as part of the stationary facility." Control of Air Pollution; Determination of Significance for Nonroad Sources and Emission Standards for New Nonroad Compression-Ignition Engines at or Above 37 Kilowatts, 59 Fed. Reg. 31,306, 31,311 (June 17, 1994).

VoltaGrid's trailer-mounted generators will be replaced by its permanent generators once construction is complete. Those permanent generators will then serve the same data center "until permanent utility power can be provided," ECF No. 46-1 at 397, which CPS states may not happen until 2032, Vantage Resp. 9. The trailer-mounted engine's residence time therefore defeats the nonroad engine "loophole." They became stationary engines the day they arrived in the Rogers Road, and must be counted in the potential to emit. 40 C.F.R. § 51.165(a)(1)(i), (ii)(A); 30 Tex. Admin. Code § 116.12(6), (29), (37).

**C. Each Campus is a Single Stationary Source.**

Plaintiffs contend that each campus is a single major stationary source subject to Nonattainment New Source Review preconstruction permitting requirements, because the power

plants and data centers at each campuses are located on a single piece of property, they share the same primary industrial grouping, and they are under common control. ECF No. 35 at 19-20 (citing 30 Tex. Admin. Code § 116.12(6), (37). Defendants do not dispute that aggregated emissions from power plant and data center facilities at each campus exceed major source thresholds. Instead, Defendants contend that the data centers and power plants are separate stationary sources because they do not share the same primary industrial grouping and that they are not under common control.

**1. The VoltaGrid power plants and Vantage's data centers belong to the same industrial grouping.**

VoltaGrid's power plants and Vantage's data centers belong to the same industrial grouping under Texas's and EPA's source definitions if the power plants are support facilities for the data centers. "[O]ne source classification encompasses both primary and support facilities, even when the latter includes units with a different two-digit SIC code." Requirements for Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 45 Fed. Reg. 52,676, 52,695 (Aug. 7, 1980). Support facilities are "typically those which convey, store, or otherwise assist in the production of the principal product." *Id.*

Vantage does not dispute that VoltaGrid's plants exist to power its data centers. Instead, it argues that a support facility must belong to "the same company" as the facility it serves. Vantage Resp. 21–22. Vantage takes that requirement from the 1972 SIC Manual's definition of an "auxiliary establishment." *Id.* Though neither EPA's preamble nor the adopted rules mention the auxiliary establishment definition and despite the fact that Vantage's position is inconsistent with EPA practice, Vantage claims that "EPA necessarily adopted" the auxiliary establishment definition and common ownership condition "when it chose the SIC Manual as its test for this prong of the stationary source definitional rule." *Id.* at 21. Vantage is wrong.

EPA incorporated the SIC Manual into its rule for one narrow purpose: to identify the "Major Group (i.e., which have the same two-digit code)." 40 C.F.R. § 51.165(a)(1)(ii)(A); *see also* 30 Tex. Admin. Code § 116.12(6). The support-facility principle comes from EPA's preamble, not the SIC Manual. The preamble defines support facilities by function, not ownership, and it expressly reaches facilities with a "different two-digit SIC code." 45 Fed. Reg. 52,695. The preamble language would be unnecessary if EPA adopted the SIC Manual's auxiliary establishment definition, because the SIC Manual already assigns auxiliaries the code of the establishments they serve. ECF No. 47-33 at 13 n.23. Ownership is addressed by the separate common-control prong. Vantage's "same company" concept appears nowhere in EPA's regulation, preamble, or guidance, and EPA's own practice rejects it.

*Meadowbrook*, which Vantage cites as authority, Vantage Resp. 7, 21, 22, 24, confirms this. It involved two separately owned companies. EPA explained that whether one is a "support facility" for another is "altogether separate" from common control. ECF No. 47-33 at 13. If support facilities had to share an owner, there would be nothing to analyze under the SIC prong where the companies are separately owned.

EPA has repeatedly found separately owned power plants are support facilities. Coors sold its power plant at a brewery to another company, which agreed to supply 100 percent of the brewery's power under a 30-year contract. EPA determined the power plant was a support facility because it lacked "a primary economic activity of its own." Letter from Richard R. Long, EPA Region 8, to Julie Wrend, Colo. Dep't of Public Health and Environment, Re: Single Source Determination for Coors/TriGen at 2-3 (Nov. 12, 1998);[6] *see also* Letter from Kathleen Cox, EPA

[6] Available electronically at: https://www.epa.gov/sites/default/files/2015-08/documents/coorstri.pdf [https://perma.cc/T393-NGEL].

Region 3, to Troy D. Breathwaite, Va. DEQ, at 7 (Jan. 10, 2012) (separately owned cogeneration plant was a dedicated support facility for BASF plant);[7] Letter from Robert B. Miller, EPA Region 5, to William Baumann, Wis. DNR at 1-2 (Aug. 25, 1999) (applying support-facility test to utility-owned generators and presuming support facility relationship where "more than 50% of the output" is dedicated to the primary facility).[8]

VoltaGrid's plants are support facilities by these measures. Vantage turned to VoltaGrid because grid power for its data centers was delayed. Vantage Resp. 9. VoltaGrid informed TCEQ its plants exist to "provide power capacity to a datacenter . . . until permanent utility power can be provided." ECF No. 1-10 at 2. VoltaGrid's Omicron plant self-consumes only about eight percent of the power it generates. Bracken Decl. ¶ 25. The rest goes to Vantage. Vantage admits its own backup generators, which also generate electricity, are "support facilities for Vantage's data center." Vantage Resp. 22. The only difference between the generators is who owns them. That is a common control issue. It does not put VoltaGrid's power plants into a different industrial grouping.

**2. VoltaGrid is an owner/operator of the data centers it is electrifying, or it does not qualify for the EGU Standard Permit.**[9]

The type of permits VoltaGrid sought ([redacted]) to proceed with construction of the power plants outside the requirements of major New Source Review confirm common control between VoltaGrid's power plants and Vantage's data centers.

---

[7] Available electronically at: https://www.epa.gov/sites/default/files/2015-07/documents/gpc2012.pdf [https://perma.cc/GZ75-442A].
[8] Available electronically at: https://www.epa.gov/sites/default/files/2015-07/documents/oscar.pdf [https://perma.cc/P2A9-FEBS].
[9] VoltaGrid's authorization under the minor source EGU Standard Permit does not shield it from Clean Air Act liability, nor is this lawsuit a collateral attack on that permit. *See* Part IV, *infra*.

VoltaGrid sought and obtained authorization under the EGU Standard Permit that identifies what eligible units may generate electricity *for*: "for use by the owner or operator and/or . . . to be sold to the electric grid." ECF No. 35-1 at 2. Units that exist to supply a third party's data center fit neither category. VoltaGrid represented to TCEQ it met the permit's requirements. ECF No. 35-14 at 26; ECF No. 35-15 at 26 ("All conditions below will be met" and generators "will meet the requirements of this standard permit[.]"). Thus, it represented itself as an owner or operator of the data centers.

VoltaGrid's position on the EGU Standard permit's applicability is nonsensical. Courts "give effect to all words in a rule to avoid treating any language as surplusage." *Lower Laguna Madre Found., Inc. v. Tex. Nat. Res. Conservation Comm'n*, 4 S.W.3d 419, 423 (Tex. App.—Austin 1999, no pet.); *accord Brazos Elec. Power Coop., Inc. v. Tex. Comm'n on Env't Quality*, 576 S.W.3d 374, 384 (Tex. 2019) (reading text so that no provision is "rendered meaningless or mere surplusage" (citation omitted)); *see also Corley v. United States*, 556 U.S. 303, 314 (2009). Every generating plant uses some of its own output. Each of VoltaGrid's engines draws power just to run. Bracken Decl. ¶ 25. If that were enough, every generating unit in Texas would generate electricity "for use by the owner or operator," and the condition would be meaningless. Similarly, the "sold to the grid" condition would be superfluous because every unit that sells to the grid also powers its itself. Defendants' reading is wrong. The only way it can claim the EGU Standard Permit authority is as an owner or operator of the data centers it powers. Unless each data center campus is a single stationary source under common control, VoltaGrid's use of the EGU Standard Permit conflicts with the permit's terms.

VoltaGrid suggests it told TCEQ it would supply power to separately owned and operated data centers, and that TCEQ found it eligible for the EGU Standard Permit because its plants

consume a small portion of the electricity they generate. VoltaGrid Resp. 6, 18–19; Bracken Decl. ¶¶ 7, 13. The permitting record does not support that account. Before this litigation, VoltaGrid's registrations described the recipient of its power only as "a datacenter" or "an adjacent facility." ECF No. 35-14 at 2, 34; ECF No. 35-15 at 34. VoltaGrid first represented that its plants serve separately owned and operated facilities in "clarifications" filed on October 8, 2026—*after* Plaintiffs gave notice and filed this lawsuit. ECF No. 46-1 at 120, 397. As of the filing of this Reply, TCEQ has not acted on those revisions. Nor do TCEQ's technical reviews contain any eligibility analysis. They simply restate VoltaGrid's description that the generators will "self-consume power . . . and provide power to a nearby datacenter." *Id.* at 41 *see id.* at 71.

The Court also should not credit Mr. Bracken's account of undocumented conversations with TCEQ staff. His recollection of what staff concluded in an unrecorded 2024 meeting and a 2025 phone call cannot establish what TCEQ decided about eligibility. When TCEQ approved the registrations, what it had before it was VoltaGrid's representation that "[a]ll conditions" of the permit "will be met." ECF No. 35-14 at 26; ECF No. 35-15 at 26.

VoltaGrid's post-lawsuit reenvisioning also fails on its own terms. The roughly 4.6 MW that VoltaGrid says it consumes at SAT-1 (Omicron) consists of power the engines draw to run itself and electricity for the power plant's office. Bracken Decl. ¶ 25. Whatever SAT-1 generates beyond its own small needs goes to Vantage. TCEQ created the EGU standard permit for owner/operator units "sited at or near a load that will use all or most of the electricity generated." TCEQ, *Air Quality Standard Permit for Electric Generating Units: Summary Document* at 1 of 41 (June 2001);[10] *see* VoltaGrid Resp. 5 n.1 (citing same). Here, the load is the data centers.

---

[10] Available electronically at: https://www.tceq.texas.gov/assets/public/permitting/air/NewSourceReview/Combustion/segu_final.pdf [https://perma.cc/F3TA-8DQP ].

### 3. Each campus is under common control, same as the Georgia Environmental Protection Division (EPD) found pursuant to materially similar contracts.

VoltaGrid informed Georgia EPD that its plant and the data center "are in fact separate facilities and should be considered separate stationary sources." Ex. T at 1. EPD then obtained the parties' contract, Ex. T, reversed its draft finding, and "determined that VoltaGrid is under common control of the data center and functions as a support facility[.]" ECF No. 35-17 at 17; *compare id.* at 2. VoltaGrid accepted aggregation. ECF No. 35-18 at 3–4.

The Contract Comparison Table, Exhibit U, shows why. Under the Georgia contract, the data center customer holds four sets of powers: it sets the equipment, directs operation, oversees performance, and takes part in permitting. Ex. U. [redacted]

[redacted] Meadowbrook treats as most relevant: "the power to direct the construction or modification of equipment that will result in emissions of air pollution" and "the manner in which such emission units operate." ECF 46-2, Meadowbrook Letter, attach. at 9–10. Those are the powers Meadowbrook treats as most relevant: "the power to direct the construction or modification of equipment that will result in emissions of air pollution" and "the manner in which such emission units operate." ECF 46-2, Meadowbrook Letter, attach. at 9–10.

Defendants give no reason why a contract that shows common control in Georgia would not show it in Texas. Both States implement the same Clean Air Act and Defendants rely on the same Meadowbrook guidance. VoltaGrid Resp. 18 n.3, 20–21. VoltaGrid's only answer is that it accepted aggregation in Georgia to avoid "monetary penalties related to project delays." *Id.* at 22. [redacted] each San Antonio campus should be treated as a single stationary source. A data center and the power plant built beside it, sized to its load, and run only to keep it operating epitomize the "common sense notion of a plant."[11] Splitting them into separate minor sources" is precisely artificial line-drawing that aggregation exists to prevent.

## II. PLAINTIFFS' EVIDENCE DEMONSTRATES IRREPARABLE INJURY

### A. Plaintiffs' Members Face a Significant Threat of Irreparable Harm

First, Defendants mischaracterize the evidence they assert Dr. Gasparini rebuts. Vantage describes Dr. Suh's declaration as a "generalized literature review" that "never attempts to show that these emissions will likely harm these members." Vantage Resp. 12, 14; *see* VoltaGrid Resp. 13. Not true. Dr. Suh applied available evidence to four of Plaintiffs' standing declarants. Citing their declarations, she identified individuals with serious health issues: severe asthma, pulmonary fibrosis, and children with asthma. Suh Decl. ¶ 83 & nn.50–53, ECF No. 35-9. She concluded that, given their proximity and the magnitude of the campus' emissions, they "*will be exposed* to air pollution emitted from the data center campuses" and "*will have* increased risk of adverse health effects from that exposure." Suh Decl. ¶¶ 22, 83 & nn.50–53, ECF No. 35-9 (emphases added).

[11] Requirements for Preparation, Adoption, and Submittal of Implementation Plans, 45 Fed. Reg. 52,676, 52,695 (Aug. 7, 1980) (citing *Alabama Power Co. v. Costle*, 636 F.2d 323, 396–97 (D.C. Cir. 1979)); *accord* Meadowbrook Letter, attach. at 3, 6), ECF No. 46-2.

She relied on site-specific, video-confirmed evidence that the plants' exhaust leaves the property and moves into nearby neighborhoods. *Id.* ¶¶ 87–91. And she explained why that exposure is itself the harm for these declarants: $NO_2$, ozone, and particulate matter (PM) have no threshold below which added exposure is without risk, and "even small increases in formaldehyde exposure increase cancer risk." *Id.* ¶¶ 20, 92. These are opinions about specific individuals living in proximity to Defendants' emissions sources.

Second, Defendants rely on a Fourth Circuit case, *W. Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 178 F.4th 102 (4th Cir. 2026), that contradicts relevant precedent in this circuit. In this circuit, Plaintiffs "need show only a *significant threat of injury* from the impending action [and] that the injury is imminent[.]" *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986) (cited in VoltaGrid Resp. 10) (emphasis added). "[A] remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (affirming preliminary injunction where "the potential harm is far from hypothetical" for indigent chronically ill plaintiffs from proposed cutbacks that would reduce available healthcare). The threatened harm need only be "more than de minimis." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (internal citations omitted). The threatened harm to Plaintiffs' standing declarants is more than de minimis. Case in point: deluging an asthmatic child with known asthma triggers is not a de minimis concern.

Once "the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (citation omitted). Harm can be satisfied even when the court "cannot accurately predict" the extent of the harm. *Louisiana v. Biden*, 55 F.4th 1017 at 1035. Dr.

Gasparini's conclusion that the plants' impacts are "insignificant" is therefore an argument about magnitude, which belongs, if anywhere, in the balance of harms.[12]

*Chemours*, on which Defendants rely, is distinguishable even if it were the relevant test in the Fifth Circuit. Vantage Resp. 7, 13–14. There, the declarant had stopped drinking and cooking with contaminated tap water. *Chemours*, 178 F.4th at 117–18. The plaintiffs' expert testified she needed additional information to opine whether the declarant would suffer irreparable harm given exposure had largely ended. *Id.* at 118–19. The district court committed clear error in relying on harms the expert acknowledge she could not evaluate without more information. In contrast, Plaintiffs' members cannot stop breathing and Defendants plan to continue emitting 24/7 for years, increasing their emissions as more engines come online. Harvey Decl. ¶¶ 10, 13–16, ECF No. 47-2; Bracken Decl. ¶¶ 12, 14, 17, ECF No. 46-1. Even Defendants opted not to try to argue that their emissions fail to reach the air that Plaintiffs' members breathe. They argue only that Plaintiffs have not modeled each member's individual exposure. VoltaGrid Resp. 12–13; Vantage Resp. 13–14. Their own expert's model shows formaldehyde above his chosen short-term screening level near the Omicron campus. Gasparini Decl. ¶ 45, ECF No. 47-17; *see* Part II.C, *infra*.

Nor do Defendants offer an expert to rebut Dr. Suh's declaration on risks to members with serious respiratory conditions. Their only expert is an air-quality modeler who does not mention Dr. Suh, asthma, or any standing declarant. *See* Gasparini Decl. ¶¶ 1–2, 8. Those members are particularly at risk from pollutants that cause serious long-term harm, including premature death, hospitalization, and impaired lung development in children. Suh Decl. ¶¶ 20, 24, 72. The same pollutants also cause harm that worsens daily life: reduced lung function, respiratory symptoms,

---

[12] Gasperini is not qualified to render opinions on harm and his modeling is unreliable. *See* Parts II.B–C, *infra*.

and asthma attacks. *Id.* ¶¶ 30, 35, 38, 42, 71. Those harms are not "merely trifling," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982), even if no one can "accurately predict" which member will suffer them or when, *see Louisiana v. Biden*, 55 F.4th at 1034–35 (harm was more than de minimis although the court "cannot accurately predict" its extent).

Plaintiffs' members' existing conditions make the threat and imminency more significant. One member takes immunosuppressants to slow progression of pulmonary fibrosis that has permanently scarred his lungs, and he sometimes needs supplemental oxygen after being outdoors. Pan Decl. ¶¶ 15, 17, 19. Another declarant's son, whose asthma is treated with prescription medicine taken by nebulizer, needs surgery for his breathing problems. Cunningham Decl. ¶¶ 10–11. Two of another declarant's children have been hospitalized for respiratory illnesses that left them needing breathing treatments during future illnesses. Abplanalp Decl. ¶ 21. And another declarant, who lives 0.4 miles from Omicron Drive, has severe asthma that requires injections every two weeks. He has suffered four asthma attacks requiring emergency treatment, including one requiring hospital admission. Ponce Decl. ¶¶ 2, 8–10, 15, ECF No. 35-2. Plaintiffs "need not show that death or serious injury has already occurred," they "need only show that there is a 'substantial risk of serious harm.'" *Ball v. LeBlanc*, 792 F.3d 584, 593 (5th Cir. 2015) (upholding finding, based on expert testimony, that the plaintiffs' medical conditions put them "at increased risk").

Every day, Plaintiffs' members are exposed to Defendants' emissions where the air already fails the health-based ozone standard. 40 C.F.R. § 81.344 (identifying San Antonio as in serious nonattainment with 2015 8-hour Ozone NAAQS). Members already feel the effects. They check air-quality reports and stay inside on bad days, cut walks and rides short because of shortness of breath, and run air purifiers at home. Pan Decl. ¶¶ 7–8, 20; Abplanalp Decl. ¶ 20; Cunningham

Decl. ¶¶ 7–8, 12; Tchou Decl. ¶¶ 13,15, ECF No. 35-8. Defendants demand air modeling and the kind of evidence required in a personal-injury case but cite no case law requiring as much. VoltaGrid Resp. 12–14; Vantage Resp. 13–14, 16. Plaintiffs offer video imagery, emissions estimates, and the declaration of a public health expert whose opinions rest on site-specific information, declarant testimony, and peer reviewed science. Nor does the existence of other sources preclude granting Plaintiffs' Motion. *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 793 (5th Cir. 2000) (injunction may be appropriate "even if it will not prevent all discharges of the pollutants affecting the plaintiff").[13]

### B. Gasparini is Not Qualified to Testify About Health Impacts.

Defendants offer Dr. Gasparini's declaration to evaluate each campus's "potential impact on human health" and label it "the only competent evidence in the record on this question." Vantage Resp. 16–17; *see* VoltaGrid Resp. 12. Gasparini is not qualified to give opinions on human health impacts. His degrees are in meteorology and atmospheric sciences, and he considers himself a Certified Consulting Meteorologist, and an expert "in the application of weather information." Gasparini Decl. ¶¶ 7–8. His work is quantifying emissions, "determining appropriate authorization mechanisms," and running dispersion models. *Id.* ¶ 6. He claims no training or experience in toxicology, epidemiology, medicine, or public health. He has published no peer-reviewed articles in ten years, and his earlier publications concern aerosol physics. *Id.* ¶ 14 & Att. 1. His statement

[13] Defendants' reliance on *Center for Biological Diversity v. U.S. Department of Transportation*, 180 F.4th 796 (5th Cir. 2026), is inapposite. Vantage Resp. 13–14. That case involved a declarant who identified "no Project-specific emission" and tied his health condition to "industrial activity generally" rather than to the LNG port he challenged. 180 F.4th at 805–06. Here, Defendants quantify the NOx, VOC, and formaldehyde each plant may emit, Bracken Decl. ¶¶ 14, 16, ECF No. 46-1, there is video evidence showing emissions plumes, and Dr. Suh explains how those pollutants harm Plaintiffs' declarants, *i.e.*, the link between project and harm that the *Center for Biological Diversity* declarant never supplied. Suh Am. Decl. ¶ 83, ECF No. 35-9.

about formaldehyde health impacts restate TCEQ screening guidance, *id.* ¶¶ 43–44, applied by him rather than by the TCEQ toxicologists who under that guidance make the judgment. ECF No. 47-48 at 2 ("[O]nly an assessment of risk by Toxicology can determine whether the guidelines . . . are applicable.").

An expert qualified in one field may not opine in another. "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999); *see* Fed. R. Evid. 702. Though the Court may consider otherwise inadmissible evidence at this stage, *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993), it should give no weight to a meteorologist's view that emissions pose no health risk. Gasparini can report his modeled concentrations. Whether those concentrations harm the children, older adults, and people with respiratory disease who live nearby is a question for a health scientist. Plaintiffs' health expert has answered that question, and Defendants offer no qualified expert in response.

### C. Gasparini's Modeling Results are Unreliable.

Gasparini's modeling results are only as reliable as the inputs. "Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). Gasparini's conclusion that Defendants' emissions are "insignificant," Gasparini Decl. ¶ 49, rests on inputs that ***exclude critical facts***: uncontrolled emissions from the trailer-mounted units (video: https://tinyurl.com/pn8mht7t), key pollutants identified in Dr. Suh's declaration ($NO_2$ and particulate matter), and emissions that occur when controls are not operating under strict control parameters. *See* ECF No. 35-10 ¶ 50.

Defendants' registrations authorize about 291 tons per year of NOx, Gasparini Decl. ¶¶ 20–23, most of it emitted as nitric oxide that "is then rapidly converted in the atmosphere to $NO_2$," Suh Decl. ¶ 28. $NO_2$ causes asthma attacks and other respiratory harm at "concentrations below

the NAAQS," *id.* ¶¶ 30, 35. Defendants also emit PM2.5 directly while their NOx and VOC emissions form additional PM2.5 in the atmosphere. Suh Decl. ¶ 48. PM2.5 causes cardiovascular harm and premature death at concentrations "below the current 24-hour national air quality standard." *Id.* ¶¶ 50, 52. Gasparini's omission of these inputs and pollutants ($NO_2$ and particulate matter) renders his conclusions about the significance of Defendants' pollution meaningless.

**D. Plaintiffs' Actions are Timely**

Defendants criticize Plaintiffs for not suing sooner. Vantage Resp. 18-20; VoltaGrid Resp. 14–16. Defendants disregard both the technical complexity of this case and their own lack of transparency, which together required significant investigation. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012) (rejecting delay argument when caused by the defendant's lack of transparency causing need for public records request). Moreover, (alleged) delay "is not determinative of whether relief should be granted." *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975).

Courts encourage investigation before filing. For example, courts have granted preliminary injunctions where the movant waited to engage an expert, *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 570–71 (S.D. Tex. 2014), and where the movant "was investigating . . . in good faith," *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 698–99 (N.D. Tex. 2015). Holding otherwise would create an incentive for plaintiffs to file prematurely.

The technical complexity of this case is obvious. Even now, VoltaGrid appears not to understand the basis of its own potential to emit calculations for VOC or why they exclude formaldehyde. *See* Part I.A, *supra*. Likewise, 69 days after receiving Plaintiffs' notice letter (and years after working with the facts and law at issue), Defendants told the Court that this case "presents highly technical questions" and obtained an extension making their first response due 99 days after that notice. ECF No. 20 at 1; ECF No. 27 at 2–3. Defendants also have chosen to release

highly relevant information as it suits them; as if they and not the Clean Air Act and this Court decide their destiny. If sophisticated Defendants with considerable financial resources needed more than three months to address facts and law known to them for years and cannot seem to get their story straight from one day to the next, Plaintiffs cannot be faulted for the time it took to build their case from public filings.

Case in point. Defendants failed to provide required notice to TCEQ when it started construction, completed construction, or commenced operation. 30 Tex. Admin. Code § 116.615(4), (5)(A)–(B). VoltaGrid quoted those requirements in both registrations and answered, "All required notifications will be submitted." ECF No. 35-14 at 23; ECF No. 35-15 at 23. By VoltaGrid's own account in this litigation, construction began at Omicron in November 2024, twenty engines began operating in July and August 2025, and construction began at Rogers Road in June 2026. Bracken Decl. ¶¶ 12, 17 Yet as of June 2026, TCEQ had received no startup notification for the Rogers Road plant, ECF No. 1-2 at 18 n.36, and Plaintiffs have found none for Omicron in TCEQ's public files. Likewise, to Plaintiffs' knowledge, there is no public record of the trailer-mounted engines that existed before Plaintiffs filed their amended motion for preliminary injunction, including in public TCEQ files.

If delay exists, it is due to Defendants' lack of transparency. Defendants hold the relevant facts. They always have. Vantage asserts that permitting records were available "from the date the permits were obtained by Defendants." Vantage Resp. 19 n.9. But on their face, those registrations reported emissions below major source thresholds and exclude emissions from VoltaGrid's co-located power plants. Discovering the violations required significant technical work and constant attention to ever-changing details, permit amendments, and purported "facts" in those materials.

And because the registrations were not public until "***the permits were obtained by Defendants***" neither Plaintiffs nor anyone else could weigh in.

Defendants' timeline is similarly obscure. It starts in December 2023. Vantage Resp. 18–19 ("roughly 31 months after construction began"); VoltaGrid Resp. 15. But what began in December 2023 was construction of data center *buildings*. The articles Vantage cites describe a "two-story" building with "four data halls" of "8 megawatts each," registered with the Texas Department of Licensing and Regulation. ECF No. 47-22 at 2; ECF No. 47-23 at 3. Neither article mentions VoltaGrid, a power plant, or a gas engine. Construction of a data center building is not a Clean Air Act violation. VoltaGrid did not apply for authorization for the Omicron Drive power plant until September 20, 2024, Bracken Decl. ¶ 8, and did not begin building the Rogers Road power plant until June 2026, id. ¶ 17. None of these events disclosed the trailer-mounted units at Rogers Road.

The declarations Defendants cite likewise show members watching buildings go up, not learning of operations, emissions, or violations. One declarant noticed "construction at the Rogers Road site" in late 2024 and had heard about "a data center," "but not from any official sources like the Texas Commission on Environmental Quality." Abplanalp Decl. ¶ 12. What she saw was "a very large, approximately three-story building." *Id.* ¶ 13. Another noticed "construction at the Omicron data center." Vickers Decl. ¶ 8, ECF No. 35-6. Another saw land cleared but, because "[t]here were no signs posted," assumed it was "a distribution warehouse." Pan Decl. ¶ 21, ECF No. 35-3. He did not learn "that data centers and on-site generators were being built and operated" until about March 2026, and he learned it in part from an alert sent by Plaintiff Sierra Club. *Id.*

Even if there had been inexcusable delay (there was not), it "is not particularly probative in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir.

2014). Unlike the discharges in *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185 (5th Cir. 1975), the harm here is growing.[14] "Harm to human health and the environment is what it is," and supposed delay "does not change the irreparable harm[.]" *United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522, 528 (D. Ariz. 2021) (a Clean Air Act enforcement case).

## III. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR RELIEF.

Defendants' claimed hardships are economic, largely self-inflicted and a matter of bargained-for contracts between sophisticated, well-resourced companies. Plaintiffs' members face threats of near and long-term harm to their health and wellbeing. When environmental injury "is sufficiently likely, . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).[15]

### A. Defendants' Claimed Harms are Economic and Self-Inflicted.

The harms Defendants press are overwhelmingly financial: construction "standby" fees, liquidated damages, contractors' idle-fee claims, and delayed rent. Atchley Decl. ¶¶ 8, 10, ECF No. 46-3; Vantage Resp. 28–29. Financial loss from an activity likely to be unlawful "merits little equitable consideration," even when the business "would be virtually destroyed by a preliminary injunction." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.12 (5th Cir. 1991) (quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988)). Vantage's

---

[14] VoltaGrid now supplies up to about 86 MW of customer load, including, at Rogers Road, through the trailer-mounted engines, since its Rogers plant is not yet operating. Harvey Decl. ¶¶ 13–14, ECF No. 47-2; Vantage Resp. 11. Once its facilities are fully built, it will supply about 306 MW of contracted load. Harvey Decl. ¶ 14. Ten registered engines at Rogers Road are installed but not yet operating. Bracken Decl. ¶ 17.

[15] Vantage cites *Amoco* for the money the defendants stood to lose, Vantage Resp. 29. But that loss counted only because nothing weighed against it. Exploration posed no probable harm, and the government would review any later development and production before it began. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544–45 (1987). Here there is no later checkpoint. The engines are already running, and Defendants circumvented the review that should have come first.

equipment-damage claim also assumes an abrupt loss of power with mentioning the possibility of a planned shutdown. Vantage Resp. 28; Davis Decl. ¶ 7.

The losses are also of Defendants' own making. Defendants knew single-source treatment was at issue. In Georgia, VoltaGrid accepted aggregation "for the purpose of expediting VoltaGrid's permit." VoltaGrid Resp. 21. VoltaGrid nonetheless began building the Rogers Road plant in June 2026. Atchley Decl. ¶ 4. Defendants kept building after Plaintiffs' July 22 notice letter and after this suit was filed. VoltaGrid installed ten engines at Rogers Road. Bracken Decl. ¶ 17. Vantage accepted delivery of backup generators for a new building as late as November 4, 2026, and expects more through April 2027. Davis Decl. ¶ 13(b), ECF No. 47-7.

The Court should not credit Defendants' self-inflicted harms. A party's claimed hardship "is given less weight if he chooses 'to incur costs in the face of a possible . . . claim.'" *Bd. of Regents of the Univ. of Hous. Sys. v. Hous. Coll. of L., Inc.*, 214 F. Supp. 3d 573, 604 (S.D. Tex. 2016) (citation omitted). A defendant that "opted to double down" after notice cannot "cite[] to the high stakes of the game as a reason to call off the bet." *Id.* at 604–05. So too here. A developer that builds a power plant in circumvention of nonattainment New Source Review, despite notice of the problem, cannot claim the resulting costs as a hardship. *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011) (affirming preliminary injunction where "any injury" to the defendant was "largely self inflicted" because it spent $800 million on plant construction before obtaining the proper environmental permit).

VoltaGrid's largest figure, up to $83.7 million in liquidated damages, arises "pursuant to its contractual relationship with Vantage and Vantage's customer." Atchley Decl. ¶ 10. Defendants negotiated these liquidated damages with each other and with a data center tenant for the risk of foreseeable delay. Negotiated payments that sophisticated companies agreed to pay each other

should not be balanced against human health. Nor do Defendants' cases help them. None involved sources operating without required major source preconstruction permits in an area that already failed air quality standards. *See* VoltaGrid Resp. 24 (citing cases involving construction costs and "temporary effects of air pollution associated with construction").

### B. The Public Interest Favors Enforcing the Act.

"Enforcement of the environmental laws is in the public interest." *In re Commonwealth Oil Ref. Co.*, 805 F.2d 1175, 1190 (5th Cir. 1986). Appeals by Defendants to jobs and tax revenue ask the Court to strike a balance that Congress already assigned to the permitting process. The Clean Air Act preconstruction permit Defendants are circumventing requires the lowest achievable emission rate and offsets, and it requires a showing that the source's "benefits . . . significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification." 42 U.S.C. § 7503(a)(5); 30 Tex. Admin. Code § 116.150(d)(4). Defendants were required to make that showing *before* construction to prevent the very claims they raise now.

Defendants argue that an injunction would "cast doubt" on the permitting system. VoltaGrid Resp. 25; Vantage Resp. 31–32. That argument misreads how the PBR and standard permit programs work. Neither program requires a case-specific finding that a facility is not a major source. Instead, the TCEQ's rules flatly prohibit using these expedited mechanisms to authorize new major sources, and they rely on enforcement to make that prohibition stick. 30 Tex. Admin. Code §§ 106.4(a)(2)–(3), 116.610(b). The Fifth Circuit has upheld Texas's expedited programs against circumvention challenges precisely because that enforcement backstop exists. *City of Seabrook v. EPA*, 659 F.2d 1349, 1367 (5th Cir. 1981) (if the state fails to enforce, "either the EPA or a concerned citizen may bring an enforcement action"); *Luminant Generation Co. v. EPA*, 675 F.3d 917, 929 (5th Cir. 2012) (same, *citing City of Seabrook*). Citizen enforcement of the

major-source prohibition is not an intrusion on the state process. It is a safeguard that makes the process lawful in the first place.

Defendants also cannot claim a protected interest in "certainty" for a registration that cannot authorize a major source. Denying relief would undermine confidence in Texas's expedited programs, because it would tell operators that the only check against circumvention is empty. *See WildEarth Guardians*, 457 F. Supp. 3d 936, 950 (D. Colo. 2020) (declining to abstain because doing so would preclude "federal oversight of a citizen's challenge to the construction and operation of a major source in violation of major-source requirements").

Vantage and VoltaGrid say the requested injunction is against the public interest because it will cost jobs. Vantage Resp. 30–31; VoltaGrid Resp. 25–26. But an injunction would not necessarily stop the data center or power plants from being built and run. A properly permitted facility still needs people to build it, install controls, and operate it. Defendants actually describe their own business interest in hiring the workforce they want, on the schedule they want, for facilities they chose to start building without the required authorizations. The public interest here is the one Congress identified when it required major sources to undergo Nonattainment New Source Review Review before construction and authorized citizens to enforce that requirement.

**C. No More Than a Nominal Bond is Warranted.**

The Clean Air Act makes security discretionary: the court "may" require a bond. 42 U.S.C. § 7604(d). In this Circuit, the court "may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citation omitted); *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981). A bond sized to self-inflicted costs and to penalties Defendants owe each other would make the Act's citizen-suit remedy as authorized by

Congress unavailable to nonprofit organizations and ordinary citizens. The Court should waive security or set a nominal bond. *See* ECF No. 35 at 27–28.[16]

## IV. THIS SUIT DOES NOT COLLATERALLY ATTACK A STATE-ISSUED PERMIT

VoltaGrid contends that "Plaintiffs' claims are barred due to the existence of validly issued TCEQ Standard Permits, which are part of Texas's EPA-approved SIP, authorizing the construction and operation of both VoltaGrid Facilities." VoltaGrid Resp. 16. VoltaGrid's gloss misstates the facts and mischaracterizes the caselaw. Assuming the "validity" of Defendants' *minor* source permits does not absolve VoltaGrid of liability for constructing *major* sources without the NNSR permit required for major sources of nonattainment pollutants. *Weiler v. Chatham Forest Prods., Inc.*, 392 F.3d 532, 539 (2d Cir. 2004) (holding that Clean Air Act citizen suit seeking injunction could proceed against facility that received state-issued minor source permit despite "state determination that a prospective source of air pollution is not a major emitting facility"); *Voigt v. Coyote Creek Mining Co.*, No. 1:15-cv-00109, 2016 WL 3920045, at *4 (D.N.D. July 15, 2016) (section 7604(a)(3) "does not contain an exception for when a state has determined . . . [a major permit] is not required and issued a minor source permit to satisfy state requirements.").

*CleanCOALition* and *Nucor Steel-Arkansas* do not hold otherwise. Those cases hold that a state's issuance of a ***major source permit*** can preclude a §7604(a)(3) claim, even if the plaintiff claims the permit was issued improperly. *CleanCOALition v. TXU Power*, 536 F.3d 469, 479 (5th Cir. 2008);[17] *Nucor Steel-Ark. v. Big River Steel, LLC*, 93 F. Supp. 3d 983, 992 (E.D. Ark. 2015) ("7604(a)(3) never authorized . . . suits contending that a permitting authority erred in granting a

[16] With respect, if the Court is inclined to require more than a nominal amount, it should not delay a preliminary ruling on the motion pending a separate bond hearing and additional briefing Defendants request. VoltaGrid Resp. 26; Vantage Resp. 32. The Court can rule on Plaintiffs' motion and set a bond after Defendants claimed losses are tested following expedited discovery.

[17] *See id.* at 470 (indicating that TXU applied for a major source PSD permit).

[major source] PSD permit."). Courts have uniformly declined to apply *CleanCOALition* to bar § 7604(a)(3) preconstruction citizen suits against defendants who have only obtained authorization to construct a *minor* source. *Citizens for Pa.'s Future v. Ultra Res., Inc.*, 898 F. Supp. 2d 741, 747–48 (M.D. Pa. 2012); *Voigt*, 2016 WL 3920045, at *5. Congress took seriously the appeal (and public health dangers) of circumventing major New Source Review, and even more so in nonattainment areas.

VoltaGrid's reliance on reliance on *Sierra Club v. Energy Future Holdings Corp.*, No.W-12-CV-108, 2014 WL 12539733 (W.D. Tex. Feb. 10, 2014), VoltaGrid Resp. 16–17, is misplaced because the dispute focused on an inapplicable provision of the Clean Air Act. Federal operating permits issued under Title V of the Act, unlike preconstruction permits, are subject to review and objection by EPA's Administrator. 42 U.S.C. § 7661d(b). If the Administrator declines to object to a Title V permit, a person may seek review of that decision in federal appellate court. *Id.* § 7607(b)(1). Actions by the Administrator subject to review under § 7607(b)(1) "shall not be subject to judicial review in . . . proceedings for enforcement." *Id.* § 7607(b)(2). Plaintiffs in *Energy Future Holdings* asked the court to disregard language in a Title V permit explaining how compliance with a particular limit should be determined. 2014 WL 12539733 at *4. The Court applied the bar at § 7607(b)(2) to hold that Plaintiffs' failure not to appeal the Administrator's failure to object to the Title V permit waived the argument. *Id.* at *4–5. Because the Act includes no process for the Administrator to object to preconstruction permits or make the Administrator's failure to object to them subject to judicial review under § 7607(b)(1), neither § 7607(b)(2) nor *Energy Futures Holdings Corp*. apply.

## **Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for preliminary injunction.

Dated: November 23, 2026

Respectfully submitted,

/s/ *Kenneth J. Rumelt*
Kenneth J. Rumelt (VT Bar No. 4801)*
Environmental Integrity Project
888 17th St., NW, Suite 810
Washington, D.C. 20006
krumelt@environmentalintegrity.org
Phone: 202-888-2707

Gabriel Clark-Leach (TX Bar No. 24069516)
Environmental Integrity Project
98 San Jacinto Blvd., Suite 400
Austin, Texas 78701
gclark-leach@environmentalintegrity.org
Phone: 202-263-4440

*Attorneys for Plaintiffs*

* Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on November 23, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

/s/ *Kenneth J. Rumelt*
Kenneth J. Rumelt