***Public Citizen, et al. v. Vantage Data Centers Management Company, LLC, et al.***
**No. 5:26-cv-06032-JKP-ESC**

**Plaintiffs Public Citizen and Sierra Club's Consolidated Reply in Support of Amended Mot. for Prelim. Injunction**

**Exhibit T**
**Agreement for Power Generation Between SF ATL2, LLC and VoltaGrid, LLC (Redacted)**
**(VG000117-VG000211)**

**From:** Jordan Strouse <Jordan.Strouse@voltagrid.com>
**Subject:** Redacted Copy of VoltaGrid Agreement in Covington
**To:** Allison, Steve <Steve.Allison2@dnr.ga.gov>
**Cc:** Korby Bracken <korby.bracken@voltagrid.com>
**Sent:** July 7, 2026 5:04 AM (UTC+00:00)
**Attached:** PGA-VG-SF 250925 [Redacted] [Executed].pdf, SOW-VG-SF 250925 [Redacted [Executed].pdf

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Steve: After some consultation internally, we have decided to transmit redacted copies of the VoltaGrid agreement to your agency. Attached is both the main Agreement for Power Generation and the related Statement of Work for the site in Covington, Georgia.

On Tuesday, along with an affidavit, I will overnight a redacted copy, an unredacted copy and the accompanying affidavit to your office at the below address:

**Steve Allison**
**Manager, Stationary Source Permitting Program**
**Environmental Protection Division**
**4244 International Parkway, Suite 120**
**Atlanta, GA 30354**
Thank you.

Jordan Strouse
General Counsel
VoltaGrid
T: +1.713.494.3590
E: jordan.strouse@voltagrid.com
VoltaGrid

**PRIVILEGED & CONFIDENTIAL COMMUNICATION**

**REDACTED COPY**

**SF ATL2, LLC dba SF ATL2 (DE), LLC**

**AND**

**VOLTAGRID, LLC**

---

# AGREEMENT FOR POWER GENERATION

---

**Information in this Submittal has been redacted by Jordan Strouse, General Counsel, VoltaGrid, LLC pursuant to the claim or claims declared in the attached affidavit that such information is protected under Georgia law from disclosure to the public.**

4910-3427-3124v.13

Docusign Envelope ID: [redacted]

REDACTED COPY

CONFIDENTIAL

# COVER SHEET

## THE PARTIES

1. **SF ATL2, LLC dba SF ATL2 (DE), LLC**, a Delaware limited liability company, having its primary place of business at PO Box 2145, El Segundo, CA 90245 (herein, "**Customer**" or "**Serverfarm**"), and

2. **VOLTAGRID, LLC**, a Texas limited liability company, having its primary place of business at 10800 Telge Road, Houston, Texas 77095 (herein, "**VoltaGrid**" or "**Contractor**").

Customer and VoltaGrid may also be referred to individually as a "**Party**" or together as the "**Parties**".

## THE CONTRACT

This Agreement for Power Generation and the following documents (collectively, this "**Contract**") comprise the full contract of the Parties:

- This Cover Sheet
- Schedule 1 – Contract Summary
- Schedule 2 – Definitions
- Schedule 3 – Contract Terms and Conditions
  - Exhibit A to Schedule 3: Statement of Work Template
  - Exhibit B to Schedule 3: Change Order Template
  - Exhibit C to Schedule 3: Insurance Requirements
- Schedule 4 – Copy of Statement of Work No. 1
- Schedule 5 – Cam us Standards and Procedures
- [redacted]
- [redacted]
- Any other attachments, annexures or exhibits to this Contract not specifically mentioned herein.

## PRECEDENCE OF DOCUMENTS

To the extent of any inconsistency between the parts of this Contract, the following order of precedence applies: (1) Schedule 1 through Schedule 3 of this Contract, (2) a Change Order, (3) a SOW, unless the Change Order or the SOW explicitly cites the conflicting terms of this Contract (e.g., by Section reference) and explicitly states that it is intended to modify those conflicting terms (in which case the conflicting terms of the Change Order of SOW will take precedence, but the modification will apply only for that Change Order or SOW) and (4) all other Schedules.

REDACTED COPY

CONFIDENTIAL

IN WITNESS WHEREOF, each Party has executed this Contract by its duly authorized representative and agrees this Contract shall be effective as of the Effective Date (as defined in Schedule 2).

**SF ATL2, LLC dba SF ATL2 (DE), LLC**

BY: [redacted] ______________

NAME: [redacted] ______________

TITLE: [redacted] ______________

DATE: [redacted] ______________

**VOLTAGRID, LLC**

BY: [redacted] ______________

NAME: [redacted] ______________

TITLE: [redacted] ______________

DATE: [redacted] ______________

The signature block below confirms that in-house counsel to VoltaGrid, LLC has reviewed and approved this document's form and content. This signature does not bind VoltaGrid, LLC or any other Party.

By: [redacted] ______________

[redacted]

REDACTED COPY

CONFIDENTIAL

Schedule 1
**Contract Summary**

| | |
|---|---|
| **End of Initial Term** | Five years following the first Phase Start Date in Statement of Work No. 1. |
| **Extension Options** | Six options of six months each. |
| **Site** | [redacted] |
| **Services** | The design, delivery, installation, operation, and maintenance of a power generation microgrid and supply of power to Customer, in accordance with each Statement of Work referencing this Contract, including Statement of Work No. 1. |
| **Customer Contract Manager** | [redacted]<br><br>*Customer's Contract Manager may be replaced by Customer from time to time with written notice to VoltaGrid |
| **VoltaGrid Contract Manager** | [redacted]<br><br>*VoltaGrid's Contract Manager may be replaced by VoltaGrid from time to time with written notice to Customer, provided that such replacement does not negatively impact the performance of the Services under this Contract. |
| **Customer notice address** | [redacted]<br>Attention: CEO<br>Email: [redacted]<br>Cc: [redacted] |
| **VoltaGrid notice address** | VoltaGrid, LLC<br>10800 Telge Road<br>Houston, Texas 77095<br>Attention: President<br>Email: [redacted] |

REDACTED COPY

CONFIDENTIAL

Schedule 2
**Definitions**

Terms in this Contract have the meanings set forth in this Schedule or as elsewhere defined in this Contract, whether in the singular or the plural or in the present or past tense. Words not otherwise defined in this Contract shall have meanings as commonly used in the English language, including their generally accepted technical or trade meaning.

**"Acceptable Counterparty"** means a person or entity that either (1) (i) has a net worth that is not less than VoltaGrid's net worth as of the Effective Date; (ii) has experience providing services of substantively similar scale and technical standards as the Services that VoltaGrid provides to Customer under this Contract [redacted] to provide the Services; (iii) is not a foreign governmental entity or agency; and (iv) is not subject to sanctions, designated by the U.S. federal government on any list as a prohibited or restricted party, or otherwise a person or entity from which Customer is not permitted to procure services under any applicable Laws or (2) to which Customer consents in writing, with such consent not to be unreasonably withheld, conditioned or delayed.

**"Affiliate"** means, in respect of a Party or other entity, any corporation, company, partnership, limited partnership, limited liability company, joint venture or other form of business entity, which controls, is controlled by, or is under common control with, that Party or other entity.

**"Air Permitting Parameters"** has the meaning set forth in engine specifications appendix in the applicable SOW.

**"Background IP"** means all Intellectual Property of a Party (or licensed to a Party by a third party) which was in existence before the date of this Contract or is developed by such Party independently and outside the scope of this Contract. For clarity and without limiting Section 7.4 or Section 7.5 of Schedule 3, Background IP excludes Project IP, but a Party may incorporate its Background IP into its Project IP.

**"Benefitted Party"** shall have the meaning set forth in Section 10.4 of Schedule 3.

**"Block Date"** means the dates identified in an SOW or otherwise specified by Customer to VoltaGrid at least 20 business days in advance (or, if Customer's data center customer does not provide Customer with notice within that period, as soon as Customer receives notice, which can never be less than 5 business days prior to a Block Date and a date still be a Block Date).

[redacted]

**"Campus Standards and Procedures"** means Schedule 5.

**"Change Order"** means the document described as such and issued by Customer to VoltaGrid under Section 1.5 of Schedule 3, using the template form set forth in Exhibit B of Schedule 3 (or any other form agreed by the Parties).

**"Commissioning Period"** has the meaning set forth in Section 5.2 of Schedule 3.

**"Completion"** means the completed performance of all Services as indicated in each relevant Statement of Work or Change Order.

**"Confidential Information"** has the meaning set forth in the NDA.

**"Consequential Damages"** means any consequential, special, exemplary, incidental, or punitive damages, loss of production, loss of revenue, loss of profit or anticipated profit, loss of business reputation, business interruptions of any nature, loss of opportunities, loss of anticipated savings or wasted overheads.

**"Contract End Date"** means the later of (1) the date that is the earlier of (a) the last day of the Initial Term; or (b) the date this Contract is terminated in accordance its terms; or (2) if Customer exercises any Extension

REDACTED COPY



Options, the date that is the earlier of: (a) the last day of the last Extension Period; or (b) the date this Contract is terminated in accordance with its terms.

**"Contract Summary"** means Schedule 1.

**"Contract Term"** means the term of this Contract, as set forth in Section 9 of Schedule 3.

**"Contract Terms and Conditions"** means Schedule 3.

[redacted]

**"Customer Contract Manager"** means the person listed in the Contract Summary, as may be updated from time to time by Customer in accordance with this Contract.

**"Customer IP"** shall have the meaning set forth in Section 7.7 of Schedule 3. For clarity, Customer IP excludes VoltaGrid's Background IP, and any enhancements, improvements or modifications thereto.

**"Customer Party"** shall have the meaning set forth in Section 10.1.2 of Schedule 3.

**"Customer Step In"** shall have the meaning set forth in Section 1.8(a) of Schedule 3.

**"Delay LDs"** shall have the meaning set forth in Section 5.1 of Schedule 3.

**"Delivery Delay"** shall have the meaning set forth in Section 5.1 of Schedule 3.

**"Delivery Obligation"** shall have the meaning set forth in Section 5.1 of Schedule 3.

**"Disrupted Services"** shall have the meaning set forth in Section 1.7 of Schedule 3.

**"Effective Date"** means the date this Contract is last signed by the Parties.

[redacted]

**"Exclusion"** shall have the meaning set forth in Section 1.9 of Schedule 3.

**"Extension Option"** means each of Customer's options to extend the Contract Term for the additional periods (each, an **Extension Period**) set forth in the Contract Summary (if any).

**"Force Majeure Event"** shall have the meaning set forth in Section 26 of Schedule 3.

**"Group"** shall have the meaning set forth in Section 10.2 of Schedule 3.

**"Impacted Party"** shall have the meaning set forth in Section 26 of Schedule 3.

**"Indemnitee"** shall have the meaning set forth in Section 10 of Schedule 3.

**"Indemnitor"** shall have the meaning set forth in Section 10 of Schedule 3.

**"Initial Term"** means the period beginning on the Effective Date and ending on the day specified in the Contact Summary.

**"Intellectual Property"** means any subject matter, whether tangible or intangible, that attracts, or is susceptible to protection by, Intellectual Property Rights.

**"Intellectual Property Rights"** means all copyright and analogous rights (including moral rights), all rights in relation to inventions (including patent rights), registered and unregistered trademarks (including service marks), registered designs, trade secrets, know-how, circuit layouts and all other rights throughout the world resulting from intellectual activity in the industrial, scientific, or artistic fields. These rights include all rights in all applications to register these rights and all renewals and extensions of these rights.

**"Laws"** means (1) legislation including regulations, by-laws, orders, awards, and proclamations having the force of law; (2) federal, state, and local statutory law and ordinances, common law, and equity (if

applicable); and (3) authority requirements, guidelines, consents, certificates, licenses, permits and approvals (including their conditions) with which a Party is legally required to comply or obtain.

[redacted]

**"Lender"** shall have the meaning set forth in Section 27 of Schedule 3.

**"Liquidated Damages"** means Delay LDs and PSO LDs.

**"Loss"** includes any action, claim, proceeding, loss, damage, cost (including professional fees and reasonable legal costs on a full indemnity basis), charge, expense, fine, interest, award, penalty, and other liability.

**"Monthly Fee"** means a recurring monthly charge for the Services.

**"MW"** means megawatt.

**"NDA"** means the Mutual Nondisclosure Agreement entered into by the Parties or their Affiliates [redacted]

**"Notice of Election"** shall have the meaning set forth in Section 10.3 of Schedule 3.

**"One-time Fee"** means a non-recurring charge for the Services.

**"Operating Parameters"** has the meaning set forth in the engine specifications appendix in the applicable SOW**.**

**"Personnel"** means, with respect to either Party, such Party's Affiliates and its or their employees, officers, directors, agents, independent contractors, contractors, subcontractors, attorneys, accountants, current and prospective lenders and financing sources and financial advisors, and, in the case of VoltaGrid Personnel, includes any invitees of the foregoing.

**"Phase"** shall mean a distinct portion of the Services scheduled to commence on a specific date, which are referred to in a Statement of Work, each of which is characterized by the initiation of a defined scope of work or Power Delivery milestones and represents a progressive step in the overall execution of the Services.

**"Phase Amendment Period"** shall have the meaning set forth in Section 5.3 of Schedule 3.

**"Phase Start Date"** means the Services commencement date for each Phase as set forth in a Statement of Work.

**"Power Delivery"** means power generation obligations of VoltaGrid provided in a Statement of Work.

**"Power Service Objective** or **PSO"** shall have the meaning set forth in Section 1.2 of Schedule 3.

**"Project IP"** means all Intellectual Property, including any designs and/or algorithms, that was created, designed, developed, discovered, or came into existence in connection with this Contract that is not Work Product. For clarity and without limiting Section 7.4 or Section 7.5 of Schedule 3, Project IP excludes Background IP, VoltaGrid IP, and Customer IP, but (a) VoltaGrid may incorporate VoltaGrid IP and/or its Background IP into its Project IP, and (b) Customer may incorporate Customer IP and/or its Background IP into its Project IP.

**"PSO LDs"** shall have the meaning set forth in Section 1.2(b) of Schedule 3.

**"Qualified Operator"** means any of (a) a recognized national major service provider for power generation plants that is not a Restricted Operator; (b) a person or entity that is not a Restricted Operator [redacted] and (ii) has

not been terminated for cause thereunder (as defined in the service or other agreements governing the power generation services)); or (c) any person or entity to which VoltaGrid consents in writing. A person or entity can satisfy the Qualified Operator requirement by either being a Qualified Operator itself or by engaging a third-party Qualified Operator.

**"Relevant Dates"** shall have the meaning set forth in Section 5.3 of Schedule 3.

**"Restricted Operator"** means any of the businesses listed in an SOW that VoltaGrid has reasonably determined may not serve as Qualified Operator due to a legitimate risk of the person or entity improperly using VoltaGrid Intellectual Property or Confidential Information to compete with VoltaGrid.

**"Scrubbers"** shall have the meaning set forth in Section 1.12 of Schedule 3.

**"Services"** include services, works, activities, tasks, and Work Product provided by VoltaGrid to Customer, including the Power Delivery.

[redacted]

**"Statement of Work"** or **"SOW"** means the description of specific Services provided under the terms of this Contract which are contained in separate statements which are signed by both Parties and made part of this Contract, and which shall describe the Services, Monthly Fees, One-time Fees, power charges, timing and any other relevant data or information related to those specific Services and the Power Delivery.

**"Statement of Work No. 1"** means the initial SOW under this Contract. A copy of Statement of Work No. 1 is attached to this Contract at Schedule 4.

**"Step In Period"** shall have the meaning set forth in Section 1.8(a) of Schedule 3.

**"Substitute Services"** shall have the meaning set forth in Section 1.8 of Schedule 3.

[redacted]

**"VoltaGrid Contract Manager"** means the person listed in the Contract Summary, as may be updated from time to time by VoltaGrid in accordance with this Contract.

**"VoltaGrid Equipment"** means the equipment deployed by VoltaGrid or its Personnel to the Site to provide the Services and the Power Delivery (including all ancillary equipment, back-up equipment, and redundant equipment).

**"VoltaGrid Financing Party"** means any lender or equity investor (including any trustee or agent on behalf of such lender or equity investor) providing debt or equity financing or refinancing to VoltaGrid or any Affiliate of VoltaGrid (including any wholly-owned Affiliate of VoltaGrid formed for the specific purposes of performing the Services hereunder).

**"VoltaGrid IP"** shall have the meaning set forth in Section 7.6 of Schedule 3. For clarity, VoltaGrid IP excludes Customer's Background IP, and any enhancements, improvements, or modifications thereto.

**"VoltaGrid Party"** shall have the meaning set forth in Section 10.1.2 of Schedule 3.

**"Work Product"** means all Intellectual Property that was expressly created or developed by VoltaGrid or its Personnel only for Customer pursuant to this Contract or a Statement of Work, such as a deliverable or report produced at Customer's request, provided that the data supporting or set forth in the Work Product may itself be Background IP or Project IP.

REDACTED COPY

CONFIDENTIAL

Schedule 3
**Contract Terms and Conditions**

1. **Services & Power Delivery**.

1.1. During the Contract Term, VoltaGrid shall provide to Customer the Services, including the Power Delivery, set forth in one or more Statements of Work to be issued by Customer and accepted by VoltaGrid. A form SOW is attached to this Schedule as Exhibit A , and the initial SOW, Statement of Work No. 1 is attached to this Contract as Schedule 4.

1.2. Available Power Delivery Time. Subject to Sections 1.8 and 1.9 herein:

(a) [redacted] (the "**Power Service Objective**" or the "**PSO**"), in accordance with the terms and conditions of this Contract and the Statement of Work, [redacted] of the Power Delivery described in the applicable SOW.

(b) [redacted] that VoltaGrid fails to meet the PSO (the "**PSO LDs**").

(c) In the event VoltaGrid's failure to meet the PSO causes [redacted] all remaining PSO LDs within 60 days of termination of this Contract.

(d) The Parties acknowledge and agree that the PSO LDs are a reasonable estimate of the damages that would be suffered by Customer due to VoltaGrid's failure to meet the PSO and is not intended as a penalty for VoltaGrid. [redacted] The Parties acknowledge that, together with Section 1.8 and Section 9.2(f) herein, this limitation of remedies is a fundamental part of the economic basis of the bargain without which each Party would not have entered into this Contract.

1.3. Unsafe Conditions.

(a) In the event that an Unsafe Condition prevents VoltaGrid from performing the Services, then, the Power Delivery shall not be reenergized until both Parties have mutually determined, in their reasonable discretion, that it is safe to reenergize the Power Delivery.

**REDACTED COPY**



(b) Each Party shall thereafter conduct an independent root cause analysis of the issue that led to the Unsafe Condition to identify the underlying cause and prevent recurrence of similar events. Both Parties agree to complete their respective root cause analysis as soon as reasonably possible (not to exceed 7 days) following the occurrence of the Unsafe Condition. The results of the root cause analysis shall be shared and discussed between the Parties in a timely manner to ensure understanding and agreement on the cause of the event and to collaboratively develop appropriate corrective actions.

(c) This clause is intended to prioritize safety, ensure prompt resolution of issues, and facilitate a cooperative approach between the Parties in addressing and preventing Unsafe Conditions.

1.4. Additional Statements of Work.

(a) Additional Statements of Work shall be deemed issued and accepted only if signed by the VoltaGrid Contract Manager and the Customer CEO (or other authorized representative of Customer). To the extent an additional Statement of Work or amendment to an existing Statement of Work modifies or affects an existing Statement of Work, it may be clarifying in nature only and may not be a Change Order. A Change Order shall be provided when the scope of the Services or the Monthly Fees or One-time Fees applicable to those Services are required to also be modified.

(b) VoltaGrid will not require Customer or its Personnel to sign, accept, or otherwise agree to any other form of order, quote, click-through terms, ticketing-terms, confirmation, acceptance, invoice, shipping document, receipt, or similar document or terms to purchase or receive any Services. The terms of any such document or terms are void and will not form part of this Contract, unless those terms are incorporated into this Contract via a signed amendment that specifically references this Section 1.4.

1.5. Changing VoltaGrid Equipment. [redacted] in either case VoltaGrid will provide as much advance notice as reasonably practicable) to Customer for on-site coordination purposes only, provided that:

(a) [redacted] impact the quality of the Services or the Power Delivery, (ii) result in additional One-time Fees or Monthly Fees in any respect, or (iii) affect the Parties' compliance with applicable permits and Laws;

(b) s[redacted]

(c) VoltaGrid provides Customer with copies of its applicable methods [redacted]

(d) Customer has not reasonably requested that VoltaGrid perform the substitution, change out, or swap out on an alternative day.

1.6. Change Orders.

(a) Either Party may request a change to the terms of an existing SOW by issuing a Change Order describing the nature of the modification for the non-requesting Party's written approval and execution. The non-requesting Party shall have 15 days from receipt of the proposed Change Order to either accept or reject the proposed Change Order in writing. Any proposed Change Order not expressly accepted in writing within 15 days of receipt shall be deemed rejected, unless otherwise agreed by the Parties.

(b) Should the Change Order have a potential impact on the SOW's Monthly Fees, One-time Fees, or schedule, within the 10-day period following the non-requesting Party's receipt of the proposed Change Order, the non-requesting Party will provide an accounting with appropriate supporting data of the impact of the proposed changes to the requesting Party.

(c) If the Parties are unable to reach agreement on the Change Order and proposed adjustments of Monthly Fees or One-time Fees within the 15 days of the requesting Party's receipt of the non-requesting Party's accounting of the fee adjustment, the Parties will escalate the disagreement according to the dispute escalation process in Section 16 herein. If escalation does not resolve the disagreement, the Change Order will be deemed to be rejected.

(d) Notwithstanding the foregoing, VoltaGrid shall be obligated to commence performance on a Change Order requested by Customer but not yet signed by both Parties only when commencing performance is necessary to prevent or mitigate any loss of power to the Campus (where such loss of power would not result in a modification of the Phase schedules). Otherwise, VoltaGrid shall have no obligation to and will not commence performance of a Change Order unless and until the Parties execute the Change Order. If VoltaGrid has commenced with performance of a Change Order without an executed Change Order, the Parties will promptly thereafter work cooperatively to finalize the Change Order terms, including any changes to Monthly Fees, One-time Fees, or schedules thereunder, and sign agreed-upon Change Order. If the Change Order is solely to add additional power and VoltaGrid commences performance before both Parties have signed the Change Order, then VoltaGrid shall be permitted to invoice Customer at its then current spot rate until the Change Order is signed. The Change Order shall be issued in accordance with the procedures set forth in this Contract and shall detail the changes to be made, the reasons for such changes, any impact on the costs of the Services, and any required adjustments to the timeline for the provision of the Services.

1.7. Phases. The Services to be provided under this Contract are divided into distinct Phases, with each Phase corresponding to a specific scope of work and Power Delivery milestones as outlined in the applicable Statement of Work. Each Phase of this Contract is subject to the following terms regarding its duration:

(a) Phase Commencement. Each Phase shall commence on its respective Phase Start Date as defined in the Statement of Work. Unless otherwise set forth in a Statement of Work, a Phase Start Date may only be modified by mutual written agreement of the Parties.

(b) [redacted] as set forth in a Statement of Work.

(c) Contract Term Incorporation of Phases. For the avoidance of doubt, and subject to any termination rights expressly set forth herein, all Phases under a Statement of Work will occur during the Contract Term.

**REDACTED COPY**



(d) Termination or Adjustment. The termination or adjustment of any Phase, including its duration, shall be subject to the termination and modification provisions set forth in this Contract, including the termination provisions outlined in Section 9 herein and the modification provisions outlined in Section 15 herein.

1.8. Disrupted Services.

(a) [redacted]

(b) [redacted]

[redacted]

[redacted]

REDACTED COPY



1.9. Liquidated Damages Exclusions. Neither VoltaGrid's failure to meet the PSO nor a Delivery Delay will result in the payment of Liquidated Damages to the extent that both (1) the failure to meet the PSO or the Delivery Delay is directly and proximately caused by any of the following circumstances in clause (a) through clause (h) below, as demonstrated to Customer's reasonable satisfaction by a written root cause analysis, and (2) VoltaGrid uses commercially reasonable efforts to mitigate the effects of the circumstances (each, an "**Exclusion**"):

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

VoltaGrid will be liable for payment of the applicable Liquidated Damages when none of the conditions under clause (a) through clause (h) above prevent VoltaGrid from curing either its failure to meet the PSO or the Delivery Delay, as applicable.

In addition, notwithstanding the foregoing, in the event of an Exclusion, VoltaGrid will be liable for payment of a portion of the Liquidated Damages to the extent VoltaGrid's (or its Personnel's) negligence materially contributed to the Delivery Delay or failure to meet the PSO.

1.10. VoltaGrid Personnel.

(a) VoltaGrid is fully responsible for all Services, whether performed by Contractor or its Personnel, and for all acts and omissions of its Personnel under this Contract. To perform the Services, VoltaGrid will use only Personnel who are experienced, properly trained, fully qualified, fit for their respective assignments, and, to the extent required, licensed to perform work pursuant to all applicable Laws.

(b) To the extent permitted by applicable Law, VoltaGrid will perform or procure background checks on its Personnel involved in the performance of the Services and will ensure that Personnel who have not cleared a background check will not provide the Services to Customer at the Campus. Customer will either specify in the first SOW under this Contract or will notify VoltaGrid at least 90 days before the first Phase Start Date for the first SOW under this Contract of, the specific background check requirements for Personnel performing Services on the Campus. If Customer does not specify or notify VoltaGrid of the specific background check requirements for the Campus, then VoltaGrid will perform or procure a customary background check.

(c) All matters pertaining to the employment, supervision, compensation, promotion, and discharge of VoltaGrid's Personnel are the sole responsibility of VoltaGrid, and VoltaGrid will comply with all applicable Laws related to its Personnel. Nothing in this Contract compels VoltaGrid to make any specific decisions with respect to these matters, and Customer will have no authority to require any decision on these matters and no liability with respect to these matters.

(d) VoltaGrid will not direct actions of Customer Personnel except as needed for safety purposes in the event of an Emergency or an Unsafe Condition. VoltaGrid and its Personnel may not rely on assistance or advice from any Customer Personnel, and VoltaGrid will be responsible for any actions taken or not taken in relation to any assistance or advice from Customer Personnel.

(e) VoltaGrid is solely responsible for paying any amounts earned by or owed or due to its Personnel and for paying, withholding, and remitting to the appropriate government agency, any applicable employment income taxes that might be owed with respect to such compensation.

(f) Upon reasonable request from Customer, VoltaGrid will, at VoltaGrid's sole expense, promptly remove or replace any Personnel currently providing Services to Customer and will manage the transition of such replacement Personnel to minimize impact on the Services.

1.11. Hazardous Materials. With the exception of any natural gas being utilized as part of the Services, VoltaGrid will not incorporate into the Services or bring onto the Campus any hazardous or toxic substance, material, or waste (including asbestos-containing material) that, now or in the future, (a) is determined by any relevant governmental authority to be capable of posing a risk of injury to health, safety, or property, or (b) the use or the disposal of which is regulated by any governmental authority.

1.12. Clean Air Act Requirements. VoltaGrid will ensure that the Services comply with the requirements of the Clean Air Act and other applicable environmental Laws, and Customer shall reasonably cooperate with and assist VoltaGrid in obtaining and maintaining all necessary air quality permits, including, as applicable, Air Operating Permits (AOP), Prevention of Significant Deterioration (PSD) permits, and Notice of Construction (NOC) permits, in each case as applicable to the Services or the VoltaGrid Equipment. As applicable, VoltaGrid will install and maintain scrubbers or other particulate matter control devices as required to meet emission standards ("**Scrubbers**"),

operate and maintain Scrubbers in accordance with the manufacturer's specifications and any applicable regulatory requirements, and regularly monitor and inspect the Scrubbers to ensure compliance and performance. [redacted]

2. **<u>VoltaGrid Obligations</u>**. VoltaGrid shall:

2.1. Designate personnel that it determines, in its sole discretion, to be capable of filling the VoltaGrid Contract Manager position who shall act as the primary contact to act as its authorized representative with respect to all matters pertaining to this Contract. The VoltaGrid Contract Manager will use commercially reasonable efforts to respond promptly to any reasonable requests from Customer for instructions, information, or approvals required by Customer, its data center customers, or applicable Laws in connection with the Services.

2.2. Make no changes to the VoltaGrid Contract Manager, except (a) following 30 days' written notice to Customer, (b) upon the resignation, death, or disability of the VoltaGrid Contract Manager, and/or (c) at the reasonable request of Customer; which in each case, VoltaGrid shall use reasonable efforts to appoint a suitable replacement as soon as possible so as to not disrupt the smooth and uninterrupted provision of the Services to Customer.

2.3. Maintain complete and accurate records relating to the provision of the Services under this Contract, including books and records (kept in in accordance with generally accepted accounting principles) relating to charges, fees, taxes, and payments under each SOW, records relating to permits required by applicable Laws, safety records, and all other relevant records in connection with VoltaGrid providing the Services.

(a) During the Contract Term and for a period of 2 years thereafter, upon Customer's written request, VoltaGrid shall allow Customer or Customer's representative to inspect and make copies of such records in connection with the provision of the Services; provided that Customer gives VoltaGrid at least 5 days advance written notice of the planned inspection, which, if performed onsite, shall take place during regular business hours.

(b) Notwithstanding the provisions of this <u>Section 2.3</u>, VoltaGrid reserves the right to exclude (or redact to the extent a record contains other information that is otherwise responsive to the audit), as necessary, any information related to its own Background IP, trade secrets, profit margins, or employee information subject to any applicable privacy laws and regulations, as necessary to maintain the confidentiality and integrity of VoltaGrid's proprietary information, financial data, and to comply with applicable Laws. This right to exclude certain information does not limit or otherwise affect Customer's rights to inspect and make copies of other records.

2.4. Ensure that VoltaGrid and all VoltaGrid Personnel comply with all applicable Laws and any Campus Standards and Procedures and use commercially reasonable efforts to keep Customer apprised of any change in law that would reasonably be expected to have a material adverse effect on the cost, provision, or timing of the Services;

2.5. Ensure that it maintains all permits, licenses, and approvals which are required and necessary for VoltaGrid to perform the Services in accordance with this Contract and applicable Laws.

2.6. Be solely responsible for the Site and all VoltaGrid Equipment.

Docusign Envelope ID: [redacted]



2.7. Promptly identify and address any Unsafe Condition associated with, or that may arise in connection with, the Services; immediately notify Customer in writing of the existence of any such Unsafe Condition; and, if possible, promptly rectify or remediate the Unsafe Condition at its own expense to ensure a safe working environment and continuous provision of the Services. VoltaGrid's failure to promptly notify Customer of any known Unsafe Condition on the Site or within a Statement of Work or to promptly rectify or remedy any such condition, if possible, shall constitute a material breach of this Contract, subject to VoltaGrid's reasonable opportunity to cure;

2.8. Undertake all measures reasonably necessary to guarantee the safety of all Personnel present at the Site.

2.9. Comply with all relevant power quality standards effectuated by National Electrical Safety Code (NESC) and Sections 6.4.1 and 6.5.1 of the Institute of Electrical and Electronics Engineers (IEEE) standard 1547 (2018).

2.10. Comply with the Operating Parameters.

2.11. Comply with the Air Permitting Parameters.

2.12. Accurately and timely report to Customer information regarding the fuel required to provide the Services in accordance with the PSO, as set forth more specifically in the applicable SOW. Upon VoltaGrid's reasonable request, Customer will authorize VoltaGrid to communicate directly with the fuel provider regarding the natural gas supply to the Campus (e.g., for purposes of submitting the required information), as long as Customer is copied on or given the opportunity to participate in such communications.

**3. __Customer Obligations__**. Customer shall:

3.1. Designate Personnel that it determines, in its sole discretion, to be capable of filling the Customer Contract Manager position who shall act as the primary contact with respect to all matters pertaining to this Contract. The Customer Contract Manager will use commercially reasonable efforts to respond promptly to any reasonable requests from VoltaGrid for instructions, information, or approvals required by VoltaGrid to provide the Services.

3.2. Reasonably cooperate with VoltaGrid in its performance of the Services and provide access to the Site, [redacted]

3.3. Be solely responsible (as between the Parties) for the Campus (excluding the Site).

3.4. Promptly identify and address any Unsafe Conditions on the Campus that could prevent VoltaGrid from providing the Services in a safe manner; immediately notify VoltaGrid in writing of the existence of any such Unsafe Condition on the Campus; and, if possible, promptly rectify or remedy the condition at its own expense. Customer's failure to promptly notify VoltaGrid of any known unsafe condition or to promptly rectify or remedy any such condition, if possible, shall constitute a material breach of this Contract, subject to Customer's reasonable opportunity to cure.

3.5. Undertake all measures reasonably necessary to guarantee the safety of all Personnel present on Campus (excluding the Site).

3.6. Take all steps reasonably necessary to prevent Customer-caused Delivery Delays in VoltaGrid's provision of the Services. Permits, licenses, and approvals necessary for the installation and operation of VoltaGrid's Equipment shall remain VoltaGrid's responsibility.

3.7. For each SOW and thereafter upon request from VoltaGrid, Customer will provide a credit support letter demonstrating that Customer has sufficient funds in available funds to pay an amount equal to the Monthly Fees for the last month in the Term plus the early termination fees that may be payable under __Section 9.4__ below.

3.8. If VoltaGrid has reasonable grounds for insecurity, based on commercial standards and objective evidence, regarding Customer's ability to perform its payment obligations under this Contract (whether or not then due) or the occurrence of a material adverse change in the creditworthiness of Customer from its creditworthiness as of the Effective Date, then, upon written notice to Customer, VoltaGrid may demand adequate assurance of Customer's performance, which Customer shall provide within 10 business days of a written request from VoltaGrid. Such adequate assurance shall mean sufficient security in the form, amount, for a term, and from an issuer, all reasonably acceptable to VoltaGrid (acting in good faith), including, but not limited to an updated financial statement, a standby letter of credit, parent company guaranty from Customer's then-current parent Affiliate, surety bond, or other commercially reasonable security acceptable to both Parties, and in an amount not to exceed seventy-five percent (75%) of the early termination fees set forth under Section 9.4. VoltaGrid's breach of or failure to perform under this Contract (including a Delivery Delay or failure to meet the PSO) shall not constitute reasonable grounds for insecurity.

**4. Invoicing; Payments; Taxes.**

4.1. In consideration of the provision of the Services by VoltaGrid and the rights granted to Customer under this Contract, Customer shall pay all undisputed Monthly Fees and One-time Fees under each SOW due and owing under a properly submitted invoice from VoltaGrid. Any Liquidated Damages assessed for a given month shall be applied as a credit on the invoice issued by VoltaGrid to Customer for that same month. If the total amount of Liquidated Damages for a given month exceeds the invoiced amount, the excess amount shall be carried forward as a credit against subsequent invoices until (a) fully applied or (b) until there are no subsequent invoices under the applicable SOW, at which point Customer will invoice VoltaGrid, and VoltaGrid will pay, for the remaining excess amount. Unless a SOW states otherwise, VoltaGrid will invoice all charges and Taxes in arrears, prorated to reflect any partial billing periods. VoltaGrid will not be entitled to any compensation other than the charges expressly set forth in this Contract and the applicable SOW. Unless otherwise provided in a SOW, all undisputed amounts will be payable within 60 days of the date of receipt of an invoice from VoltaGrid. Payment by Customer to VoltaGrid of all invoiced amounts under this Contract shall constitute payment in full for the performance of the Services.

4.2. Each Party will be responsible for identifying, paying, and reporting to the relevant authorities all taxes and other governmental fees and charges for which it is legally responsible (and any penalties, interest, and other charges) that are imposed on that Party or otherwise required by the transactions governed by this Contract. VoltaGrid may charge and Customer will pay all applicable national, state or local sales, use, and excise taxes, that VoltaGrid is legally obligated to charge; VoltaGrid will submit to Customer a valid invoice for such sales, use, and excise taxes, and comply with all applicable tax filing and reporting requirements with respect to payments under this Contract. Customer may provide VoltaGrid with an exemption certificate or equivalent information acceptable to the relevant taxing authority, in which case VoltaGrid will not charge or collect the taxes covered by that certificate. In no event shall either Party pay or be responsible to pay any taxes imposed on, or with respect to, the other Party's income, revenues, gross receipts, personnel, or real or personal property, or other assets.

4.3. VoltaGrid represents that as of the Effective Date, there are no taxes, fees, or charges related to carbon emissions or similar environmental levies (collectively, "**Environmental Levies**") imposed on VoltaGrid and/or the VoltaGrid Equipment based on the Services provided under Statement of Work No. 1, except as specifically listed in Statement of Work No. 1. VoltaGrid shall bear full responsibility for remitting to the applicable taxing authority any and all Environmental Levies imposed on VoltaGrid and/or the VoltaGrid Equipment. Upon receipt of an invoice from VoltaGrid, Customer will advance or reimburse (at Customer's option) VoltaGrid on a pass-through basis and without markup, for any Environmental Levies that came into effect after the Effective Date or are not otherwise listed in Statement of Work No. 1. VoltaGrid shall separately itemize Environmental

Levies on invoices and provide supporting documentation with each invoice that evidences its calculation and payment of the Environmental Levies. VoltaGrid shall ensure that all payments of Environmental Levies are made timely and in compliance with applicable Laws and regulations. Failure to comply with these obligations may result in additional charges, including any penalties or interest assessed by the taxing authority, for which VoltaGrid shall be solely responsible. VoltaGrid will reasonably cooperate with Customer (and, as applicable, its customers and tenants) to speak with the applicable taxing authorities regarding the breadth or applicability of the proposed Environmental Levies.

4.4. Neither Party shall have the right to offset any amounts that may be owed to the other Party under this Contract, against any other contract between the Parties or any of their wholly owned Affiliates unless such offsetting is mutually agreed upon by the Parties in writing. Each Party shall only have the right to withhold any amounts due if that Party has notified the other Party of a bona-fide dispute prior to the due date of such amounts and until such time as the dispute is resolved, provided that neither Party will be prevented from disputing amounts that have already been paid if that Party reasonably discovers a discrepancy after the payment date. The Parties will use commercially reasonable efforts to resolve disputes within 90 days from the due date of the subject invoice and will escalate any disputes not resolved within the 90-day period to the then-current Customer Contract Manager and the then-current VoltaGrid Contract Manager. No payment of any amount, whether disputed or undisputed at the time of payment, shall waive any rights of either Party, including the right to later contest such payment and obtain reimbursement. Except for disputed charges that VoltaGrid resubmits after the Parties resolve the dispute, Customer has no obligation to pay any charges invoiced more than 12 months after they accrue.

4.5. [redacted] In addition to all other remedies available under this Contract (which VoltaGrid does not waive by the exercise of any rights hereunder), VoltaGrid shall be entitled to suspend the provision of any and all Services under a Statement of Work during any period that Customer has failed to pay any Fees under such Statement of Work when due hereunder (other than Fees subject to a bona-fide dispute of which VoltaGrid has been notified in accordance with <u>Section 4.4</u> or administrative payment errors as evidenced by Customer) within 10 business days after the date of notice from VoltaGrid or immediately if any payment failure happens more than twice in any 12 month period, provided that VoltaGrid will resume performance when Customer cures its failure by paying the Fees.

**5. <u>Delays; Delivery/Installation of the VoltaGrid Equipment</u>.**

5.1. <u>VoltaGrid Delivery Delays</u>. Subject to <u>Section 1.7</u> herein and <u>Section 1.8</u> herein:

(a) In the event VoltaGrid fails to [redacted] (the "**Delay LDs**").

(b) [redacted]

REDACTED COPY

CONFIDENTIAL

[redacted]

(c) The Parties acknowledge and agree that the Delay LDs are a reasonable estimate of the damages that would be suffered by Customer due to late delivery and is not intended as a penalty for VoltaGrid. The Delay LDs are a remedy that is exclusive and is in lieu of all other remedies related to Phase Delivery Delays, whether at law or in equity, including but not limited to claims for specific performance, rescission, restitution, or any forms of damages, including Consequential Damages, provided that nothing in this Section 5.1 will limit Customer's exercise of its rights under Section 1.8 herein. The Parties acknowledge that, together with Section 1.8 herein, this limitation of remedies is a fundamental part of the economic basis of the bargain without which each Party would not have entered into this Contract.

(d) If Section 1.9 applies, then VoltaGrid's Delivery Obligations will resume when the conditions originally causing the applicable Exclusion no longer prevents VoltaGrid from curing the Delivery Delay.

5.2. VoltaGrid Installation/Ready to Deliver Power and Commissioning Period. Upon delivery of the VoltaGrid Equipment to the Site, the Parties shall commence a commissioning and testing period (the "**Commissioning Period**") that shall occur prior to each applicable Phase Start Date. The Commissioning Period shall include:

(a) VoltaGrid and Customer shall work cooperatively to conduct integrated testing of the VoltaGrid Equipment and Customer's data center systems, including but not limited to: [redacted]

(b) The Commissioning Period for each Phase shall commence upon VoltaGrid's notification that the VoltaGrid Equipment for such Phase is installed and ready for testing and shall continue for a period not to exceed the applicable Phase Start Date, unless extended by mutual written agreement of the Parties.

(c) Customer shall be responsible for providing and paying for all natural gas required during the Commissioning Period for each Phase, including gas needed for testing, commissioning activities, and integrated systems validation. VoltaGrid shall not be liable for any delays or issues arising from Customer's failure to provide adequate gas supply during the Commissioning Period.

(d) Customer shall be responsible for the Monthly Fees on a pro-rata basis for the amount of deployed MWs at the Site beginning on the applicable Phase Start Date (not during the Commissioning Period), provided that VoltaGrid has demonstrated its ability to provide the Power Delivery in accordance with this Contract following successful completion of the Commissioning Period. The pro-rata calculation will be based on the number of days in the month that VoltaGrid is operational and capable of providing the Power Delivery.

(e) The Commissioning Period for each Phase shall be deemed complete when: (i) all integrated systems testing has been successfully completed; (ii) both Parties have

confirmed in writing that the systems are operating as intended; and (iii) any identified material issues have been resolved to Customer's reasonable satisfaction.

Upon delivery of the VoltaGrid Equipment to the Site and VoltaGrid's ability to provide the Power Delivery in accordance with each applicable Phase Start Date, Customer shall be responsible for the Monthly Fees on a pro-rata basis for the amount of deployed MWs at the Site. The pro-rata calculation will be based on the number of days in the month that VoltaGrid is operational and capable of providing the Power Delivery.

5.3. Customer Alteration of Phases/Fees Schedule. Customer shall have the option to amend any or all of the Phases and the corresponding estimated Phase Start Dates detailed in the Fees Schedule (the "**Relevant Dates**") for a period of 90 days following full execution of this Contract, provided that any such amendments shall be subject to VoltaGrid's reasonable approval based on equipment and personnel availability (the "**Phase Amendment Period**"). If Customer exercises its option to amend any of the Relevant Dates during the Phase Amendment Period, the Parties shall execute an amendment to this Contract and such amendment will provide for the revised Phases to be followed by the Parties. If Customer does not amend any of the Relevant Dates during the Phase Amendment Period, then the existing Phases shall be enforceable.

5.4. Customer Postponement. Notwithstanding Sections 5.2 or 5.3 herein, Customer is granted the ability to postpone the commencement of each or any of the Phases (except the final Phase) in a Statement of Work by up to 60 days for each respective Phase upon at least 4 months' advance written notice to VoltaGrid prior to the applicable Phase Start Date, provided (a) the Contract Term shall automatically be extended by a period equal to the postponement of any Phase, and (b) Customer will pay VoltaGrid, on the terms set forth in Section 4 above, an amount equal to 53.2% of the Monthly Fees, prorated as applicable to reflect only the days of the postponement.

5.5. Testing/Commissioning.

(a) All testing, commissioning, and validation of the VoltaGrid Equipment and the Power Delivery shall be performed solely by VoltaGrid or its authorized representatives.

(b) These commission and testing procedures shall be conducted in accordance with VoltaGrid's standard testing protocols, procedures, and benchmarks, and in accordance with industry best standards and applicable Laws (including local fire and building codes), subject to the following requirements:

(i) [redacted]

[redacted]

(iii) Unless an authorized representative expressly waives this requirement in writing, VoltaGrid will not commence any Service until IST on all infrastructure, systems, and equipment that will support that Service is complete.

REDACTED COPY



(iv) At each stage of commissioning, VoltaGrid will use commercially reasonable efforts to provide Customer with draft reports on individual tests within 48 hours after those tests are completed and will provide Customer with final commissioning reports as soon as reasonably possible.

(v) [redacted]

(vi) Neither Customer's nor its Personnel's observation or approval of any commissioning will limit any of Customer's rights or VoltaGrid's obligations under the Contract or will result in a waiver by Customer of any requirement for the Services or of any rights Customer has to require VoltaGrid to remediate any flaws or deficiencies in the Services.

(c) Without limiting the foregoing, VoltaGrid shall provide Customer with timely notice, details, and results of such all commissioning and testing procedures upon Customer's request.

**6. Services Guarantee.**

6.1. VoltaGrid warrants and covenants that it shall:

(a) Deliver the VoltaGrid Equipment and perform the Services in accordance with the terms and subject to the conditions set forth in the respective Statement of Work and this Contract.

(b) Perform the Services using Personnel of industry standard skill, experience, and qualifications.

(c) Perform the Services in a timely, workmanlike, and professional manner in accordance with generally recognized industry standards for similar services.

Nothing in this Section will modify the terms of Sections 1.2(d) or 5.1(c).

6.2. VOLTAGRID MAKES NO WARRANTIES OR GUARANTEES EXCEPT FOR THOSE PROVIDED UNDER THIS CONTRACT (INCLUDING IN ANY SOW). ALL OTHER WARRANTIES, EXPRESS AND IMPLIED, ARE EXPRESSLY DISCLAIMED.

**7. Intellectual Property.**

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

REDACTED COPY



[redacted]

[redacted]

[redacted]

[redacted]

**8.** **Confidentiality**.

[redacted]

[redacted]

[redacted]

**9.** **Term, Termination, and Survival**.

9.1. The Contract Term shall commence as of the Effective Date and shall continue thereafter until the Contract End Date. Customer shall have the number of Extension Options set forth in the Contract

Summary, which Customer may exercise in its sole discretion by providing VoltaGrid with written notice at least 9 months prior to the expiration of the then-current Contract Term.

9.2. Termination for Cause. This Contract may be terminated for cause prior to the Contract End Date on written notice, which termination shall be effective as of the date of the written termination notice pursuant to this Section 9.2, under the following circumstances:

(a) by either Party, if the other Party breaches any material provision of this Contract and either the breach cannot be cured or, if the breach can be cured, the defaulting Party has not promptly (and in any event within 10 days for non-Service-impacting breaches and within 1 day for Service-impacting breaches) commenced to cure such breach after receipt of written notice of the breach or has failed to diligently continue such efforts thereafter or has failed to cure such breach within 45 days after receipt of written notice for non-Service-impacting breaches and within 14 days after receipt of written notice for Service-impacting breaches (or any longer period agreed by the parties in writing);

(b) by VoltaGrid, if Customer fails to pay any Monthly Fees when due hereunder and such failure continues for 45 days after Customer's receipt of written notice of nonpayment from VoltaGrid (or any longer period agreed by the Parties in writing);

(c) by VoltaGrid, if Customer fails to provide adequate assurance of performance reasonably acceptable to VoltaGrid pursuant to Section 3.8;

(d) [redacted]

(e) by either Party if the other Party (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (iv) makes or seeks to make a general assignment for the benefit of its creditors or (v) applies for, or consents to, the appointment of a trustee, receiver or custodian for a substantial part of its property or business;

(f) [redacted]

(g) [redacted]

NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH IN THIS CONTRACT, THE CUSTOMER SHALL NOT BE PERMITTED TO TERMINATE THIS CONTRACT FOR CAUSE IN THE EVENT THAT VOLTAGRID IS UNABLE TO PROVIDE THE POWER DELIVERY OR IS IN DEFAULT UNDER THIS CONTRACT IF SUCH INABILITY OR DEFAULT IS THE DIRECT AND PROXIMATE RESULT OF ANY WILLFUL MISCONDUCT OR GROSSLY NEGLIGENT ACT OR OMISSION OF CUSTOMER, OR ANY ENTITY OR INDIVIDUAL UNDER THE CONTROL OR DIRECTION OF THE CUSTOMER, OR ANY CLIENT OR CUSTOMER OF CUSTOMER THAT CAUSES DAMAGE TO OR LOSS OF ANY VOLTAGRID'S EQUIPMENT. IN SUCH EVENT, ANY ASSOCIATED FAILURE OF VOLTAGRID TO PROVIDE THE POWER DELIVERY OR ANY DEFAULT BY VOLTAGRID UNDER THIS CONTRACT SHALL NOT BE CONSIDERED A BREACH OF THIS CONTRACT BY VOLTAGRID AND SHALL NOT PROVIDE THE CUSTOMER WITH A RIGHT TO TERMINATE THIS CONTRACT FOR CAUSE.

9.3. Termination for Convenience. Customer may terminate this Contract or any SOW or any Phase under a SOW at any time for its convenience upon 180 days' prior written notice to VoltaGrid. In

the event that Customer exercises its right to terminate for convenience under this Section 9.3, Section 9.4 herein shall automatically apply.

9.4. Early Termination Fees. If this Contract or a SOW is terminated for convenience by Customer under Section 9.3 or is terminated by VoltaGrid under Section 9.2(a), (b) or (c) herein, Customer may, at its option, either:

(a) Elect to have the Monthly Fees (or any portion thereof [redacted] discontinued immediately, and the remaining Monthly Fees will be due in a lump sum from Customer to VoltaGrid, [redacted] of the Monthly Fees corresponding to the amount of MW terminated for each month remaining in the Contract Term, after which Customer will no longer have the Monthly Fees for the terminated MW and no additional payments with respect to the terminated MW will be made; or

(b) Elect to have the Monthly Fees continue, in which case VoltaGrid will use commercially reasonable efforts, performed in good faith, to find a replacement customer (in any industry and any location) to utilize the same VoltaGrid Equipment following the termination whether in part or in whole. If VoltaGrid is successful in obtaining a replacement customer, then Customer shall only be responsible for the difference between (i) Customer's Monthly Fees for the remainder of the Contract Term and (ii) the new customer's Monthly commitment (or equivalent) for the same period of time, if any, to be paid to VoltaGrid in a lump sum (or pro rata per MW if more than one customer is required).

For the avoidance of doubt, the foregoing shall not excuse Customer from payment of any Monthly Fees, One-time Fees, or Power Charges accrued prior to such termination and shall not excuse VoltaGrid from payment of any Delay LDs and PSO LDs outstanding at the time of termination.

9.5. Modification for Relocation. [redacted]

(a) the new SOW will specify the applicable Property;

(b) the new SOW will include any additional modifications necessary to account for the new location [redacted]

(c) after the Services are delivered and operational at the new location, the new SOW term will continue for the same number of months remaining in the original SOW, unless otherwise agreed by the Parties;

(d) the new SOW will have the same Monthly Fees as the original SOW, unless the Parties agree to extend the term of the new SOW, in which case the Monthly Fees will be adjusted as agreed by the Parties;

(e) Customer will pay, on the terms set forth in Section 4 above, at Customer's sole election upon 30 days' prior notice to VoltaGrid, either:

[redacted]

[redacted]

[redacted]

(f) Customer shall incur all demobilization and mobilization costs to the new location during the Services Transition Period; [redacted]

(g) the new SOW will include the Phase Start Date(s) specified by Customer, subject VoltaGrid having a Services Transition Period of no fewer than 10 business days or if 10 business days is not possible for VoltaGrid, then the shortest duration practicable agreed by VoltaGrid);

(h) the new SOW will detail any other terms of the relocation and use of the relocated VoltaGrid Equipment (either all or a prorated amount in units [redacted] at the new location, provided that those terms and conditions are no less favorable to Customer than the pricing and terms and conditions of this Contract; and

(i) the new SOW will have the same performance characteristics for the VoltaGrid Equipment as in the original SOW, subject to any conditions specific to the new site (e.g., altitude, atmospheric conditions, or topography).

9.6. Demobilization. VoltaGrid shall ensure that any demobilization is conducted in a manner that prioritizes the safety of all personnel and the integrity of the Site and in a manner which does not unreasonably disrupt the operation of the Site. This includes the orderly removal of the VoltaGrid Equipment and associated materials, and the completion of any necessary site restoration activities which were solely caused by the VoltaGrid Equipment at the Site and/or VoltaGrid's demobilization of such VoltaGrid Equipment. This obligation shall survive the termination of the Services or this Contract.

9.7. Effect of Termination.

(a) Upon termination of this Contract, at Customer's option if Customer terminates this Contract under Section 9.2 or if the Parties otherwise agree in writing, the provisions of this Contract will continue to apply to each SOW then in-effect until (i) the SOW expires in accordance with its own terms or (ii) Customer terminates the SOW for any of the reasons that Customer may terminate this Contract. Otherwise, upon termination or expiration of this Contract, all SOWs then in-effect will terminate automatically.

(b) Following termination of this Contract, except as expressly set forth herein (including under this Section 9), each Party's obligations under this Contract will immediately cease, and unless Section 9.4 applies, the Monthly Fees will be discontinued effective as of the effective date of termination, and there will be no more amounts due to VoltaGrid for the remaining Contract Term, provided that the foregoing shall not (i) excuse Customer from payment for any Monthly Fees, One-time Fees, or Power Charges accrued prior to such termination or (ii) excuse VoltaGrid from paying all outstanding Delay LDs and PSO LDs outstanding at the time of termination.

REDACTED COPY

CONFIDENTIAL

9.8. Transition Services.

(a) After this Contract or a SOW is terminated or expires, VoltaGrid will cooperate with Customer, its applicable service provider, or its power provider to facilitate the transfer of the power in an orderly manner that does not disrupt the operations of the data center, and Customer will reimburse VoltaGrid's reasonable, actual out-of-pocket costs, provided that (i) Customer expressly approves the costs in advance, such approval not to be unreasonably withheld, conditioned or delayed and (ii) VoltaGrid provides Customer with itemized invoices and supporting documentations for the costs. VoltaGrid's cooperation and the provision of transition services shall never be an extension of a Phase or any Power Delivery unless agreed in a Change Order.

(b) [redacted]

9.9. Purchase Options

[redacted]

[redacted]

9.10. Survival. The rights and obligations of the Parties set forth in this Section 9, Section 10, and any right or obligation of the Parties in this Contract which, by its nature, should survive termination or expiration of this Contract, will survive any such termination or expiration of this Contract, and with respect to Confidential Information that constitutes a trade secret under applicable law, the rights and obligations set forth in the NDA will survive such termination or expiration of this Contract in accordance with the terms of the NDA.

**10. Indemnification; Limitation of Liability.**

10.1. [redacted]

[redacted]

REDACTED COPY

CONFIDENTIAL

[redacted]

10.1.2. For the avoidance of doubt, except for actions or claims under Section 10.1.1(a), in no event shall any third-party actions or third-party claims referenced in Section 10.1.1 include (a) any actions or claims by one VoltaGrid Party against another VoltaGrid Party or (b) any actions or claims by one Customer Party against another Customer Party.

**VoltaGrid Party**, as such term is used only in this Section 10.1.2, shall mean VoltaGrid or any Affiliate, officer, director, employee, agent, permitted assign, or representative of VoltaGrid.

**Customer Party**, as such term is used only in this Section 10.1.2, shall mean Customer or any Affiliate, officer, director, employee, agent, permitted assign, or representative of Customer.

10.2. General Indemnities.

(a) [redacted]

REDACTED COPY



[redacted]

[redacted] [redacted]

(c) **Group** as such term is used only in this Section 10 shall mean individually or in any combination, either Party, the Party's Affiliates, and subcontractors of any tier, and each of their respective Personnel.

(d) **Regardless of cause** only as used in this Section 10.2 means regardless of whether the Losses are caused by the sole, joint, contributory, or concurrent negligence (in any amount), strict liability, products liability, breach of warranty, breach of agreement, breach of statue, or other fault or form of liability (excepting gross negligence, willful or intentional conduct) of any member of Customer Group, any member of VoltaGrid Group or any pre-existing condition.

10.3. Indemnification Procedures.

(a) Promptly after an Indemnitee receives notice of any claim for a Loss for which it will seek indemnification pursuant to this Contract, the Indemnitee will notify the Indemnitor of the claim in writing. No failure to so notify the Indemnitor will abrogate or diminish the Indemnitor's obligations under this Section 10 if the Indemnitor has or receives knowledge of the claim by other means or if the failure to notify does not materially prejudice its ability to defend the claim. Within 15 days after receiving an Indemnitee's notice of a claim, but no later than 10 days before the date on which any formal response to the claim is due, the Indemnitor will notify the Indemnitee in writing as to whether the Indemnitor acknowledges its indemnification obligation and elects to assume control of the defense and settlement of the claim (a "**Notice of Election**"). In issuing a Notice of Election, Indemnitor may reserve its rights to seek contribution against the Indemnitee for portions of the claim that are not subject to indemnification by the Indemnitor, in which case the Indemnitee will have the right to participate in the defense and settlement of the claim at its own expense using counsel selected by it.

(b) If the Indemnitor timely delivers a Notice of Election, it will be entitled to have sole control over the defense and settlement of the claim, except as provided in the immediately preceding paragraph. After delivering a timely Notice of Election, Indemnitor will not be liable to the Indemnitee for any attorneys' fees subsequently incurred by the Indemnitee in defending or settling the claim except as provided in the immediately preceding paragraph. In addition, the Indemnitor will not be required to reimburse the Indemnitee for any amount paid or payable by the Indemnitee in settlement of the claim if the settlement was agreed to without the written consent of the Indemnitor.

(c) If the Indemnitor does not deliver a timely Notice of Election for a claim, the Indemnitee may defend and/or settle the claim in such manner as it may deem appropriate, and the Indemnitor will promptly reimburse the Indemnitee upon demand for all Losses suffered or incurred by the Indemnitee with respect to the claim.

10.4. Property Damage Waiver. [redacted]

[redacted]

10.5. Consequential Damages. EXCEPT FOR ANY LIABILITY ARISING FROM OR RELATED TO A PARTY'S (A) INDEMNIFICATION OBLIGATIONS, (B) NON-DISCLOSURE AND PRIVACY OBLIGATIONS UNDER THIS CONTRACT, OR (C) DELIBERATE, RECKLESS, OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE, OR PROFIT OR LOSS OF DATA OR DIMINUTION IN VALUE, OR FOR ANY CONSEQUENTIAL DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE (IN EACH CASE OTHER THAN ANY SUCH AMOUNTS OR DAMAGES AWARDED TO A THIRD PARTY IN CONNECTION WITH A THIRD PARTY CLAIM PURSUANT TO WHICH CUSTOMER OR VOLTAGRID IS LIABLE TO SUCH THIRD PARTY).

10.6. Deliberate Breach. NO LIMITATION OF LIABILITY CONTAINED IN A STATEMENT OF WORK SHALL LIMIT DAMAGES AVAILABLE FOR A DELIBERATE OR INTENTIONAL BREACH OF THE CONTRACT BY CUSTOMER.

10.7. Limitation of Liability. THE LIMITATION OF LIABILITY SET FORTH IN A STATEMENT OF WORK SHALL APPLY TO AND GOVERN THE OBLIGATIONS OF THE PARTIES UNDER THIS CONTRACT.

**11. Insurance.**

11.1. [redacted]

11.2. During the term of this Contract and for as long as VoltaGrid Equipment is located at the Site, VoltaGrid shall, at its own expense, ensure that its insurance coverage extends to all VoltaGrid Equipment present on the Site. This coverage shall protect against loss or damage of any kind, and

in the event of such loss or damage, VoltaGrid's insurance will be primary for the cost of repair or replacement of VoltaGrid's equipment. Upon Customer's request, VoltaGrid shall provide a certificate of insurance evidencing this specific coverage. This obligation shall survive until the removal of the VoltaGrid Equipment from the Site or the end of the Contract Term, whichever occurs later.

11.3. During the Contract Term and for a period of 2 years thereafter, VoltaGrid shall, at its own expense, maintain and carry the insurance required under Exhibit C to this Schedule 3.

**12. Entire Contract.** This Contract, including and together with any related Statements of Work, exhibits, schedules, attachments, and appendices, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter.

**13. Notices**. All notices, requests, consents, claims, demands, waivers, and other communications under this Contract must be in writing and addressed to the other Party at its address set in the Contact Summary (or to such other address that the receiving Party may designate from time to time in accordance with this Section 13). Unless otherwise agreed herein, all notices must be delivered by personal delivery, nationally recognized overnight courier, or certified or registered mail (in each case, return receipt requested, postage prepaid) or by email of a PDF document (with confirmation of transmission). Except as otherwise provided in this Contract, a notice is effective only (a) on receipt by the receiving Party; and (b) if the Party giving the notice has complied with the requirements of this Section 13.

**14. Severability**. If any term or provision of this Contract is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Contract or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Contract to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**15. Amendments**. No amendment to or modification of this Contract is effective unless it is in writing, identified as an amendment to this Contract and signed by an authorized representative of each Party.

**16. Dispute Resolution**.

16.1. In the event of a dispute between the Parties regarding the terms and conditions of this Contract, the Parties shall first engage in good faith discussions to attempt to resolve the dispute amicably as a condition precedent to any court proceedings.

16.2. If mediation is unsuccessful, any dispute between the Parties regarding the terms and conditions of this Contract shall be filed in the appropriate state or federal court having jurisdiction in accordance with Sections 22 and 23 herein.

**17. Waiver**. No waiver by any Party of any of the provisions of this Contract shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Contract, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Contract shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**18. Assignment.**

18.1. Customer shall not assign, transfer, delegate, or subcontract any of its rights or delegate any of its obligations under this Contract without the prior written consent of VoltaGrid; provided, however, that Customer shall be permitted to assign its rights and obligations under this Contract to (i) any lender of Customer or its Affiliates, (ii) to any buyer or transferee of the Site, or (iii) to any of Customer's Affiliates, in each case without the consent of VoltaGrid. Any purported assignment or delegation in violation of this Section 18.1 shall be null and void. No assignment or delegation shall relieve Customer of any of its obligations under this Contract.

18.2. VoltaGrid may, with prior written notice to Customer but without Customer's consent, assign any of its rights or delegate any of its obligations to (a) any Affiliate (including any wholly-owned Affiliate of VoltaGrid formed for the specific purpose of performing the Service, (b) to any Qualified Operator acquiring all or substantially all of VoltaGrid's assets, or (c) to any VoltaGrid Financing Party as collateral security, provided, however, that if VoltaGrid's obligations hereunder are assigned or otherwise transferred in connection with such VoltaGrid Financing Party's collateral foreclosure or other exercise of remedies, the VoltaGrid Financing Party or other entity assuming such obligations shall be an Acceptable Counterparty. Any purported assignment or delegation in violation of this Section 18.2 shall be null and void. No assignment or delegation shall relieve VoltaGrid of any of its obligations under this Contract.

**19. Successors and Assigns**. This Contract is binding on and inures to the benefit of the Parties to this Contract and their respective permitted successors and permitted assigns.

**20. Relationship of the Parties**. The relationship between the Parties is that of independent contractors. The details of the method and manner for performance of the Services by VoltaGrid shall be under its own control, Customer being interested only in the results thereof. VoltaGrid shall be solely responsible for supervising, controlling, and directing the details and manner of the completion of the Services. Nothing in this Contract shall give Customer the right to instruct, supervise, control, or direct the details and manner of the completion of the Services, except that the Services must meet Customer's final approval and shall be subject to Customer's general right of inspection throughout the performance of the Services and to secure satisfactory final completion. Nothing contained in this Contract shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

**21. No Third-Party Beneficiaries**. Except for indemnification obligations enforceable by Indemnities, members of the Customer Group, and members of the VoltaGrid Group, this Contract benefits solely the Parties to this Contract and their respective permitted successors and assigns and nothing in this Contract, express or implied, confers on any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Contract.

**22. Choice of Law**. This Contract and all related documents including all exhibits attached hereto, and all matters arising out of or relating to this Contract, whether sounding in contract, tort, or statute are governed by, and construed in accordance with, the laws of the State of Georgia, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Georgia.

**23. Choice of Forum**. Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation, or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Contract, including all exhibits, schedules, attachments, and appendices attached to this Contract, and all contemplated transactions, including, but not limited to, contract, equity, tort, fraud, and statutory claims, in any forum other than the courts of the State

REDACTED COPY



of Georgia sitting in Newton County, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation, or proceeding only in the courts of the State of Georgia sitting in Newton County. Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

**24.** **<u>WAIVER OF JURY TRIAL</u>**. EACH PARTY ACKNOWLEDGES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS CONTRACT, INCLUDING EXHIBITS, SCHEDULES, ATTACHMENTS, AND APPENDICES ATTACHED TO THIS CONTRACT, IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT LEGALLY PERMISSIBLE, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS CONTRACT, INCLUDING ANY EXHIBITS, SCHEDULES, ATTACHMENTS, OR APPENDICES ATTACHED TO THIS CONTRACT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**25.** **<u>Counterparts</u>**. This Contract may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. A signed copy of this Contract delivered by electronic signature, email of a PDF document or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Contract.

**26.** **<u>Force Majeure</u>**.

[redacted]

[redacted]

[redacted]

REDACTED COPY



[redacted]

**27.** **<u>Direct Agreement; Estoppel</u>**.

[redacted]

[redacted]

**28.** **<u>No Liens</u>**. VoltaGrid covenants that no mechanic's or materialmen's claims, liens, or notices will be filed or maintained by VoltaGrid or any third-party contractor, laborer, or materialman of VoltaGrid against Customer of the Campus, any improvements constructed thereon or made thereto, or on account of any Services provided by VoltaGrid under this Contract. Neither VoltaGrid nor any of its Personnel will have any lien, claim or encumbrance upon any property owned, leased, or subject to an indefeasible right of use by Customer or its Personnel. To the extent permitted by applicable Laws, VoltaGrid waives, and will cause its applicable Personnel to waive, any lien, claim, or encumbrance upon any such property.

**29.** **Sustainability**. Each Party will endeavor to conduct its business with a commitment to principles and standards of sustainable development, including by striving to adhere to fundamental standards for occupational health and safety, environmental protection, labor and human rights, and corporate governance as required by applicable Laws and industry best practices, and will ensure that its Personnel also strive to adhere to these standards. VoltaGrid will use reasonable efforts to perform its obligations as efficiently as possible when using resources such as energy, water, and raw materials, including by providing options regarding resource recycling and recovery. Upon Customer's request, and subject to redactions or exclusions to adequately safeguard VoltaGrid Intellectual Property and other information protected or restricted under contractual or other legally binding confidentiality obligations owed to third parties, VoltaGrid will provide Customer with sustainability-related reports; and Customer may share data from those reports with its data center customers to the extent required for Customer to comply with its contractual requirements, provided that such data sharing is subject to confidentiality obligations no less stringent than those agreed to by the Parties under the NDA. Customer may specify sustainability-related reports required by its end customer(s) in an SOW. If Customer requests any additional sustainability-related reports that are not listed in an SOW and require information that is not tracked in VoltaGrid's regular business practices, then VoltaGrid will notify Customer, and the Parties will cooperate to determine whether VoltaGrid can track and report on that information in the future. Any sustainability reports that VoltaGrid cannot reasonably produce in its ordinary course of business shall be provided at Customer's sole cost and expense.

**30.** **Trade Compliance**. Each Party represents and covenants that it and its Personnel are not and will not become subject to sanctions or otherwise designated on any list of prohibited or restricted parties or owned or controlled by such a Party, including the lists maintained by the United Nations Security Council, the U.S. government (e.g., the US Department of Treasury's Specially Designated Nationals list and Foreign Sanctions Evaders list and the US Department of Commerce's Entity List), the European Union or its member states, or other applicable governmental authority. VoltaGrid and its Personnel will comply with all applicable import, re-import, sanctions, anti-boycott, export, and re-export control laws, such as the Export Administration Regulations, the International Traffic in Arms Regulations, and economic sanctions programs administered by the Office of Foreign Assets Control. VoltaGrid is solely responsible for all tariffs, customs duties, and any other taxes or fees related to the importation of goods or materials necessary for the performance of the Services under this Contract.

**31.** **Anti-Bribery**. VoltaGrid will not, and will ensure that its Personnel do not, pay bribes to anyone for any reason, whether in dealings with governmental authorities or the private sector, or otherwise violate any applicable anti-corruption laws when performing under this Contract. Customer may immediately terminate or suspend performance under this Contract if VoltaGrid breaches these obligations. VoltaGrid will maintain true, accurate, and complete books and records concerning any payments made to another party in relation to this Contract. Customer or its designees may inspect VoltaGrid's books and records to verify compliance with the obligations under this Section by VoltaGrid and its Personnel.

**32.** **Equal Opportunity**. Each Party will abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a), and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, or national origin. These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or veteran status.

**33.** **<u>Construction</u>**. References to "Schedules," "Sections" or "Exhibits" shall be to schedules, sections, or exhibits of this Contract except as the context may otherwise require. Wherever used in this Contract, (a) the word "including" means "including without limitation," (b) the word "day" means "calendar day," (c) "Section" includes all subsections of the reference section of this Contract, (d) each gender includes all genders, (e) the singular includes the plural and the plural the singular as context requires, and (f) "will," "shall," and "must" are used interchangeably to indicate mandatory obligations, future actions, or necessary requirements and are intended to convey the same level of commitment and responsibility. Section headings are included for ease of reference only and will not affect construction.

**Exhibit A to Schedule 3**
**Statement of Work Template**

**STATEMENT OF WORK NO. __**

This Statement of Work No. [__] (this "**SOW**") is effective as of the last date signed below (the "**SOW Effective Date**") by and between **SF ATL2, LLC** ("**Customer**") and **VOLTAGRID, LLC** ("**VoltaGrid**") and is governed by and made part of the Agreement for Power Generation dated [DATE], between Customer and VoltaGrid, as amended (the "**Contract**").

The Parties hereby agree as follows:

**Scope**: VoltaGrid shall provide the necessary equipment, mobilization, demobilization, skilled labor, supervision, equipment, materials, tools, and safety equipment including all required personal protective equipment (PPE) as required by the site rules and governing standards and procedures, and incidentals for the Services. The following sections further set forth the scope of work, protocols, deliverables, conditions, and mutual agreement associated with the requirements of the Services.

**I.** **Services**: VoltaGrid shall be responsible for the following key activities including all labor, supervision, equipment, materials, tools, health and safety obligations, and incidentals related to:

[Insert]

**II.** **Customer Obligations**:

[Insert]

**III.** **VoltaGrid Obligations**:

[Insert]

**IV.** **Phases**: The Services under the scope of work will be subject to the following Phases with the corresponding Phase Start Dates:

[Insert]

**V.** **Fees**:

A. Monthly Fees.

[Insert]

B. Pass-through Charges and Reimbursable Amounts.

[Insert]

C. One-time Fees.

[Insert]

**VI.** **SOW Term**:

[Insert as needed]

**VII.** **Limitation of Liability**:

[insert SOW-specific damages cap]

**REDACTED COPY**



## VIII. <u>Facility Contacts</u>

| | Name | Email | Phone |
|---|---|---|---|
| **Customer Campus Manager** | | | |
| **Customer Regional Director** | | | |
| **Customer VP of Operations** | | | |
| **VoltaGrid Site Contact** | | | |

IN WITNESS WHEREOF, each Party has executed this SOW by its duly authorized representative, and it shall become effective as of the SOW Effective Date indicated above:

| **SF [INSERT SITE CODE], LLC** | **VOLTAGRID, LLC** |
|---|---|
| BY: ______________________ | BY: ______________________ |
| NAME: ______________________ | NAME: ______________________ |
| TITLE: ______________________ | TITLE: ______________________ |
| DATE: ______________________ | DATE: ______________________ |

REDACTED COPY



**Exhibit B to Schedule 3**
**Change Order Template**

**CHANGE ORDER #[insert] TO STATEMENT OF WORK NO. [__]**

**Change Order Effective Date: [insert]**

This Change Order #[insert] to Statement of Work No. __ (this "**Change Order**") is issued under the Agreement for Power Generation dated [DATE], between SF ATL2, LLC ("**Customer**") and VoltaGrid, LLC, ("**VoltaGrid**"), as amended (the "**Contract**"), and hereby amends the terms of the Statement of Work No. __ dated [DATE] between Customer and VoltaGrid, as amended (the "**SOW**"). Except as set forth in this Change Order, all other terms and conditions of the SOW, including any other Change Orders unless otherwise modified or terminated by mutual written agreement of the Parties, remain in full force and effect.

**I. Description of Change Order**:

[insert a general description of Change Order, including who initiated it]

**II. Change Order Pricing Details**:

The SOW is amended as follows:

| **Schedule of Values for Change Order** | | | | | | |
|---|---|---|---|---|---|---|
| **No.** | **Cost code** | **Item** | **Qty** | **Unit** | **Unit Price** | **Subtotal** |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Total Value for this Change Order:** | | | | | | |

**Summary:**

| | |
|---|---|
| Original Contract Value: | Previous Completion Date: |
| Current Contract Value: | Schedule Adjustment by this CO: |
| Change Order Value: | Revised Completion Date: |
| Revised Contract Value: | |

REDACTED COPY

CONFIDENTIAL

The SOW shall be modified, if at all, as follows:

| Modified Term | Start Date | Finish Date |
|---|---|---|
| | | |

**III. Authorization to Proceed**:

Customer hereby grants authorization to proceed with this Change Order to the SOW and VoltaGrid agrees to enact the changes incorporated in this Change Order on the terms and conditions set forth herein, in the SOW, and in the Contract.

IN WITNESS WHEREOF, each Party has executed this Change Order by its duly authorized representative, and it shall become effective as of the Change Order Effective Date indicated above:

**SF ATL2, LLC**

BY: ______________________

NAME: ______________________

TITLE: ______________________

DATE: ______________________

**VOLTAGRID, LLC**

BY: ______________________

NAME: ______________________

TITLE: ______________________

DATE: ______________________

REDACTED COPY

CONFIDENTIAL

**Exhibit C to Schedule 3**
**Insurance Requirements**

VoltaGrid (herein, "Contractor") shall effect and maintain the following insurances at all times during the Contract Term and for at least two years thereafter (or any longer period as may be set out in the Contract). [redacted]

**1. LIMITS LIABILITY**

(a) C[redacted]

[redacted]

(d) Additional Insured Endorsement. Contractor must have Serverfarm added to the policy by endorsement form reflecting ongoing and completed operation coverages. If an ISO endorsement form is to be used, it is a requirement that such additional insured endorsement will not contain an exception and/or exclusion once (or if) the contractor leaves the job site or premises and/or the installation work, product or equipment is operating within its intended use. A certificate of insurance can be used to so note the additional insured interest. However, the actual endorsement must be provided to Serverfarm as soon as it becomes available. Wording will be as follows:

[redacted] This insurance shall be primary with respect to any other insurance available to such additional insured and shall be endorsed in a manner that will prohibit the contractor's insures from seeking contribution from such insurance of the additional insured.

(e) Contractor's coverage must be primary and non-contributing to insurance provided by the Serverfarm Group.

(f) Contractor's policy must contain a waiver subrogation clause in favor of Serverfarm and the Serverfarm Group, including any rights of recovery under workers' compensation.

(g) Contractor's policy must provide severability of interest and may not contain "insured versus additional insured" exclusions.

REDACTED COPY



(h) All limits in this Section may be met through any combination of VoltaGrid's general and umbrella policies.

(i) Bonding / Crime Insurance.

(i) [redacted]

[redacted]

2. **PROFESSIONAL LIABILITY COVERAGE**

Contractor must maintain professional liability coverage at limits not less than $[redacted] million claims made and $[redacted] million aggregate. Policy must include cyber liability, data privacy and errors and commissions (E&O) coverages.

3. **UMBRELLA/EXCESS LIABILITY INSURANCE**

(a) Depending upon the size and occupancy of the location in question, additional limits of liability may be required and shall be provided by Contractor. At a minimum, coverage must include:

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

(iv) Additional Insured Endorsement: Contractor must provide the correct additional insured endorsement for all excess policies as required under Section 1(d) above.

(v) Contractor's policy must contain a waiver subrogation clause in favor of the Serverfarm Group.

(b) Contractor's policy must provide severability of interest and may not contain "insured versus insured" exclusions.

4. **EVIDENCE OF PROPERTY INSURANCE**

Contractor must show evidence of coverage for owned, leased, borrowed or hired equipment, infrastructure, and materials onsite, including theft coverage.

5. **WORKERS' COMPENSATION**

(a) [redacted]

(b) Coverage must include a waiver of subrogation in favor of the Serverfarm Group.

6. **AUTOMOBILE LIABILITY COVERAGE**

(a) [redacted]

(b) Owned, non-owned and hired coverage must be included unless specifically waived.

(c) If applicable, coverage must also be included under the Umbrella excess policy, depending upon the size and nature of the risk/exposure.

**7. POLLUTION LIABILITY COVERAGE**

Contractor will maintain pollution liability insurance [redacted]e. Coverage shall include both sudden and gradual pollution, transportation pollution liability, and on-site and off-site clean-up costs.

**8. PROPERTY (ALL-RISK) LIABILITY COVERAGE**

Contractor will maintain insurance for the Site, any improvements thereto, and all buildings and infrastructure (including fixtures) thereon, against loss due to fire, fire prevention, and other casualties included in industry best practice extended coverage insurance policies, in each case in an amount equal to replacement cost. Coverage should be on Special Form (ISO CP 10 30) or equivalent. Coverage should include business interruption.

**9. NOTICE OF CANCELLATION**

Insured shall provide policy endorsements guaranteeing notice of cancellation, non-renewal, or material change in coverage, such as ISO form CG 02 24. All surplus lines must also be disclosed.

**10. INSURANCE CARRIERS**

(a) [redacted]

(b) Contractor may use admitted or non-admitted insurance carriers as long as the insurance carrier is a licensed carrier in the state in which the property is located, and the insurance carriers meet the financial security as defined above.

**11. INSURANCE TERMS**

Contractor and any of its subcontractors (as applicable) shall file with Serverfarm a valid/original "Certificate of Insurance" on the standard ACORD form evidencing that all required insurance is in full force and effect. VoltaGrid shall maintain current and valid Certificates of Insurance which shall be kept on file with Serverfarm at all times during the term hereof and during the performance of the Services pursuant to Contractor. Serverfarm will not process any invoices or applications for payment submitted by VoltaGrid for Services performed under this Contract or any SOW unless Serverfarm has a valid/original Certificate of Insurance on file for Contractor and all of its subcontractors. Contractor shall not make any changes in or allow the required insurance coverage to lapse without first obtaining Serverfarm's prior written approval.

**REDACTED COPY**

CONFIDENTIAL

**Schedule 4**
**Copy of Statement of Work No. 1**

**STATEMENT OF WORK NO. 1**

Upon its execution by both Parties, Statement of Work No. 1 will be deemed to be added to this Schedule 4 automatically and with no further action required by either Party.

REDACTED COPY

CONFIDENTIAL

Schedule 5
**Campus Standards and Procedures**

The Campus Standards and Procedures provide Customer's standards, policies, and procedures that are of general application at the Campus in relation to matters such as safety, health, the environment, the community or industrial relations. This Schedule includes part of the Campus Standards and Procedures (copies of which have, if not included in this Schedule, separately been, or will be, provided to VoltaGrid). Customer shall notify VoltaGrid in writing of any updates to these standards, policies and procedures, and VoltaGrid will promptly notify Customer if any of the updates cause any adverse impact to VoltaGrid's costs, schedule, or ability to perform the Services. In the event VoltaGrid can demonstrate the adverse impact to Customer's reasonable satisfaction, then, at Customer's option, either (a) Customer may modify the updates to prevent the adverse impact or (b) the parties shall negotiate in good faith appropriate adjustments to the pricing and/or schedule before such updates become effective.

**SECURITY AND ACCESS**

Serverfarm buildings maintain strict physical security and access policies. All individuals requesting access into a Serverfarm facility must be positively identified. This process requires the individuals submitting valid (unexpired) government-issued photographic identification. Examples include valid passports, driver's licenses, military IDs, or green cards. All ID badges reflect the exact name listed on the government-issued photographic identification.

Authorized Personnel can be issued permanent access badges, provided they are approved by an authorized Serverfarm representative and have been through the Serverfarm access process. After a permanent access badge has been issued, authorized Personnel will have unrestricted 24X7 access to the Site. Visitors who are approved by an authorized Serverfarm representative and have been through the Serverfarm access process will be issued a single-use access badge. These visitors must be escorted at all times by a permanent, authorized Serverfarm representative. Serverfarm staff will provide the escort service if approved in advance and subject to an escort fee.

Anyone entering a secured area is required to wear a Serverfarm-issued ID badge (temporary or permanent). All ID badges are the property of Serverfarm and must be returned upon request. No modifications or additions may be made that interfere with the visibility, clarity, or use of ID badges. ID badges are to be worn on the individual's person in such a manner as to be visible at all times.

The sharing of badges between individuals for any purpose whatsoever is strictly prohibited. Tailgating is strictly prohibited. Serverfarm man traps are equipped with anti-tailgating devices. Individuals are prohibited from entering any non-authorized areas on the Campus, including meet-me rooms, Infrastructure rooms, fire suppression rooms, and the roof. Any violations of the access policies will result in immediate suspension of access to the Campus.

**PROHIBITED MATERIALS**

The following items are prohibited at Serverfarm data centers and campuses:

- Food or drink in data halls and critical equipment areas
- Tobacco products (including smokeless) except in any outdoor designated smoking areas
- Explosives, firearms or weapons of any type
- Hazardous materials or other chemicals
- Alcohol, illegal drugs, as well as other intoxicants
- Magnets and electromagnetic devices in data halls and critical equipment areas
- Radioactive materials

- Photography equipment (unless preauthorized by Data Center Management) or recording equipment of any kind (other than tape backup equipment)
- UPS equipment not provided by Serverfarm
- Paper products (other than equipment manuals) or other combustible materials of any kind, including cardboard and boxes, in data halls and critical equipment areas

**SAFETY AND ENVIRONMENTAL REQUIREMENTS**

To provide a safe and secure service, Serverfarm requires that all individuals adhere to the following guidelines:

- Keep areas clean and free of debris at all times.
- Do not store extraneous combustible materials or paper products (including cardboard and boxes) onsite except as expressly permitted in writing by Serverfarm. To minimize fire risk, Serverfarm reserves the right to remove any cardboard, paper, debris, and other combustible materials stored onsite without Serverfarm's express written permission.
- Keep any non-functioning equipment and miscellaneous items in storage or office areas.

**BUILDING EVACUATION**

If the Data Center fire alarm or other life safety alarm is activated, individuals onsite must immediately evacuate the applicable building and report to an assembly point free and clear of danger. Evacuees are to remain at the assembly point until they are informed that they may leave the premises or enter the building by Serverfarm's security operations, data center management, or the local authorities.

**RIGHT TO AMEND SCHEDULE**

Serverfarm reserves the right to make reasonable updates to this Schedule with written notice to VoltaGrid. This Schedule does not limit the applicability of any other parts of the Campus Standards and Procedures that Serverfarm provides to VoltaGrid.

Docusign Envelope ID: [redacted]

REDACTED COPY

CONFIDENTIAL

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

Docusign Envelope ID: [redacted]

**REDACTED COPY**

CONFIDENTIAL

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

Docusign Envelope ID: [redacted]

REDACTED COPY

CONFIDENTIAL

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**REDACTED COPY**

CONFIDENTIAL

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

REDACTED COPY

CONFIDENTIAL

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

REDACTED COPY

CONFIDENTIAL

[redacted]

Docusign Envelope ID: [redacted]

REDACTED COPY

CONFIDENTIAL

[redacted]

**REDACTED COPY**

CONFIDENTIAL

[redacted]

[redacted]

**REDACTED COPY**

CONFIDENTIAL

[redacted]

[redacted]

**REDACTED COPY**

CONFIDENTIAL

[redacted]

[redacted]

[redacted]

**REDACTED COPY**

<u>Schedule 7</u>

[redacted]

Intentionally omitted.

REDACTED COPY

CONFIDENTIAL

# STATEMENT OF WORK NO. 1

This Statement of Work No. 1 (this "**SOW**") is effective as of the Effective Date of the Contract (the "**SOW Effective Date**") by and between **SF ATL2, LLC dba SF ATL2 (DE), LLC** ("**Customer**") and **VOLTAGRID, LLC** ("**VoltaGrid**") and is governed by and made part of the Agreement for Power Generation between Customer and VoltaGrid, as amended (the "**Contract**").

The Parties hereby agree as follows:

**Scope**: VoltaGrid shall provide the necessary equipment, mobilization, demobilization, skilled labor, supervision, equipment, materials, tools, and safety equipment including all required personal protective equipment (PPE) as required by the site rules and governing standards and procedures, and incidentals for the Services. The following sections further set forth scope of work, protocols, deliverables, conditions, and mutual agreement associated with the requirements of the Services.

## I. SERVICES

VoltaGrid's demarc for the Services is [redacted] VoltaGrid shall be responsible for the following key activities including all labor, supervision, equipment, materials, tools, health and safety obligations, and incidentals related to:

1. **Design of the microgrid for the Power Delivery**:

   (a) Single line diagrams of the VoltaGrid Equipment.

   (b) Layout diagrams, elevations, and details of the VoltaGrid Equipment.

   (c) Create schedule with Phases and set up weekly progress meetings.

   (d) Protection settings as it pertains to VoltaGrid Equipment, the Site, and Customer's Personnel.

   (e) Grounding and bonding diagrams.

   (f) Lightning protection plans and specs.

   (g) Monitoring (e.g., electrical power monitoring system/EPMS and building management system/BMS) plans and specs.

   (h) Arc flash study.

   (i) Gas distribution to generation system internal to the power plant node, external piping and gas yards to be provided by Customer.

   (j) Emission controls.

2. **Installation, delivery, and placement of all VoltaGrid Equipment**:

   (a) Generators

   (b) SCRs

   (c) Transformers [redacted]

   (d) [redacted] conductor within VoltaGrid Equipment

   (e) [redacted] conductor on VoltaGrid supply side

   (f) [redacted] VoltaGrid supply side protection

   (g) [redacted] distribution poles and buswork

   (h) Satellite communications

Information in this Submittal has been redacted by Jordan Strouse, General Counsel, VoltaGrid, LLC pursuant to the claim or claims declared in the attached affidavit that such information is protected under Georgia law from disclosure to the public.

REDACTED COPY



(i) Operations command center

(j) Distribution gas lines

(k) Gas pressure reduction equipment

(l) Gas distribution system [redacted]

(m) Gas and electric interconnections (as applicable)

(n) Auxiliary power supply for:

  (i) Gas pressure reduction equipment

  (ii) Operational command center

(o) Commissioning and testing of all VoltaGrid Equipment or any other equipment or materials supplied or installed by VoltaGrid or its Personnel

(p) Site-specific safety plans and crane pick plans

(q) Rigging and supervision

(r) Termination of all VoltaGrid Equipment

3. **Operation and Maintenance**:

(a) Operation and maintenance of VoltaGrid Equipment

(b) On site operators and maintenance staff monitoring Services 24 x 7

(c) Controls and monitoring of the VoltaGrid Equipment and all aspects of the Services

(d) Supply emission reporting documentation as required by the Contract and applicable Laws

(e) Access to VoltaGrid's customer portal, which will have daily, weekly, and monthly data regarding maintenance and operations.

(f) Gas filtering, monitoring, and metering

(g) Collaboration with Customer (and vice versa) regarding safety, maintenance, and operational standards and procedures.

4. **Reporting**:

(a) Provide copies of the documents and data on the timelines set forth in Appendix D. Generally, in the event that any applicable documents, data, or other deliverables have not be provided or made available in a timely manner to the receiving Party from the providing Party, the Parties will work together to mitigate the effects of the delay.

(b) **Nominations**.

  (i) At least two (2) business days prior to the start of a new calendar month, [redacted] shall provide its daily nomination plans for the upcoming month to the City of Covington and its agents [redacted].

  (ii) Subject to and consistent with the nomination procedures used by Transcontinental Gas Pipeline Company, LLC ("**TRANSCO**"), [redacted] shall nominate with TRANSCO, in accordance with daily requirements to meet the PSO, the quantities of natural gas that needs to be transported to the Facility.

  (iii) [redacted]

**REDACTED COPY**



[redacted]

(iv) [redacted] shall use reasonable efforts to ensure that receipts and deliveries remain reasonably in balance (meaning the amount received and delivered by the City of Covington are the same) on both a daily and monthly basis, consistent with the operational balancing provisions of TRANSCO' FERC Gas Tariff.

(v) VoltaGrid will reasonably cooperate with Customer and the City of Covington to minimize any operational imbalances between the daily quantities received by the City of Covington for transportation and the daily quantities of gas delivered to the Facility, provided that in no circumstance will any failure to do so subject VoltaGrid to any liability under this Contract, including but not limited to any failure to meet the PSO.

(vi) At least 2 business days prior to any deadline for nominations that VoltaGrid has agreed to make under this Contract (the "**Daily Data Center Nomination Deadline**"), Customer shall provide VoltaGrid with electrical nominations specifying Customer's anticipated power requirements for the applicable period. Such nominations ("**Daily Data Center Nominations**") shall include:

(1) daily anticipated electrical load requirements in MW for each day of the nomination period;

(2) any anticipated significant load variations or special requirements during the nomination period; and

(3) any planned maintenance, outages, or other events that may affect Customer's electrical demand.

(vii) Customer shall use commercially reasonable efforts to provide accurate Daily Data Center Nominations based on the best information available to Customer at the time; provided that Customer acknowledges that failure to timely report Daily Data Center Nominations to VoltaGrid may result in the interruption of natural gas supply. If Customer becomes aware of any material changes to its electrical requirements after providing Daily Data Center Nominations but before VoltaGrid's nomination deadline, Customer shall promptly notify VoltaGrid of such changes. In the event Customer fails to provide Daily Data Center Nominations by the Daily Data Center Nomination Deadline, VoltaGrid is permitted to base its nominations on historical usage patterns, Customer's most recent Daily Data Center Nominations or other commercially reasonable estimates.

(c) The Parties will work together to identify any additional reports not specified in this SOW or the Contract (if any) that VoltaGrid will provide to Customer, subject to the terms of the Contract.

5. **Demobilization**:

(a) Removal of all VoltaGrid Equipment

(b) All return shipping of VoltaGrid Equipment

VoltaGrid provides demobilization free of charge if the Contract is not terminated before the end of the Initial Term (unless by Customer for cause). Otherwise, if the Contract is terminated before the end of the Initial Term either by Customer for convenience under Section 9.3 of Schedule 3 or

by VoltaGrid for cause, the demobilization costs [redacted]

## II. CUSTOMER OBLIGATIONS

1. The following persons or entities are Restricted Parties: N/A.

2. Customer is responsible for all items it is obligated to provide [redacted] including all land preparation and civil work required for the installation of the VoltaGrid Equipment. Customer's responsibilities shall include:

   (a) site grading, leveling, and earthwork to prepare the Site for equipment installation;

   (b) if applicable, provision of adequate stormwater management;

   (c) installation of any required concrete pads, or structural supports for the VoltaGrid Equipment;

   (d) clearing of vegetation as necessary;

   (e) soil compaction and stabilization;

   (f) provision of access roads and pathways suitable for heavy equipment delivery and installation;

   (g) installation of perimeter fencing and security measures for the Campus and fencing around the gas meter yard, as required by Customer's commitments to its data center customer(s) and/or applicable Laws;

   (h) obtaining all necessary environmental permits and approvals for site preparation activities performed by Serverfarm and its Personnel;

   (i) the provision of all reasonably requested below-grade utility connections to the Site boundary;

   (j) all electrical gear that is associated with connecting to the load side of VoltaGrid's [redacted];

   (k) ensuring compliance with all applicable zoning, building codes, and environmental regulations related to site preparation and civil work performed by Serverfarm and its Personnel;

   (l) providing VoltaGrid with Customer load profiles (steady-state and transient) and voltage/frequency specifications;

   (m) providing VoltaGrid with a historical/representative gas composition analysis from the City of Covington; and

   (n) providing VoltaGrid with schematics of meter station or a representative sample from the City of Covington.

   Customer shall complete all such land preparation and civil work in accordance with VoltaGrid's reasonable specifications and requirements provided to Customer as specified in the Section II.1 of this SOW and in accordance with the timelines specified in with Appendix D.

3. **Space for Site.**

   (a) Customer must provide VoltaGrid with adequate space for the Site at the Campus based on the design drawings and equipment layout requirements by VoltaGrid.

(b) The Parties agree that the space depicted in Appendix E (as may be updated by the Parties) meets the requirements of Section 3(a) above.

(c) If Customer does not provide VoltaGrid the space depicted in Appendix E, and as a result VoltaGrid fails to meet the PSO or perform a Delivery Obligation, then Section 1.9(a) of Schedule 3 will apply, subject to the terms and conditions of Section 1.9.

4. Customer will coordinate with VoltaGrid (and vice versa) on construction phasing.

5. Customer is responsible for securing, obtaining, and maintaining all easements, rights of way, land use permits, and similar approvals or authorizations required from any relevant state and local governmental authorities and from any relevant local utilities, as required for VoltaGrid to provide the Services and use the Site, in accordance with this SOW, the Contract, [redacted] This includes any easements or rights of way necessary for VoltaGrid and its Personnel to access (a) the Site, (b) reasonably requested utility connections, (b) natural gas pipeline connections, (d) electrical interconnections, and (e) any other infrastructure specified by VoltaGrid in writing and required for VoltaGrid to perform the Services at the Site.

6. Customer is responsible for the procurement, delivery, and adequate supply of all fuel, including natural gas required for VoltaGrid's performance of the Services. If Customer does not ensure that sufficient quantities of natural gas are available at the Site to meet the power generation requirements specified in this SOW, and as a result VoltaGrid fails to meet the PSO or perform a Delivery Obligation, then Section 1.9 of Schedule 3 of the Contract will apply, subject to the terms and conditions of Section 1.9.

7. Customer will make available to VoltaGrid a [redacted] load bank for Customer to use as needed. If any additional load banks are needed, (i) Customer shall free issue such additional load banks to VoltaGrid or (ii) VoltaGrid may invoice Customer (on a flowthrough basis) all of the costs in renting or acquiring the additional load banks required for this SOW.

**OBLIGATION ACKNOWLEDGEMENT. The Parties acknowledge that VoltaGrid's ability to provide the Services, including connecting the VoltaGrid Equipment and meeting the Power Service Objective, is dependent upon Customer's timely and complete performance of certain obligations set forth in Section II of this SOW, which Customer's performance is, in turn, dependent upon VoltaGrid's timely and complete performance of certain obligations set forth in Sections I and III of this SOW. In the event that Customer fails to complete, or causes any delay in the completion of, any of Customer's obligations set forth in Section II of this SOW, and such failure or delay was not caused by VoltaGrid's failing to complete, or causing any delay in the completion of, any of VoltaGrid's obligations set forth in Sections I and III of this SOW, then Section 1.9 of Schedule 3 may apply.**

## III. VOLTAGRID OBLIGATIONS

1. VoltaGrid is responsible, at its sole expense, for providing, in accordance with applicable Laws, all temporary: office space, storage space, restroom facilities, eating facilities, internet service, power, water, heating and cooling, and other accommodations at the Site to be used by its onsite Personnel, provided that Customer has arranged the necessary utility connections that VoltaGrid reasonably requested by the applicable date in Appendix D.

2. VoltaGrid shall maintain critical spares on Site.

3. VoltaGrid is solely responsible for the design of all protective settings, including grounding bonding diagrams, and Customer will have no liability to VoltaGrid or any third party for the design or settings of the VoltaGrid Equipment.

4. [redacted]

[redacted]

5. Without limiting the Parties' respective obligations under Schedule 3 of the Contract, (a) VoltaGrid is responsible for obtaining permits specifically related to the Services, the VoltaGrid Equipment, and its operations on the Site; and (b) unless otherwise agreed by the Parties in writing, Customer shall be responsible for obtaining and maintaining all permits relating to its operation of a data center, including occupancy permits for data center facility and any other permits [redacted] Each Party shall bear the cost of permits for which they are responsible.

6. VoltaGrid will resolve failures involving the Services as follows:

   (a) VoltaGrid will notify Customer of any major failure (meaning the Service is not operational and no workaround is possible, or workaround exists but is unacceptable to Customer) within 5 minutes of any such failure, begin rectifying any major failure immediately, work continuously (i.e., 24/7) until the major failure is resolved or is otherwise no longer a major failure, and will provide Customer with reasonable status updates.

   (b) VoltaGrid will notify Customer of any serious failure (meaning the Service is operational but performance is seriously degraded or there is a material risk of it becoming a major failure, and if a workaround has been provided, it is not a permanent solution) within 15 minutes of any such failure, begin rectifying any major failure as soon as reasonably possible, work until the serious failure is resolved or is otherwise no longer a serious failure, and will provide Customer with status updates every hour.

   (c) VoltaGrid will notify Customer of any minor failure (meaning the Service is operational, but a problem or issue has been identified that causes a slight degradation in performance, or there is a risk of it becoming a major failure or a serious failure) within two hours of any such failure, begin rectifying any major failure that day, work during ordinary business hours until the minor failure is resolved, and will provide Customer with status updates four hours.

7. VoltaGrid will provide contact protocol for HSE and any risk to the supply of power.

8. In the event that Customer becomes unreasonably delayed or non-responsive in their response time to the acceptance of drawings and specifications, VoltaGrid must notify Customer and copy the Customer Contract Manager regarding such unreasonable delays or non-responsiveness. If, after such communication, Customer does not address their unreasonable delays or non-responsiveness within 5 business days (or any other period reasonably agreed by the Parties), and such unreasonable delays or non-responsiveness negatively impacts VoltaGrid's ability to perform its obligations under this SOW and VoltaGrid has performed reasonable mitigation efforts, VoltaGrid may issue a Change Order requesting an extension of the relevant Phase Start Date to the extent necessary to remedy the negative impact of Customer's unreasonable delays or non-responsiveness. The Change Order shall detail the extent of the requested extension and provide a justification in relation to Customer's unreasonable delay or non-responsiveness. This Change Order shall be issued in accordance with the procedures set forth in the Contract. Any such requested extension shall not be unreasonably withheld or delayed by Customer.

9. VoltaGrid will maintain supply of both regular maintenance parts and supplies as well as of critical parts to both maintain and ensure continuous operations and meet up-time requirements.

10. [redacted]

REDACTED COPY

CONFIDENTIAL

11. All operation and maintenance will be performed by VoltaGrid and its Personnel in accordance with the Contract, VoltaGrid's safety and other standards, and all OEM standards.

12. VoltaGrid will maintain appropriate redundancy to meet its obligations set forth in this Contract.

13. [redacted]

14. VoltaGrid Power Delivery will be provided by the Phase Start Dates.

## IV. PHASES

1. **Specifications**.

(a) Engine technical specifications for VoltaGrid Equipment are attached as Appendix C.

[redacted]

(b) Engine Minimum Load: [redacted]

(c) Voltage Stability: [redacted]

(d) Frequency Stability: [redacted]

(e) Block Loads: The VoltaGrid Equipment is capable of handling [redacted] engine capacity.

[redacted]

(f) Ramp Rate: Max ramp rate is [redacted]

[redacted]

(g) Gas provider will meet gas composition as provided on Appendix A.

(h) Gas provider will meet VoltaGrid provided gas delivery specification as provided on Appendix B – Gas Specifications to this SOW.

REDACTED COPY

CONFIDENTIAL

2. **Phase Start Dates and Descriptions**.

The Services under the scope of work will be subject to the following Phases with the corresponding Phase Start Dates:

| Phase | Phase Start Date | Description of Phase |
|---|---|---|
| Construction Phases A – B (see <u>Section V.1(a)</u>) | [redacted] | Install and rovide ower [redacted]<br><br>These Phases will end at the Phase 1 Start Date. |
| 1 | [redacted] | Install and rovide rime ower [redacted] |
| 2 | [redacted] | Install and provide prime power [redacted] |
| 3 | [redacted] | Install and rovide rime ower [redacted] |
| 4 | [redacted] | Install and rovide rime ower [redacted] |
| 5 | [redacted] | In t ll n r i rim [redacted] |

## V. MONTHLY FEES AND OTHER CHARGES

1. **Monthly Fees**. The Monthly Fees are scheduled and escalate as the installation scales to meet the requirements as laid out in Phases.

(a) <u>Monthly Fees Schedule</u>

| Start Date | End Date | Phase | [redacted] | Fees per Phase | Cumulative Monthly Fees |
|---|---|---|---|---|---|
| [redacted] | Phase 1 Start Date | Construction Phase A [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | Phase 1 Start Date | Construction Phase B [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | Last day of Initial Term | Phase [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | Last day of Initial Term | Phase 2 - [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | Last day of Initial Term | Phase 3 [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | Last day of Initial Term | Phase 4 [redacted] | [redacted] | [redacted] | [redacted] |

REDACTED COPY



| Start Date | End Date | Phase | Monthly Fees per kWh | Fees per Phase | Cumulative Monthly Fees |
|---|---|---|---|---|---|
| [redacted] | Last day of Initial Term | Phase 5 [redacted] | [redacted] | [redacted] | [redacted] |

(b) Testing and Power Delivery Timing. The Parties acknowledge that VoltaGrid requires testing of the VoltaGrid Equipment and Services as part of its performance obligations under this Contract. The Parties shall cooperate in good faith to determine and document (i) the time when power is first provided to the data center building on the Campus (which may be before a Phase Start Date) and (ii) the time when power is first provided to Customer's end customers (which will be no later than the Phase Start Date). Such determinations shall be made through reasonable testing protocols and validation procedures mutually agreed upon by the Parties.

(c) SOW Specific Monthly Fee Payment Terms.

(i) [redacted]

[redacted]

[redacted]

(d) Price Escalator

(i) CPI Indexing.

(1) If Customer exercises its first Extension Option, VoltaGrid may adjust the Monthly Fees each year thereafter during the Contract Term based on the Consumer Price Index (CPI) for All Urban Consumers, U.S. City Average, All Items, Not Seasonally Adjusted, as published by the Bureau of Labor Statistics of the United States Department of Labor ("**CPI-U**").

(2) The adjustment shall be calculated as follows:

a) The base CPI-U shall be the CPI-U for the last month of the calendar quarter immediately preceding the last month of the Initial Term.

b) On each annual anniversary of the first day of the first Extension Period, VoltaGrid may adjust the Monthly Fees by a percentage equal to the year-over-year percentage change in the CPI-U.

c) In the event the CPI-U is discontinued or substantially altered, the Parties shall agree upon a substitute index or method that reasonably reflects and continues the intended economic effect of the CPI-U adjustments as described herein.

REDACTED COPY



d) In no event shall there be a decrease in Monthly Fees based on the CPI-U adjustments.

(3) Subject to clause (b) below, the adjusted Monthly Fees shall become effective on the first day of the first Extension Period and on each anniversary thereof during the Contract Term.

(ii) Notification and Billing

(1) VoltaGrid shall provide Customer with a written notice of the adjusted Monthly Fees under clause (i) above at least 30 days prior to the effective date of the adjustment.

(2) All invoices issued after the effective date of the adjustment shall reflect the adjusted pricing in accordance with this Section and will include a detailed explanation to allow Customer's accounts payable department to determine how VoltaGrid calculated the amount of the adjustment and verify VoltaGrid's calculation.

2. **Pass-through Charges and Reimbursable Amounts**.

Not applicable under this SOW.

3. **One-time Fees**.

Customer will pay VoltaGrid the following One-time Fees:

| Item | Amount | Earliest Invoice Date |
|---|---|---|
| Mobilization costs, for the Services described in Section I.1 and Section I.2 of this SOW | [redacted] excluding the Construction Phases) | Phase Start Date for applicable Phase |

**VI. TERM OF PHASES**

1. Section 1.7(c) of Schedule 3 does not apply to this SOW.

2. Each of Phase of this SOW will end on the last day of such Phase as set forth in Section V.1(a) above.

**VII. LIMITATION OF LIABILITY**

1. SERVERFARM LIABILITY CAP. [redacted]

REDACTED COPY

CONFIDENTIAL

[redacted]

2. VOLTAGRID LIABILITY CAP. [redacted]

## VIII. TERM OF SOW

This SOW will terminate upon the earlier of (a) termination or expiration of the Contract or (b) termination or expiration of the last Phase under this SOW.

## IX. FACILITY CONTACTS

| Contact Role | Name | Email | Phone |
|---|---|---|---|
| **Customer Campus Manager** | TBD | | |
| **Customer Regional Director** | [redacted] | [redacted] | [redacted] |
| **Customer VP of Operations** | [redacted] | [redacted] | [redacted] |
| **VoltaGrid Site Contact** | TBD | | |

If any contact above is specified as "TBD" or if any contact above changes, the applicable Party will promptly email the other Party with the new contact's name, email, and phone number.

IN WITNESS WHEREOF, each Party has executed this SOW by its duly authorized representative, and it shall become effective as of the SOW Effective Date indicated above:

**SF ATL2, LLC dba SF ATL2 (DE), LLC**

BY: [redacted]

NAME: [redacted]

TITLE: [redacted]

DATE: [redacted]

**VOLTAGRID, LLC**

BY: [redacted]

NAME: [redacted]

TITLE: [redacted]

DATE: [redacted]

[redacted]

**REDACTED COPY**

CONFIDENTIAL

## APPENDIX A TO STATEMENT OF WORK NO. 1

## GAS COMPOSITION ANALYSIS

(attached)

Docusign Envelope ID: [redacted]

REDACTED COPY

[redacted]

**REDACTED COPY**

CONFIDENTIAL

**APPENDIX B TO STATEMENT OF WORK NO. 1**

**GAS DELIVERY SPECIFICATION**

(attached)

Docusign Envelope ID: [redacted]



REDACTED COPY

VoltaGrid

# FUEL SCOPE OF SUPPLY

## SERVER FARM - ATL

[redacted]

[redacted]

[redacted]

**CONFIDENTIAL AND PROPRIETARY**

This document and its contents are confidential and are the proprietary property of VoltaGrid, protected by patents, copyrights, and other intellectual property rights. Any partial or full disclosure to third parties, in any form, is strictly prohibited without prior written authorization from VoltaGrid.

REDACTED COPY



## Table of Contents


**1.0 Introduction....3**

1.1 Site Location....3

1.2 Scope....3

**2.0 References....3**

**3.0 General Technical Parameters....3**

**4.0 Fuel Supplier Data Sharing Requirements....5**

4.1 Minimum Data Requirements....5

4.2 Data Access and Transmission....5

4.3 Security and Reliability....5

4.4 Responsibilities....5

**5.0 Generator Load Profiles....6**

5.1 [redacted]....6

5.2 [redacted]....8

**6.0 Fuel Distribution Systems....9**

6.1 [redacted]....9

6.2 [redacted]....11

6.3 [redacted]....11

6.4 [redacted]....12

**7.0 Appendix....13**

7.1 Terms & Definitions....13

## 1.0 Introduction

This document provides the scope of supply for permissible fuel supply parameters, fuel quality, and process description for the various fuel delivery methods approved by VoltaGrid.

### 1.1 Site Location

[redacted]

### 1.2 Scope

[redacted]

## 2.0 References

- [redacted]

## 3.0 General Technical Parameters

**Table 1** - General Technical Parameters – Fuel Provider Sco e

[redacted]

[redacted]

## 4.0 Fuel Supplier Data Sharing Requirements

To ensure operational visibility, troubleshooting, and optimization of fuel supply to the facility, the Fuel Supplier shall provide access to real-time and historical data relevant to the fuel delivery system.

[redacted]

## 5.0 Generator Load Profiles

[redacted]

[redacted]

REDACTED COPY



[redacted]

[redacted]

REDACTED COPY



[redacted]

**5.2** [redacted]

[redacted]

[redacted]

**. ue str u on ystems**

### 6.1 Utility Natural Gas Supply

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# 7.0 Appendix

## 7.1 Terms & Definitions

[redacted]

REDACTED COPY

CONFIDENTIAL

**APPENDIX C TO STATEMENT OF WORK NO. 1**

**JENBACHER TECHNICAL SPECIFICATION**

(attached)

[redacted]

REDACTED COPY

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Docusign Envelope ID: [redacted]

[redacted] [redacted]

REDACTED COPY

[redacted]

[redacted]

[redacted]

F[redacted] [redacted]

REDACTED COPY [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Docusign Envelope ID: [redacted]

REDACTED COPY [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Docusign Envelope ID: [redacted]

REDACTED COPY

[redacted] [redacted] [redacted]

[redacted]

[redacted]

Docusign Envelope ID: [redacted]

REDACTED COPY

CONFIDENTIAL

## APPENDIX D TO STATEMENT OF WORK NO. 1

## PROVISION OF DELIVERABLES

| Section | Deliverable* | Date Provided to Customer* |
|---|---|---|
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] |

* The Parties will update and revise this table as dates and deliverables are finalized. Upon agreeing on the finalized table, the finalized table will replace the table above automatically, with no need to amend this SOW.

** This deliverable requires information from Customer and coordination between the Parties regarding the final settings.

*** The Parties will work together to determine the location, specification, and sizing, and Customer will obtain from the City of Covington schematics of the gas meter station or a representative sample.

REDACTED COPY

CONFIDENTIAL

## APPENDIX E TO STATEMENT OF WORK NO. 1

## SITE PLAN VIEW

(attached)

The attached site plan view is agreed as of the SOW Effective Date. The Parties may update the site plan view attached to this Appendix by mutual agreement. Upon if the agreed-upon, finalized site plan view differs from the attached site plan view, the finalized site plan view will replace the attached site plan view automatically, with no need to amend this SOW.

REDACTED COPY

[redacted]

VoltaGrid

SITE LAYOUT
DETAIL SITE VIEW

| NO. | DATE | REVISION DESCRIPTION | DRAWN | CHECK | APPR |
|---|---|---|---|---|---|
| 0 | [redacted] | ISSUED FOR REVIEW | TRICIA.K | | |

SERVER FARM - ATL2

DRAWING NO.: [redacted]

SCALE: NONE

REV.: 0

1 OF 2

REDACTED COPY

[redacted]

VoltaGrid

SITE LAYOUT
FULL DETAIL

| NO. | DATE | REVISION DESCRIPTION | DRAWN | CHECK | APPR |
|---|---|---|---|---|---|
| 0 | 0[redacted] | ISSUED FOR REVIEW | TRICIA.K | | |

SERVER FARM - ATL2

DRAWING NO.: V[redacted]

SCALE: NONE

REV.: 0

2 OF 2